TIMBERLY E. HUGHES,
Plaintiffs *in Propria Persona*
59 Long Bay Road
Akaroa, New Zealand

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA

     PLAINTIFF

v.                                  CASE NO.  <u>3:18-cv-5931-JCS</u>

TIMBERLY E. HUGHES

     DEFENDANT

_____/


## DEFENDANT'S PRE-TRIAL BRIEF


STATE OF CALIFORNIA      )
                              )     ss
COUNTY OF SAN FRANCISCO   )

# TABLE OF CONTENTS

**INTRODUCTION AND SUMMARY**        …………...…………………………    **pg.  3**


**ARGUMENT**        ……………………………...…………………………........……    **pg.  3**

      A.        PLAINTIFF FAILED TO SATISFY ITS BURDEN OF PROOF  ….    pg.  3

      B.        FAILED TO PROVE WILLFULNESS OR RECKLESS DISREGARD  pg.   8

      C.        FAILED TO PROVE SUBSTANTIAL LOSS OR HARM ………..    pg.  10

      D.        CONCLUSION AND DEFENSE …..……………………………    pg.  12

**LEGAL STANDARDS**        …………………………………….....……………    **pg.  15**

      A.        BURDEN OF PROOF        …………………………………………    pg.  15

      B.        WILLFULNESS        …….…...…………………………………….    pg.  15

      C.        REASONABLE CAUSE        …………………………………..    pg.  17

      D.        NO SUBSTANTIAL LOSSES        …………….………………    pg.  18

      E.        EXCESSIVE  PENALTIES ………………………………………    Pg.  20


**CONCLUSION**        ……………………………...…………………………....    **pg.  32**

.

## INTRODUCTION AND SUMMARY

This is a civil action regarding collection from Ms. Hughes for civil penalty assessments of FBAR penalties for the failure to timely report her financial interest in foreign bank accounts for the period 2010, 2011, 2012 and 2013. Ms. Hughes is not a resident of San Francisco, California and has lived in New Zealand since April of 2010.

Regarding these matters, there are no genuine issues of material facts in dispute. However, the penalties for 2010 are not timely and passed the statute of limitations on June 30, 2018. This complaint was filed on September 27, 2018. Therefore, the year of 2010 should be excluded.

## DEFENDANT

Defendant, Timberly E. Hughes is not a resident of San Francisco, California and resided as a permanent resident of New Zealand since April of 2010. Ms. Hughes owned a property in San Francisco during the events that gave rise to the civil penalties at issue, and the Plaintiff is using this fact for the jurisdiction and venue for these proceedings. Ms. Hughes grew up in a rural area of northern Nevada. Her father was Chief Deputy in the Washoe County Sheriff's Department in Nevada, and grew up living on a farm and was raised to always respect the law and always hire professional experts to make sure that everything was always in compliance of all the laws and regulations. Ms. Hughes always wanted to be a farmer, unfortunately as a young teenager, her father developed terminal cancer and his wish was that Ms. Hughes would attend University and get a higher education so that she could take care of her mother and her siblings. So her dream of a farmer was put on hold.

## ARGUMENT

A. **PLAINTIFF FAILED TO SATISFY ITS BURDEN OF PROOF**

Ms. Hughes was not aware of 31 U.S.C. & 5314 or 31 C.F.R. & 1010.350(a) and the requirements of filing Forms TDF 90-22.1 or FBAR reports for financial accounts exceeding $10,000 during the previous calendar year. Ms. Hughes hired accountants and lawyers in both New Zealand and the United states prior to investing in the business in New Zealand.

See Exhibit A, letters confirming the set up and structure and instructions for filing tax returns for both New Zealand and the United States.  Ms. Hughes was never informed by either her accountants or lawyers in both the United States and New Zealand that there were requirements to file these separate FBAR forms.  Ms. Hughes relied on her accountants and lawyers to fulfill all her regulatory compliance and was not aware of these additional requirements until she was informed by the IRS Auditor, Jonathan Lauren on August 21, 2014.  Ms. Hughes complied immediately after being informed of these requirements and filed her 2011, 2012 and 2013 FBAR forms directly to the IRS Auditor, Mr. Jonathan Lauren on August 26, 2014.  See attached Exhibit B.

Ms. Hughes was than informed by IRS Auditor Mr. Lauren, that these forms had since been updated and was instructed to file new forms on line, which Ms. Hughes complied with immediately and filed the new required forms on September 22, 2104.  See attached Exhibit C.

Ms. Hughes's former U.S. tax attorney, Steven Katz, spoke directly with Mr. Lauren, the IRS Auditor, on September 30, 2014, confirming that the willful FBAR penalties would not be pursued and was still deciding whether to impose the non-willful penalty or no penalty at all.  See attached Exhibit D.

## DEFENDANT'S FOREIGN BANK ACCOUNTS

Ms. Hughes  was the sole owner of Takamatua Valley Vineyards Ltd., (TVV), an LAQC Company in New Zealand since 2001.  Ms. Hughes owned Cuba Uncorked Ltd. (CU), a New Zealand Look Through Company  in 2013, which was closed  in 2014.

During the years of the complaint, Ms. Hughes had signatory over 7 accounts all held at ANZ Bank located in New Zealand.  Listed below are the high balances in each account for the year.  As a disclaimer, Ms. Hughes is including the year 2010 for a list of accounts but is not waiving her claim that this year should be excluded from the penalties  and should be deducted from the calculations.

**YEAR 2010**

Takamatua Valley Vineyards

 #1000 – Secured Overdraft Line - $13,000 NZ = $9,200 US, No FBAR required

 #1004 – Secured Collateral for Loan from ANZ - $103,015 NZ = $72,000 US

 #0600 – TVV Checking Account – overdrawn entire year, No FBAR required

 #0625 – TVV Savings Account - $102,450 NZ = $71,715 US

**YEAR 2011**

Takamatua Valley Vineyards

 #1000 – Secured Overdraft Line - $13,511 = $9,458 – No FBAR required

 #1004 – Secured Collateral for Loan from ANZ - $56,505 NZ = $39,554 US

 #1005 – Term Deposit - $50,000 NZ = $35,000 US

 #1006 – EQ Funds -Term Deposit - $45,000 NZ = $31,500 US

 #0600 – TVV Checking Account  - $1,039 NZ = $997 US – No FBAR Required

 #0625 – TVV Savings Account - $1,093,123 NZ = $765,186 US – Mortgage Loan

**YEAR 2012**

Takamatua Valley Vineyards

 #1000 – Secured Overdraft Line - $13,958 NZ = $9,771 US – No FBAR required

 #1004 - Secured Collateral for Loan from ANZ - $56,508 NZ = $39,556 US

 #1005 – Term Deposit - $51,125 NZ = $35,787 US

 #1006 – EQ Funds -Term Deposit - $45,000 NZ = $31,500 US

 #0600 – TVV Checking Account  - $2,749 NZ = $1924 US – No FBAR Required

 #0625 – TVV Savings Account - $843,671 NZ = $590,570 US – Mortgage Loan

**YEAR 2013**

Takamatua Valley Vineyards

     #1000 – Secured Overdraft Line - $14,377 NZ = $10,063 US

     #1004 - Secured Collateral for Loan from ANZ - $58,216 NZ = $40,751 US

     #1005 – Term Deposit - $52,923 NZ = $30,046 US

     #1006 – EQ Funds -Term Deposit - $46,897 NZ = $32,828 US

     #0600 – TVV Checking Account  - $1,372,374 NZ = $960,661 – Bank Error Loan

     #0625 – TVV Savings Account - $58,181 NZ = $40,727 US

Cuba Uncorked

     #4400 – Cuba Uncorded ANZ Checking - $31,333 = $21,933 US

     Ms. Hughes's accounts were not all over the aggregate value exceeding $10,000 in US currency.  In fact, the government has made numerous mistakes in the calculation of penalties.  The penalties on the monies in the account, included calculations on accounts that did not require an FBAR filing, #1000 and #0600 should not have been included in the penalty amounts for the years 2010, 2011 and 2012.  Also, the TVV Checking account #0600 calculation includes a bank error and duplicate amount of $688,006 NZ = $481,604 US.  This would reduce the assessed penalty by $120,401.  See attached Exhibit E.

     The penalties on the amounts are not accurate for these reasons:  The spikes in the accounts in 2011 and 2012 in TVV account #0625 and in 2013 TVV account #0600 were from the bank making a simple journal entry as part of the mortgage loan secured on the business property and these amounts were journaled by the bank, for one day while if funded the new loan and paid down the existing loan.  These are liabilities, these are not a line of credit and was never my money, but a simple journal entry made by the bank.  They were never available to me.  I could not have taken them out of the account.  If you remove the loan balances from the penalty amounts the following amounts would be due:

2010 – should be excluded as it has exceeded the statute of limitations.

2011 – based on a total of high balances of $106,054 = $21,211

2012 – based on a total of high balances of $106,834 = $21,369

2013 – based on a total of high balances of  $176,348 = $35,269

 The Government feels the need to penalize Ms. Hughes for not timely filing the FBAR even though it is clear that the fines should be based on the $100K that Ms. Hughes actually had access to.  The Plaintiff is overstepping in calculating on monies that never belonged to Ms. Hughes.   Every step of the way Ms. Hughes complied with the IRS Auditor and Ms. Hughes is still being harassed by them.  Ms. Hughes tried to comply with everything that the IRS and the DOJ requested.  Ms. Hughes never knew about the FBAR requirements and the foreign entity was disclosed on the taxes from 2001 to 2013.

 Everything was disclosed, nothing was concealed or hidden, however, these were just reported on different forms, and the fact is that the Government has made numerous mistakes in the calculation of the penalties.  These proceedings started with the initial Audit in October of 2013, eight years ago, and this was set to be finalized in January of 2014, however the original Auditor left on maternity leave and then the Ms. Hughes's file was transferred to Mr. Lauren in mid-2014.  Ms. Hughes has done nothing but comply, even when the IRS Auditor came back and asked Ms. Hughes to recreate the tax returns from 2001 – 2008, Ms. Hughes worked hard to find any records and build back from the beginning and was assured by the IRS Auditor that no penalties would be applied for these past years, they just wanted a full snap shot of the business.  Ms. Hughes went way beyond what any tax payer would be required to do and then was slapped in the face with penalties for not complying with the 5471 and 926 forms and then the flow through entities were disallowed and the entities were changed to a foreign corporation so all past expenses were then added back in to income, triggering fourteen years of penalties and increases in income taxes.  This other issue is now sitting with the OIC department and waiting on a final ruling.

B.  **FAILED TO PROVE WILLFULNESS OR RECKLESS DISREGARD**

The dispute in this case concerns the proper interpretation of the civil penalty provided by 31 U.S. Code S 5321(a)(5) for a willful violation of the regulations.  The facts giving rise to this dispute are as follows:

Willfulness is conduct that is voluntary, rather than accidental or unconscious, and it can be established from conduct meant to conceal sources of income or other financial information. See Williams, 489 Fed. Appx. at 658; Sturman, 951 F.2dat1476; McBride, 908 F. Supp. 2d at 1205. It is undisputed that Zwerner deliberately concealed his Swiss bank account for approximately40 years. He readily admitted in his deposition that "this was a -- as far as I was concerned my secret account."...Of course, consistent with such an effort to keep the account a secret, Zwerner failed to report the account on an FBAR form for the years at issue. Without ever mentioning the account to his own CPA, there would have been no way Zwerner could have reported the account to the government as required.

The undisputed facts therefore show that Zwerner deliberately engaged in "conduct meant to conceal or mislead sources of income or other financial information." Williams, 489Fed.Appx.at 658. This is enough to establish willfulness under 31 U.S.C. § 5321 regardless of whether Zwerner specifically knew of the FBAR reporting requirements. As discussed above, for a violation to be willful, the relevant inquiry is whether the failure to disclose the required information itself was purposeful rather than inadvertent, not whether the individual subjectively believed they [sic "he"] did possesses the legal duty to file an FBAR.  See Williams, 489 Fed. Appx. at  558-660; McBride, 908 F. Supp. 2d at 1204-1212.

Ms. Hughes earned a Bachelor Degree in International Business and a minor in Political Science from Gonzaga University.  See Exhibit F.

Ms. Hughes formed a small bookkeeping business in March of 1991, while working as a data entry/administrative assistant for Rodde McNellis, a development company in San Francisco.  Ms. Hughes answered part-time bookkeeping ads in the newspaper and was hired to pay bills and track expenses for various small businesses in San Francisco.  One client was an oral surgeon and his CPA firm, Seiler & Co., based in Redwood City,

California, asked Ms. Hughes if she would be interested in supporting one of their clients that was looking for a personal assistant and someone that could pay their bills.

Ms. Hughes was hired by Claude and Louise Rosenberg as their personal assistant and bookkeeper.  Mr. Rosenberg requested that Ms. Hughes be available to them on a 24/7 basis and that her duties would be to do whatever they needed.  Rides to the doctor, dentist, events, working with his secretary to get him to his appointments, personal shopping and working closely with his CPA firm, Seiler & Co., making sure that all the reports Ms. Hughes sent to them would be finalized by them.  Mr. Rosenberg taught Ms. Hughes how to track his expenses and prepare reports that he would need to see and always had them reviewed and finalized by his CPA firm, Seiler & Co.

Ms. Hughes would receive a list of missing items for their tax preparation and it was Ms. Hughes's duty to follow up with the bank, investment firms and partnerships to make sure all relevant tax forms (i.e. 1099's, K-1's, etc.) were sent either to Mr. Rosenberg directly or directly to Seiler & Co..  Ms. Hughes never administered the estate, she worked directly with the Trust Lawyers, and the CPA firm.  None of the partnerships or the brokerage accounts required Ms. Hughes's bookkeeping services, she simply coordinated what the CPA firm requested and sent them the documents that were prepared directly by each entities accountants.   See attached Exhibit G, typical email from Seiler & Co., requesting information.

Ms. Hughes did offer basic bookkeeping services for a few small businesses, however Ms. Hughes worked directly with each of these businesses individual CPA firms. Ms. Hughes did prepare a few tax returns for friends and family, however she hired and paid an independent CPA to review all the tax returns that she prepared.

In September of 2010, New Zealand suffered a devastating earthquake that destroyed the building which was our home, our winery, our cellar door and the function facility where we run our business and prevented us from carrying on our business.  Ms. Hughes's Accountant, Mike Gibbons, a CPA and Lawyer, passed away in November 2009, he would review the returns for filing in the US.  Normally Ms. Hughes would always prepare her returns for him to review and the only difference was those few years, Ms. Hughes did not have a US accountant for the tax years 2010 – 2013 to review them.   During the prior 9

years, Mr. Gibbons never informed Ms. Hughes that there were any FBAR form requirements.  Ms. Hughes prepared her own tax returns for those few years as she did not find a new accountant to help her due to all the overwhelming things going on those years. See attached Exhibit H.

Ms. Hughes filed her 2010 – 2013 returns using the forms provision in Turbo Tax. She followed the forms filed the prior years by her US accountant, Mike Gibbons.  Simply, pulling up the forms that were listed in the prior year returns. The prior years, Mr. Gibbons would net together all the income, including any sales or interest income and put them on Schedule C.  The Schedule C noted from 2001 – 2013 that it was a foreign business in New Zealand.  Nothing was hidden or concealed, but simply filed on a different form.  Because the Schedule C was an overall loss of income, Ms. Hughes was not aware of the FBAR filing requirement until she was advised of it by the auditor. The taxpayer attempted to properly file her Forms 1040 and in 2012 and 2013 she indicated on her Schedule B the existence of a New Zealand bank account. She believed that this satisfied any foreign reporting requirement. She also reported the income from the foreign bank accounts within the receipts for the related entities.  She was never referred to the FBAR filing requirements as Turbo Tax simply asks if you have a foreign account and if you are required to file an FBAR.  If you check the boxes, there are no further instructions of what you need to do past checking the boxes while working in the forms provision of the program.

In the years 2009 – 2012, Ms. Hughes suffered the death of her accountant in November 2009, the death of her mother in March 2010, the death of Mrs. Rosenberg in July 2010, the first devastating earthquake in September 2010, the second earthquake in February 2011, in December 2012 Ms. Hughes's mother in-law died, so those few years the tax returns were simply filed following her last 9 years based on how her prior accountant had prepared them, and unfortunately she filed them without any review.

During the second year of the audit in 2015, the IRS changed the Company from a single member LLC flow through entity to a foreign Corporation and disallowed all expenses from 2010 - 2013, after fourteen years of filing one way they changed it to that, and then they also said that if it didn't meet the standard of the Foreign Corp, than it was a hobby loss, so either way Ms. Hughes would lose the expense deductions.

## C.  FAILED TO PROVE SUBSTANTIAL LOSS OR HARM

Ms. Hughes asks the court to review the penalties that the IRS has assessed as there are many errors in their calculations.

The 2010 penalties should be removed for they are out of time.  The penalties in relation to the loan advances that were a simple journal entry by the bank for the mortgage liability should be removed from the calculations as well as the double bank error counting the penalty twice in 2013.

Ms. Hughes has struggled from the beginning with the investment in New Zealand, the devastating earthquake in 2010 and the second one in 2011 damaged the building and Ms. Hughes was unable to open to the public for over a decade, so the business needed to be supported by Ms. Hughes's bookkeeping after tax income to pay the mortgage, insurance, taxes and operating costs.

This audit and the FBAR litigation has been going on for over eight years, and Ms. Hughes has been embroiled with fighting this law suit as well as the audit issues.  Ms. Hughes has complied with every request that was outside of the normal time period for filing and was assured that there would be no penalties, and then was assessed penalties from 2001-2013.

Ms. Hughes was forced to sell her building in San Francisco to cover the mounting debt that she incurred from her attorney's fees to defend her in this litigation and the audit. She was only able to cover a portion of the debt incurred from her attorney by the proceeds from the sale of the building.  So not only has Ms. Hughes been fighting the FBAR litigation, and the audit, but now she is fighting the pandemic with limited income, draconian lockdowns and limited access to the internet.  She is completely worn out, she doesn't know what to say, she hired all the professionals to help her set everything up legally and guide her through all that she needed to do to comply and has fought this for over eight years.

So who is harming whom?

Ms. Hughes, at this point, respectfully requests that this matter be dismissed.

Ms. Hughes disputes the amount of civil penalties assessed against her for the reason that the penalty statue, 31 U.S.C. 5321(a)(5)(c) does not apply to the facts in

evidence and is unsupported by any evidence.  None of the funds in Ms. Hughes's accounts were from illegal activity.  Ms. Hughes has met the four thresholds described in the Internal Revenue Manual, in that she had no previous FBAR penalty assessments, the funds in the ANZ accounts were not derived from illegal sources or used for criminal purposes, the taxpayer fully cooperated during the audit, and the IRS did not assert a civil fraud penalty with respect to the unreported income stemming from the ANZ accounts.  (See Exhibit I from the US Tax Court acknowledging there were not civil fraud penalties).

### D. CONCLUSION AND DEFENSE

In researching many other FBAR cases, one thing is clear and also irrefutably different from this case.  They all had millions of dollars in question and numerous accounts, they all underreported income earnings on these accounts as well as some were from illegal activities.  This case is unique in that there was only a little over $70,000 US value (all after tax monies), that was actually liquid and owned by Ms. Hughes.  Also, there was an insurance payout for the earthquake damage of $46,000 that was held as collateral for the bank for the repairs to the building that they held the note on.  The other amounts that Ms. Hughes is being penalized on were loan advances that Ms. Hughes never had access to and were only in her account for 24 hours or less, no monies were earned on these funds as Ms. Hughes had to pay the bank interest on these funds.

Discovery was unfair and the Plaintiff has still not proven material allegations and Ms. Hughes asked for several protective orders, all of which were denied, still, plaintiff could not prove allegations as a matter of law.

The plaintiff has failed to prove necessary facts establishing that the plaintiff's conduct or failure to act were willful in violation of any reporting or disclosure obligations.

During the months prior to purchasing the business in New Zealand, Ms. Hughes hired attorneys and accountants in both New Zealand and the U.S. to structure the foreign company and set up the accounts for the business.  Ms. Hughes was able to secure a loan for the purchase of the New Zealand business from National Bank (now known as ANZ Bank) which was secured by the building and business in New Zealand.  These loan proceeds do not equate to income, even though you get the benefit of the building, you also get the liability, and the monthly requirement to pay the loan, with no change in net worth

Ms. Hughes was never told by any of her accountants or lawyers that an FBAR was due. US vs. Sandra J. de Forrest.   Is this not sufficient to raise a material issue of fact over whether Ms. Hughes acted willfully?  What would be the motivation to not file, as it was clear Ms. Hughes was not hiding any foreign accounts.

Congress enacted the Bank Secrecy Act of 1970 ("BSA"), codified at 31 U.S.C. && 5311, in response to an increasing "unavailability of foreign and domestic bank records of customers thought to be engaged in activities entailing criminal or civil liability."  Cal. Bakers Ass'n v. Shultz, 416 U.S. 21, 26 {33 AFTR 2d 74-1041} (1974).  "(T)he express purpose of the Act (was) to require the maintenance of records, and the making of certain reports, which have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." Id. (citations omitted).  As interpreted by the Shultz Court, "Congress was concerned about a serious and widespread use of foreign financial institutions, located in jurisdictions with strict laws of secrecy as to bank activity, for the purpose of violating or evading domestic criminal, tax, and regulatory enactments." Id.

Ms. Hughes disputes the amount of civil penalties assessed against her for her willful failure to file FBAR's for 2010-2013.   Specifically she argues that the willful civil penalty provided under 31 U.S.C. &&  5321(a)(5)(c) is not correct.

None of the funds in the Ms. Hughes's accounts were from illegal activity, there are 7 accounts in question.  One was for the business overdraft line of credit which was for $10K NZ - it was only over the threshold of US $10K by $63 in 2013.  The other was a $50,000 NZ term deposit which was held as collateral for the bank, this was generated from funds from her US bookkeeping business and was after tax funds that were transferred down as the bank requested them.  Both of these accounts were controlled by the bank.  This term deposit was broken and reinvested making up two different term deposits.

The 3rd term deposit was $45K - this was paid by the earthquake commission for the repairs to the damage of the building from the devastating earthquake in September 2009 which destroyed the building and the business was closed, and then the second big quake in February of 2010, again causing more damage and the building remained closed until December 2019, ten years after the first quake.  These funds were controlled by the bank to be used solely for the repairs to the property, and were dispersed to the contractor in late 2019.

There were two business checking accounts and a business savings account.   Funds were transferred between these accounts depending on where funds were needed.

Under United States v. Ratzlaf, 510 U.S. 135 (1994), willful for purposes of criminal penalties under the Bank Secrecy Act requires actual knowledge that one is violating the law. That "willful" for purposes of civil penalties under the Bank Secrecy Act should have the same meaning.  The Supreme Court had remarked that "willful" is a term with many meanings and, in Safeco Ins. Co. v. Burr, 551 U.S. 47 (2007), the Supreme Court in the civil context "willful" includes "reckless disregard."  For purposes of the civil FBAR willful penalty, willful includes both actual knowledge and reckless disregard, which is determined under an objective standard: a person acts with reckless disregard if he acts or fails to act "in the face of an unjustifiably high risk of harm that is either known or so obvious that I should be known."  This differs from criminal recklessness and willful blindness, both of which include an objective element.  Nor is reckless disregard negligence, since it requires "a high risk of harm, objectively assessed."

If you look to the language of  the willful penalty , which bases the amount of the penalty "in the case of a violation involving a failure to report the existence of an account or any identifying information required to be provided with respect to an account, the balance in the account at the time of the violation."  From this language, one can conclude that Congress intended the willful penalty to be applied on an account by account basis.  Surely Congress would not have intended to penalize law abiding citizens trying to comply but mistakenly report on different forms as this is a complex requirement, even the auditors and managers had to consult with international experts to determine treaty language and requirements.

If you then look at the language of the non-willful penalty and the reasonable cause exception.  While the reasonable cause exception to the non-willful penalty was related to the "balance in the account," the non-willful penalty itself did not contain any reference to "account" or "balance in the account."   One can presume that Congress acted intentionally when it drafted the non-willful penalty language without these references.  Further, because the BSA aimed "to avoid burdening unreasonably a person making a transaction with a

foreign financial agency," an individual required to file an FBAR form was only required to file one report for each year.  As a result, "it stands to reason that a 'violation' of the statute would attach directly to the obligation that the statute creates – the filing of a single report – rather than attaching to each individual foreign financial account maintained."  Additionally, no matter how many foreign accounts a person has the requirement to file an FBAR is only triggered if the aggregate balance in the accounts is over $10,000.  It thus makes no sense "to impose per-account penalties for non-willful FBAR violations when the number of foreign financial accounts an individual maintains has no bearing whatsoever on that individual's obligation to file an FBAR in the first place."  *United States v. Bittner, 126 AFTR 2d 2020-5051 (E.D. Tex. 6/29/2020).*

## LEGAL STANDARD

### A.    BURDEN OF PROOF

The legal standard for failing to disclose financial interests on an FBAR form is by a preponderance of the evidence; U.S. v. McBride, 908 F.Supp.2d 1186 at 1214.

### B.    NO EVIDENCE OF WILLFULLNESS

As is the case with the standard for willfulness, the courts are uniform with regard to the burden of proof for civil FBAR penalties; the government bears the burden of proving liability for the civil FBAR penalty by a preponderance of the evidence.  Bohanec, 263 F. Supp. 3d at 889, noted, the Supreme Court has held that the court in clear and convincing burden of proof applies in civil matters "where particularly important individual interests or rights are at stake." Herman & MacLean v. Huddleston, 459 U.S. 375, 389 (1983). Important individual interests or rights include parental rights, involuntary commitment, and deportation. Huddleston, 459 U.S. at 389. However, the preponderance of the evidence standard applies where "even severe civil sanctions that do not implicate such interests" are contemplated. The court in Bohanec held that civil FBAR penalties do not rise to the level of "particularly important individual interests or rights," and accordingly, the preponderance of the evidence standard applies. Bohanec, 263 F. Supp. 3d at 889.

This was also the holding of the court in United States v. Williams, No. 1:09–cv–437, 2010 WL 3473311 (E.D.Va. Sep. 1, 2010), rev'd on other grounds, United States v. Williams, 489 Fed.Appx. 655 (4th Cir.2012), the court in McBride, 908 F. Supp. 2dat 1201, and the court in Bedrosian, 2017 WL 4946433. As the court in Garrity recently noted, every court that has answered the question [of the burden of proof] has held that the preponderance of the evidence standard governs suits by the government to recover civil FBAR penalties, 2018 WL 1611387 (D. Conn. Apr. 3, 2018).

A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986). Substantive law identifies which facts are material. Id. The trial court "must resolve all reasonable doubts in favor of the party opposing the motion. Mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden. Rather, the Court requires "significant probative evidence" from the nonmovant to dismiss. The Court must consider all of the evidence but "refrain from making any credibility determinations or weighing the evidence." Turner v. Baylor Richardson Med. Ctr., 476 F. 3d 337, 343 (5 th Cir. 2007).

Having rejected the Government's contention that Flume had actual knowledge, the court then addressed the issue of whether Flume acted with reckless disregard. It rejected the Williams and McBride holdings that a taxpayer is deemed to have "constructive knowledge" of the FBAR requirement from the fact that he signed an income tax return. The court gave three grounds for finding this theory unpersuasive: 1) it ignores the distinction between willful and non-willful violations since, if every taxpayer by signing a return is presumed to know of the need to file an FBAR "it is difficult to conceive of how a violation could be nonwillful"; 2) it would require the court to presume that Flume had examined his returns and thus knew of the FBAR requirement, which it would not do on summary judgment; 3) the theory is "rooted in a faulty policy argument" since constructive knowledge means that even though a person does not have actual knowledge, the law pretends you do for policy reasons.

The Flume court also held that summary judgment was not appropriate on the question of whether Flume acted recklessly. Although Flume admitted he did not read the

FBAR instructions, the court gave two reasons why this may not have been reckless: a) Flume may have relied on his CPA to read the instructions and b) since the instructions stated that there were exceptions, Flume might have believed his CPA determined an exception applied. Another aside, are the courts wrong in treating "reckless" conduct as willful? Reckless and willful are not treated as identical by Congress. Sec. 6662(c), which imposes a negligence penalty, states "the term 'disregard' includes any careless, reckless, or intentional disregard." Congress clearly distinguished intentional conduct from reckless conduct.

## C.    REASONABLE CAUSE

Ms. Hughes had reasonable cause for untimely filing FBAR forms.   Ms. Hughes requests that this court take judicial notice of the "Criteria for Relief From Penalties" in the Internal Revenue Manual (IRM) Penalty Handbook Part 20.1.1.3 (10-19-2020) and Part 20.1.1.3.2 (11-21-2017) and Part 20.1.1.3.2.2 (02-22-2008).  "Any reason that establishes a taxpayer exercised ordinary business care and prudence but nevertheless failed to comply with the tax law may be considered for penalty relief."

The plaintiff has previously argued that the court, in analyzing the "reasonable cause" defense for FBAR purposes, should consider case law, regulations, and other guidance addressing the concept of "reasonable cause" in the context of delinquency penalties under 26 USC Section 6651; see, Moore v. U.S., (DC WA 2015) 115 AFTR 2d ¶2015-591.

The types of accounts were loan accounts in a foreign currency, and these were reported, but these were not taxable and reported on Form 1040.

Ms. Hughes was not properly advised by her accountant.

Her US accountant had died in November 2009.

Ms. Hughes suffered two devastating earthquakes in September 2010 and February 2011.

Ms. Hughes did timely disclose accounts and amounts, but without using the FBAR forms.

Upon receiving notice from the IRS, Ms. Hughes promptly filed the FBAR disclosures.

Initial IRS examination concluded that her conduct was not willful and after completion of the audit, the auditor's supervisor changed the administrative findings of the auditor to state that Ms. Hughes's conduct was willful.  The court has also refused to consider Ms. Hughes's objections and request for an in camera review of notes from the audit that she believes provides material facts establishing that the agents concluded her actions were not willful.

Ms. Hughes also requests this court to take judicial notice of the IRM Penalty Handbook, Part 20.1.1.3.2.2.1 (11-25-2011) as it pertains to situations involving "Death, Serious Illness, or Unavoidable Absence" and Part 20.1.1.3.2.2.2 (10-19-2020) as it pertains to situations involving "Fire, Casualty, Natural Disaster, or Other Disturbance-Reasonable Cause".

## D.    NO SUBSTANTIAL LOSSES

Many actions may cry out for redress, but not all give rise to proper lawsuits. As with the familiar basketball adage, "no harm, no foul" was the watchword for gaining access to a courtroom. And harm meant something specific—demonstrable injury actually incurred.

The injury requirement anchors tort law, and much of civil law more generally. It is also a cornerstone condition of the right to appear in federal court. As the Supreme Court recently affirmed, Article III standing requires injury, meaning harm of a sort "concrete, particularized, and actual or imminent." Clapper v. Amnesty Int'l USA, 133 S. Ct. 1138, 1147 (2013).

In recent years, the injury rule has come under assault, increasingly honored in the breach.  Courts have permitted plaintiffs to employ various work-arounds to end-run the time-honored injury requirement. The result is a blurring of the line between actionable and non-actionable wrong, fuzziness in the application of torts and warranty law in environmental litigation and beyond, and a tug of war between those courts guarding the courthouse doors and others willing to open them wide.

Holding Firm on Injury. The injury requirement serves important social, legal, and political functions. For one, injury separates courtroom resolution from the work of expert regulatory agencies, which are free to make social policy decisions and regulate products

untethered to the personal circumstances of any given claimant. Courts lax on injury often wind up taking on de facto the role of such regulatory bodies, blurring the line between the branches of government.

Requiring injury also helps ensure that courts act like courts, resolving genuine cases and controversies and matters ripe for resolution, by "defin[ing] the class of persons who actually possess a cause of action" and "provid[ing] a basis for the factfinder to determine whether a litigant actually possesses a claim." Caronia, 22 N.Y.3d at 446. Insisting on injury also safe guards against "frivolous and unfounded" lawsuits, conserving the courts' resources for disputes that are ripe and ready for adjudication. Id. Moreover, allowing the uninjured to recover may lead to inequitable division of resources, with fewer funds available to the injured. See Metro-N. Commuter R.R. Co. v. Buckley, 521 U.S. 424, 442-44 (1997); Caronia, 22 N.Y.3d at 451.

In determining if Ms. Hughes acted willfully, one can look at the Courts ruling in McBride, following the United States Supreme Court's reasoning in Herman & MacLean v. Huddleston, determined that the preponderance of the evidence standard was appropriate when only money, rather than the taxpayers' "particularly important individual interests or rights," were at issue. This means that the government can support a willful FBAR penalty with a lower standard of evidence than is needed to prove a civil fraud penalty.  What is important to note here is that Ms. Hughes's interests and rights are being infringed based on the penalties on non-taxable loan proceeds which are a liability to Ms. Hughes, not an asset.

What amount did the plaintiff suffer?  Nothing, there were no tax obligations for the loan in foreign currency.  The loans are not considered income and therefore there would be no tax liability.  In fact, the harm is the cost the Government has incurred on this litigation and proceedings to garnish loan proceeds as income, far outweighing any actual harm to the US.

All interest earnings were reported on the Schedule C for 2010, 2011 and 2013, and on Schedule B for 2012.  The United States was not prejudiced nor did it suffer harm or substantial harm or losses.  In fact, the largest losses suffered by the United States were due to the complaint being filed by the Department of Justice and the protracted litigation

and the collaboration with the court to permit unlimited discovery and causing Ms. Hughes the need to file far more defensive motions that would otherwise be necessary.

## E.   EXCESSIVE PENALTIES

Ironically, the level of intent by adopting "reckless disregard" will have huge ramifications of people complying with any tax filings. If Ms. Hughes had simply not filed any returns and not checked any boxes, she would have been better off. There is no rule of law anymore if the Government can take the stance that the taxpayer could have known and should have filed a certain form, but did not, therefore it is willful and will be subjected the harshest of penalties, than the question is why file at all and report anything?   The Government will continue to move the goal posts to get the highest penalties, so what is the incentive for anyone to comply?

The penalties sought to be imposed by the plaintiff are excessive and in fact, uncollectible.   The plaintiff has knowledge of this and it appears that the plaintiff has an ulterior motive to continue seeking these penalties against the Ms. Hughes.

The funds giving rise to this matter involved a non-taxable loan in foreign currency and are not subject to the penalties or amount of penalties sought by the plaintiff.

Admittedly, while the question of whether the income tax return was incorrect is dramatically and  substantially different than "willfully" failing to file the FBAR form (this was before the law evolved to "recklessness").

The government is threatening multiple year FBAR penalties with higher than 20% of the account balances, that is based on non-taxable loan advances, journaled by ANZ Bank. The Eighth Amendment to the U.S. Constitution does in fact limit the ability of the IRS to assert these draconian penalties.

The IRS and the Department of Justice ("DOJ"), which have been charged with the enforcement of these provisions, has recognized, implicitly in their enforcement of the statute, that the Eighth Amendment does provide a limitation to the amount of FBAR penalties. The limitation had been recognized not because a court had to tell the government there was a limitation; rather, because the government itself recognized in its

administration of the statute and its litigation strategy that there was such a limitation.

The statute authorizes the stacking of a civil and criminal fine for the same violation.

Prior to the recent legislation under the Jobs Act of 2004, the civil penalty for willful violations could be up to $100,000 per violation. Notwithstanding the fact that few, if any, penalties were ever imposed for violations during the almost 40-year history of the reporting Requirements.   Congress increased the civil penalty for willful violations to an amount up to the greater of $100,000 or 50 percent the balance in the account at the time of the violation. The legislative provision amending the FBAR penalties originated in the Senate and only included the addition of a penalty for non-willful reporting violations. Only in the Conference Committee was the increased penalty for willful violations added to the legislation.   The legislative history to the 2004 Jobs Act provides no rationale for increasing the willful FBAR penalty from a maximum of $100,000 to an amount up to 50% of the foreign bank account. The legislative history focuses entirely on adding a penalty of up to $10,000 for non-willful FBAR reporting violations. As noted in the Senate Report:

> "The Committee understands that the number of
>
> individuals involved in using offshore bank accounts
>
> to engage in abusive tax scams has grown significantly
>
> in recent years. For one scheme alone, the IRS estimates
>
>  that there may be hundreds of thousands of
>
> taxpayers with offshore bank accounts attempting to
>
> conceal income from the IRS. The Committee is
>
> concerned about this activity and believes that improving
>
> compliance with this reporting requirement is vitally
>
> important to sound tax administration, to combating
>
> terrorism, and to preventing the use of abusive tax
>
> schemes and scams. Adding a new civil penalty that
>
> applies without regard to willfulness will improve

compliance with this reporting requirement."

It appears Congress was concerned with taxpayers not complying with their foreign reporting obligations and took the legislative leap to conclude that increasing the penalty, to what amounts to draconian levels, would fix the problem. It has certainly sent a chilling message for the non-compliant taxpayer—but what Congress did not consider were the constitutional limits on imposing excessive penalties in an effort to change taxpayer behavior—limits which go back to the origins of our republic and protections which were born out of the excessive fines imposed by the unlimited power of the King. Fortunately, we have a Constitution which limits the government's ability to punish—including limitations on draconian financial penalties for even willful non-compliance with the laws.

The Excessive Fines Clause of the Eighth Amendment to the Constitution—by requiring that any fine including the FBAR penalty—be "proportionate" to the conduct it seeks to punish, provides real limitations on the Government's ability to impose an excessive FBAR penalty. The case law developed under the Excessive Fines Clause also provides a meaningful structure, through a proportionality analysis, of how the IRS must exercise its discretion in imposing the FBAR penalty, in order to avoid running afoul of the Constitution by imposing the type of excessive penalties which the Eighth Amendment sought to banish to medieval English history. The Eighth Amendment provides:

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

The Supreme Court has explained that the Excessive Fines Clause "limits the government's power to extract payments, whether in cash or in kind, 'as punishment for some offense.'" "The notion of punishment, as we commonly understand it, cuts across the division between the civil and the criminal law." "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: the amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish."

The Supreme Court considered the Excessive Fines Clause in Austin, where it held that the Clause applied to certain forfeitures by the federal government. In Austin, the

Supreme Court held that the Excessive Fines Clause applied to forfeitures of property under 21 USC §§881(a)(4) and (a)(7), and remanded for a determination of whether the forfeiture was excessive.

The Supreme Court made clear that to come within the ambit of the Excessive Fines Clause, the forfeiture could in part serve a remedial purpose; it was only necessary for the forfeiture to be in part punishment. In evaluating whether the Excessive Fines Clause applied, the Supreme Court explained: "We need not exclude the possibility that a forfeiture serves remedial purposes to conclude that it is subject to the limitations of the Excessive Fines Clause.  We, however, must determine that it can only be explained as serving in part to punish." The Court evaluated the history of forfeiture as well as the particular forfeiture statutes at issue, and found punishment to be an aspect of these forfeitures. For instance, there was an innocent owner defense, and the relevance of the culpability of the owner made the statutes look more akin to punishment.  While Austin dealt with forfeitures and not a fine or penalty such as the FBAR penalty, the label is not what is determinative—what counts is whether the imposition of the penalty has a punitive element to it—and one can have no doubt that an FBAR penalty equal to 50% of the taxpayer's foreign bank account will be punitive in most factual situations under any reasonable understanding of the word punishment.  Would this not apply to Ms. Hughes, the penalties being applied are on non-taxable loans that Ms. Hughes has the liability outstanding.

Having determined that the Excessive Fines Clause could apply to a forfeiture in Austin, the Court took the next step in Bajakajian and found that if a forfeiture was so disproportionate to the conduct sought to be punished that it was indeed unconstitutional. In Bajakajian, the Supreme Court held that forfeiture of $357,144, under 18 USC §982(a)(1), in connection with a criminal conviction for willfully failing to report that he was transporting more than $10,000 out of the United States in violation of 31 USC §5316(a)(1)(A), violated the 8th Amendment's excessive fines clause.  "The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." "Although the Government has asserted a loss of information regarding the amount of currency leaving the country, that loss would not be remedied by the Government's confiscation of

Bajakajian's $357,144.18 "Full forfeiture of Bajakajian's currency would be grossly disproportional to the gravity of his offense." Bearing in mind that the funds the IRS is penalizing here are not on any funds leaving the US, but on business loans in New Zealand.

In many cases the application of the 50% FBAR penalty could be disproportionate to the conduct sought to be punished and should suffer the same fate as the forfeiture in Bajakajian. For example, assume an individual willfully failed to report the existence of a foreign bank account with a balance of $2 million dollars and for which there was unpaid tax of $150,000. The IRS could assert a penalty of up to 50% of the account balance for each year in which there was a willful failure. Assuming the IRS asserted a penalty of 50% for one year—or a penalty of $1million dollars, the penalty seems grossly disproportionate to the conduct sought to be punished—this is especially so if the taxpayer was also required to pay a civil fraud penalty on the unpaid tax which was evaded.

In determining that the forfeiture was excessive in Bjakajian, the Supreme Court compared the penalty structure under the Federal Sentencing Guidelines to determine how the law viewed the seriousness of the offense. The Supreme Court determined that under the Guidelines, the period of incarceration was five months and the fine was up to $5,000 and that a forfeiture of $347,000 was disproportionate under the 8th Amendment.

The Supreme Court affirmed the lower courts determination that a forfeiture of $15,000 and a $5,000 fine was proportionate and constitutional.

The Supreme Court's decision in Halper lends support to the conclusion that the willful FBAR penalty constitutes punishment and is subject to the proportionality limitations. Like the constitutional inquiry pursuant to the Excessive Fines Clause, analysis under the Double Jeopardy Clause also distinguishes between sanctions that constitute punishment and those that do not. In Halper, the Supreme Court held that where the amount of the fine bears no rational relation to the government's loss, the fine constituted punishment that unconstitutionally violated the Double Jeopardy Clause when imposed subsequent to a criminal conviction for the same act. The Court found that imposition of a fine in excess of $130,000 to be sufficiently disproportionate when compared to the government's costs of approximately $16,000.23 Although Halper was largely disavowed for purposes of Double Jeopardy analysis in Hudson, it is still viable on how the Court evaluates whether a civil

penalty constitutes punishment for constitutional purposes. Halper was largely overruled by Hudson because the Supreme Court determined that the Double Jeopardy Clause limited successive prosecutions—not successive punishments. Indeed, in Justice Breyer's concurrence in Hudson, he noted that, "the Court in Halper might have reached the same result through application of the constitutional prohibition of "excessive fines."

The constitutionality of a tax penalty and whether it constitutes punishment has been before the Supreme Court before—but not in the context of the Excessive Fines Clause. The seminal case with regard to the civil fraud penalty and whether it constituted punishment was Helvering v. Mitchell.  Although Mitchell was a Double Jeopardy case, the Court's analyzed whether the civil fraud penalty was punishment (thus implicating the Double Jeopardy Clause) or purely remedial in character and not punishment. In finding that the civil fraud penalty was remedial in character, the Court stated:

> The remedial character of sanctions imposing
>
> additions to a tax has been made clear by this Court. …
>
> They are provided primarily as a safeguard for the
>
> protection of the revenue and reimburse the
>
> government for the heavy expense of investigation and the
>
> loss resulting from the taxpayer's fraud.

The Government will be hard pressed to demonstrate that the 50% FBAR penalty for "willful" failures is anything but punishment—especially where it is imposed in addition to the civil fraud penalty applied to the understatement of income tax. Moreover, the Supreme Court's subsequent punishment analysis in Austin and Bajakajian suggests that Mitchell's punishment analysis has been undermined and that Mitchell is limited to tax penalties imposed under the Internal Revenue Code and is not applicable to a forfeiture imposed because of a Title 31 violation or a penalty imposed under Title 31—like the FBAR penalty.

Even with respect to tax penalties, a number of courts have revisited the application of "punishment analysis" in the wake of Austin, and have "recognized that…it is now

possible for forfeitures and fines in civil cases to be regarded as punitive exactions, thus implicating the Excessive Fines Clause." The taxpayers in McNichols, Thomas, and Little each challenged the civil penalty imposed under the Internal Revenue Code (Title 26) as punishment under the Excessive Fines Clause. The courts of appeals all suggested that the Excessive Fines Clause must be considered, but found that the imposition of these civil tax penalties did not violate the Excessive Fines Clause in those cases because "the additions to tax at issue in these cases are purely revenue raising because they serve only to deter noncompliance with the tax laws by imposing a financial risk on those who fail to do so." The Fourth Circuit in Thomas explained that the penalty, being based on the Taxpayer's individual tax deficiency, essentially protects the penalty from being excessive. "If the addition to tax is always calculated as fifty percent of the tax deficiency… the sanction could not be excessive as to one person, but not excessive as to another."

The rationale surrounding the Excessive Fines Clause is equally applicable to the FBAR context.  In order to be subject to the Excessive Fines Clause, the FBAR penalty for willful reporting violations must, at least in part, be punishment.  If it is solely remedial it is not subject to the Excessive Fines Clause.  Like in Austin, the lack of culpability of the owner was a defense to forfeiture under those statutes, the civil FBAR penalty that provides that 50% of the account to be taken demands willfulness on the part of the taxpayer. This mensrea component in both the forfeiture statutes and the FBAR civil penalty is consistent with punishment.

The FBAR civil penalty for willfulness has much more in common with the penalty for the reporting offense in Bajakajian than with the civil penalties in the tax cases. In Bajakajian, like application of the FBAR penalty, the penalty is simply based on how much currency the individual happened to have in his suitcase or bank account—which may have little to do with the culpability of the taxpayer.  In the context of a willful FBAR violation, an individual who failed to report $10,000,000 would be subject to a penalty of $5,000,000, whereas an individual who committed the same violation, but only had $1,000,000 in the bank would be penalized $500,000. Unlike the tax penalty held to be constitutional in Mitchell because of its correlation to the tax loss involved, the willful FBAR penalty has no correlation to the amount of the Government's tax loss and suffers the

same constitutional problem as the forfeiture in Bajakajian.

Since the willful FBAR penalty is at least in part punishment, the Supreme Court's proportionality analysis under the Excessive Fines Clause (and the Double Jeopardy Clause) should be applied in determining whether the penalty is excessive and therefore unconstitutional.    "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality:

The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish."  The standard, as articulated by the Supreme Court, is: "A punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense."    In finding the forfeiture grossly disproportional to the gravity of Bajakajian's offense, the Court stated:

"Respondent's crime was solely a reporting offense.    It was permissible to transport the currency out of the country so long as he reported it."   Also, the "violation was unrelated to any other activities" and "he does not fit into the class of persons for whom the statute was principally designed:  He is not a money launder, a drug trafficker, or a tax evader."    In addition, the maximum sentence that could have been imposed on Bajakajian was six months with the maximum fine being $5,000.

The lower courts have been applying the Supreme Court's proportionality analysis in an effort to place some constitutional limit on the Government's ability to make excessive forfeitures.    For example, in Varrone, in an opinion written by Judge (now Justice) Sotomayor, the following Bajakajian factors were used in evaluating the amount of the forfeiture:  [1] "the essence of the crime" of the [defendant] and its relation to other criminal activity, [2] whether the [defendant] fit into the class of persons for whom the statute was principally designed, [3] the maximum sentence and fine that could have been imposed, and [4] the nature of the harm caused by the [defendant's] conduct.

Following Bajakajian, the Congress amended the statute governing forfeitures to include a proportionality analysis.  Title 18, Section 983(g) provides: "(g) Proportionality.

(1) The claimant under subsection (a)(4) may petition the court to determine whether the forfeiture was constitutionally excessive.

(2) In making this determination, the court shall compare the forfeiture to the gravity of the offense giving rise to the forfeiture.

(3) The claimant shall have the burden of establishing that the forfeiture is grossly disproportional by a preponderance of the evidence at a hearing conducted by the court without a jury.

(4) If the court finds that the forfeiture is grossly disproportional to the offense it shall reduce or eliminate the forfeiture as necessary to avoid a violation of the Excessive Fines Clause of the Eighth Amendment of the Constitution."

The Excessive Fines clause has found its way into at least one decision pertaining to FBAR related cases.  In Bussel, the district court acknowledged that the Excessive Fines Clause of the Eighth Amendment can apply to a willful FBAR penalty, finding that the FBAR penalty is punitive and therefore constitutes a "fine." After determining on summary judgment that the defendant violated the FBAR statute and did so willfully, the court evaluated whether the willful FBAR penalty imposed by the Government was an excessive fine in violation of the Eighth Amendment excessive fines clause. We note that the Government asserted only one 50% penalty. Following the factors in Bajakajian, the district court in Bussell considered the following factors in conducting the required proportionality inquiry: (1) the nature and extent of the crime and whether the violation was related to other illegal activities; (2) the other penalties that may be imposed for the violation; and (3) the extent of the harm caused.

**(1) Nature and Extent of Crime**

In Bussell, the court held that this factor did not favor either the Government or the taxpayer, because (1) while tax evasion is not as serious as some crimes that ultimately trigger civil forfeiture actions, the Bank Secrecy Act was targeted at tax evaders and (2) the taxpayer did not carry her burden of showing that the money at issue was derived from a lawful source. The court in Bussell noted that where the money at issue was derived from a lawful source and not connected to other illegal activities, stronger Eighth Amendment protections are triggered.

**(2) Other Penalties that May Be Imposed**

In Bussell, the court ultimately held that the amount of the FBAR penalty was unconstitutional, because it exceeded the maximum civil penalty provided under statute for the violation of the willful FBAR statute. The court accordingly reduced the FBAR penalty from $1,221,806 to $1,120,513.43.

**(3) Harm Caused**

In Bussell, the court distinguished Bussell from Bajakajian on the basis that in Bussell, there was a tax loss to the public whereas in Bajakajian the only harm was the loss to the Government of the information that the money at issue had left the country. Therefore, for this factor, the harm caused by the tax deficiency alleged by the Government must be considered in evaluating the proportionality of this harm to the penalty. In Bajakajian, the Supreme Court concluded that there was no inherent proportionality in the forfeiture at issue in that case, explaining: "It is impossible to conclude, for example, that the harm respondent caused is anywhere near 30 times greater than that caused by a hypothetical drug dealer who willfully fails to report taking $ 12,000 out of the country in order to purchase drugs."

Initially, the IRS promulgated mitigation guidelines in the Internal Revenue Manual to promote consistency and guide its agents in administering the FBAR penalty.  The mitigation guidelines were originally developed before the increase in the amount of the willful penalty to up to 50 percent of the unreported account and, while updated, do not take into account how excessive the FBAR penalty can be on large accounts in comparison to the conduct—the tax loss—sought to be punished–an analysis required by the Constitution. The mitigation guidelines only provide relief with respect to accounts of up to a maximum of $1 million. Account holders in excess of that amount can be penalized of up to the full extent of the statute.  However, the most significant change in this area relates to Interim Guidance Memorandum for FBAR penalties, SBSE-04-05-150-0025, released on May 5, 2015, which places restraints on power of IRS Examiners. The Interim Guidance has since been incorporated into the Internal Revenue Manual (IRM).

The statutory FBAR penalty provisions only establish maximum penalty amounts, leaving the IRS to determine the appropriate FBAR penalty amount below that threshold based on the facts and circumstances of each case. In this regard, IRS examiners are instructed to use their best judgment when proposing FBAR penalties, taking into account all the available facts and circumstances of a case.  For cases involving willful violations over multiple years, IRS examiners will recommend a penalty for each year for which the FBAR violation was willful. Assuming six years is still open under the statute of limitations, the IRS examiner could assert a total penalty of 300 percent of the amount of the account. Notwithstanding the large potential penalty, examiners are now instructed that in most cases, the total penalty amount for all years under examination will be limited to 50 percent of the highest aggregate balance of all unreported foreign financial accounts during the years under examination. In such cases, the penalty for each year will be determined by allocating the total penalty amount to all years for which the FBAR violations were willful based upon the ratio of the highest aggregate balance for each year to the total of the highest aggregate balances for all years combined, subject to the maximum penalty limitation in 31 USC §5321(a)(5)(C) for each year.

Examiners may recommend a penalty that is higher or lower than 50 percent of the highest aggregate account balance of all unreported foreign financial accounts based on the facts and circumstances. The new IRS guidance however provides that in no event will the total willful penalty amount exceed 100 percent of the highest aggregate balance of all unreported foreign financial accounts during the years under examination. The new guidance places a very important limitation on the examining agent's ability to assert these draconian penalties.

Before release of the guidance, multiple-year, 50-percent willful FBAR violations were a real possibility and not uncommon. Even more significant, the mere threat of the imposition of multiple penalties would force many taxpayers to accept a settlement to avoid financial devastation. For example, in Zwerner, the IRS imposed four willful penalties, only to have three willful penalties sustained in jury trial. In this case, the assessed FBAR penalties upheld by the jury aggregated $2,241,809 on an offshore account that had an apparent high balance of $1,691,054 during the years at issue.

Multiple-year, maximum penalties are unnecessarily punitive. To redress unfairness, and likely in recognition that the imposition of multiple year FBAR penalties could run counter to Excessive Fines Clause of the Eighth Amendment, the new Guidelines attempt to make the FBAR penalties more proportional to the tax offense committed. In almost all FBAR-related cases, the amount of unreported income tax obligation pales in comparison to the potential FBAR penalties that could potentially be imposed. By restricting the agent's ability to impose multiple-year penalties, the IRS is attempting to adhere to constitutional limitations and avoid the appearance of Government overreach.

Over the last 10 years, the Government in litigation has pressed for the watering down or weakening of the standard of willfulness that must be found to sustain the willful FBAR penalty. While the IRS' original position was that "willful" meant what we would ordinarily think it means—the violation of a known legal duty, the Government has pressed for a lesser standard of culpability—"recklessness"—as sufficient to apply the willful FBAR penalty. The Court's have in large part been receptive to the Government's position.

The debate and litigation concerning the proper standard of culpability will continue—but what we point out is that as the culpability standard for applying the willful FBAR penalty is weakened, this will present issues of the application of the Excessive Fines Clause. Taxpayer culpability is one of the touchstones to the application of the Excessive Fines Clause. Where there is a lesser culpability—proportionality will require a lower penalty.  The punishment should fit the crime and reckless behavior has always been viewed in the law as deserving a lesser consequence.

Any punishment, however, must fit the crime and the penalty must be proportionate to the conduct involved.

**CONCLUSION**

The government penalty scheme really has nothing to do with an apparent noble effort to prevent money laundering, the purpose of these disclosure forms and rules is to punish and abuse people such as Ms. Hughes. She hired an attorney who exacerbated the dispute over a seven year period that cost Ms. Hughes over $200,000 in legal fees, then confessed his incompetence to continue defending her by suggesting that she default against the complaint when Ms. Hughes ran out of money to pay his fees.

The court then granted leave to answer out of time and proceeded to deny Ms. Hughes's request for a fair and impartial hearing, deny any meaningful discovery efforts, allow the plaintiff to conduct any discovery it wanted, even in violation of the rules and to the substantial prejudice of Ms. Hughes, for example, permitting the plaintiff to introduce a new witness after the time limit for discovery had been exceeded, and then overruling Ms. Hughes's objections and denying her efforts to cross-examine or depose the witness.

This entire proceeding is nothing but an indictment against a very unfair and illegal system of taking property, it is a syndicate, not a taxing function of any legitimate governmental purpose.

WHEREFORE, the Defendant respectfully prays that this Court:

Enter Judgement in favor of the Defendant.

The Defendant requests that this court dismiss the complaint and for other relief and deemed appropriate by the court.

Timberly E. Hughes
Timberly E. Hughes, Affiant

STATE OF CALIFORNIA              )
                                 )        ss
COUNTY OF SAN FRANCISCO  )

Subscribed and Sworn to before me a notary public on this 20h day of April 2021.

_____
Signature of Notary                                   [ls]

TIMBERLY E. HUGHES,
Defendant *in Propria Persona*
59 Long Bay Road
Akaroa, New Zealand

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA
     PLAINTIFF

v.                                 CASE NO.  <u>3:18-cv-5931-JCS</u>

TIMBERLY E. HUGHES
     DEFENDANT
_____/

## CERTIFICATE OF SERVICE

     I Timberly E. Hughes hereby certify that a true and correct copy of the foregoing was duly served upon the plaintiff's attorney of record, David L. Anderson and Nithya Senra, at the address of P. O. Box 683, Ben Franklin Station, Washington, DC  20044, via first class mail and online this  20th  day of April 2021.

By: *Timberly E. Hughes*