DAVID A. HUBBERT
Acting Assistant Attorney General

NITHYA SENRA (CABN 291803)
BORIS BOURGET (ORBN 172172)
Trial Attorneys, Tax Division
U. S. Department of Justice
    P.O. Box 683, Ben Franklin Station
    Washington, D.C. 20044
    Phone:    (202) 307-6570 (Senra)
                (202) 307-2182 (Bourget)
    Fax:      (202) 307-0054
    E-mail:    Nithya.Senra@usdoj.gov
               Boris.Bourget@usdoj.gov
*Attorneys for the United States of America*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:18-cv-5931-JCS |
| Plaintiff, | UNITED STATES' POST-TRIAL BRIEF |
| v. | |
| TIMBERLY E. HUGHES, | |
| Defendant. | |

**INTRODUCTION**

Following two days of trial on June 8-9, 2021, hearing witnesses, and receiving and reviewing various exhibits, the Court should find that Timberly E. Hughes willfully failed to disclose her foreign financial accounts on timely filed FBARs for the 2010, 2011, 2012 and 2013 calendar years. Ms. Hughes flouted her reporting requirements, refused to review any of the IRS's instructions for reporting foreign financial accounts, and failed to consult any of the numerous tax advisers in her personal and professional circles. Meanwhile, she misreported her business revenues to maximize tax deductions and, ultimately, reduce her personal tax bill.

Even if the Court accepts that Ms. Hughes did not maliciously or intentionally fail to report her foreign financial accounts, her conduct satisfies the recklessness standard in the civil context. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007) (willfulness covers "not only knowing violations of a

1  standard, but reckless ones as well."); *see also, e.g.*, *United States v. Ill. Cent. R. Co.*, 303 U.S. 239, 242-

2  43 (1938) (holding, in civil penalty context, that willfulness includes "careless disregard whether or not

3  one has the right so to act"). Recklessness is an objective standard, "entailing 'an unjustifiably high risk

4  of harm that is either known or so obvious that it should have been known.'" *Safeco*, 551 U.S. at 68

5  (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)).

6      Prior to trial, the parties agreed that (1) Ms. Hughes is a U.S. person; (2) Ms. Hughes had

7  signatory authority over foreign bank accounts during each of the years at issue; and (3) the aggregate

8  value of the accounts was more than $10,000 during each year at issue. *See* Minute Order, May 25,

9  2021, Dkt. 147 at 2. Most, if not all, of the material facts are also uncontested. Stip. Facts., Dkt. 132 at

10  2-7; *see also* Dkt. 147 at 2 (noting that Ms. Hughes stipulated to all of the United States' Proposed

11  Stipulated Facts contained in its Proposed Pretrial Order).

12      The sole dispute remaining is whether Ms. Hughes' failure to report her foreign financial

13  accounts was *willful* as applied in FBAR cases throughout this circuit. *See, e. g.*, *United States v.

14  Goldsmith*, No. 3:20-cv-87-BEN-KSC, 2021 WL 2138520, at *15 (S.D. Cal. May 25, 2021); *United

15  States v. de Forrest*, 463 F. Supp. 3d 1150, 1157-58 (D. Nev. 2020). The evidence supports such a

16  finding. In addition to failing to properly disclose her foreign financial accounts, Ms. Hughes made

17  numerous misrepresentations on her tax returns regarding the overseas businesses that hold these

18  accounts. She misrepresented their addresses to give the appearance that they were U.S.-based entities

19  and shifted gross receipts from other businesses onto the Form 1040 Schedule C for one business to give

20  the appearance that it was an entity engaged in for profit. As a result, Ms. Hughes was able to reduce her

21  personal income tax liability by approximately $600,000.

22      During this litigation, including trial, Ms. Hughes provided self-serving and conflicting

23  testimony in an attempt to retroactively rationalize her failure to disclose her foreign financial accounts

24  on FBARs. Her lack of credibility, coupled with the underreporting of her overall tax liability, are

25  probative of a willful failure to report her foreign financial accounts.

26  //

27  //

28

## FACTUAL SUMMARY

**I.     Professional Background**

Ms. Hughes earned a degree in business administration from Gonzaga University in 1986. Stip. Facts. ¶ 2, Dkt. 132. In the early 1990s, she formed Hughes Bookkeeping Company ("HBC") after working as a bookkeeper for Rodde McNellis. *Id.* at ¶ 6-8. She began working with CPA firm Seiler LLP, who referred her to Claud and Louise Rosenberg. *Id.* at ¶ 11. The Rosenbergs oversaw a large philanthropic trust, consisting of over 97 partnerships and more than 30 brokerage accounts. *Id.* at ¶¶ 10-16; Lauren Testimony Tr. 40:1-7. As a bookkeeper, Ms. Hughes worked "closely" with a team of tax advisors and attorneys. Stip. Facts. ¶ 11. Ms. Hughes has also worked as a part-time tax preparer since the early 1990s, preparing tax returns for friends and family. Stip. Facts. ¶ 17; Interview Notes ¶¶ 3-4, Ex. 26. She hired a CPA, Allison Perry, to review these returns. Hughes Testimony Tr. 120:2-5.

In 2001, Ms. Hughes formed Akaroa Convention Centre (2000) Limited in New Zealand, which eventually morphed into an entity called Takamatua Valley Vineyards ("TVV") in 2005. Stip. Facts. ¶ 20. TVV is a vineyard in Akaroa, New Zealand. Ms. Hughes is the sole owner and director of TVV. *Id.* In 2013, she formed Cuba Uncorked Limited ("CU"), a wine bar in Wellington, New Zealand. Like TVV, CU is owned solely by Ms. Hughes.

**II.    Income Tax Audit**

    **A.     Income Shifting**

The IRS initiated an income tax audit of Ms. Hughes in November 2013. Lauren Testimony Tr. 35:13-22. The IRS sent Ms. Hughes a notice at that time and Anna Seymour, the original Revenue Agent assigned to the case, contacted Ms. Hughes via telephone in December 2013. *Id.* Initially, the audit focused on Ms. Hughes' filings for 2011 but was later expanded to include her income tax filings from 2001 to 2013, her foreign account reporting from 2010 to 2013, and other international penalties not at issue here. *Id.* at 35:23-36:6. As a result of the income tax audit, the IRS made two principal determinations: first, TVV and CU were per se foreign corporations rather than U.S. sole proprietorships, so they could not be reported on Schedule C. Ex. 41 at 24, 48, 52, 76. And second, even if TVV and CU were sole proprietorships, they were not entities engaged in for profit under 26 U.S.C.

§ 183, and thus, not entitled to deductions for business expenses greater than their reported gross income. *Id.* After receiving notice of the IRS's determination, Ms. Hughes filed a petition with the United States Tax Court and ultimately agreed to an additional tax assessment (*i.e.* deficiency) of $628,555 and an accuracy penalty under 26 U.S.C. § 6662(a) totaling $151,932.08.[1] Ex. 41 at 183-185.

During the audit, RA Lauren reviewed the separate profit and loss statements for TVV, CU, and HBC. HBC generated significant revenue during the years at issue, collecting approximately $4 million in gross receipts between 2010 and 2013. RA Lauren discovered that TVV had few actual gross receipts of its own. Virtually all of the gross receipts reported on TVV's Schedule C during 2010 and 2012 were actually receipts shifted over from HBC's books. This made TVV appear more profitable than it actually was, limiting the chance that TVV would be flagged as an entity not engaged in for profit and, thus, preventing Ms. Hughes from claiming TVV's losses as a deduction.

Ultimately, the IRS concluded that both TVV and CU were subject to the limitations under 26 U.S.C. § 183. *See* Income Exam Form 886-A, Ex. 41 at 48-50, 76-78. These were summarized again at the conclusion of the FBAR examination and sent to Ms. Hughes in October 2015. *See* FBAR Exam Form 886-A, Ex. 44 at 22-30. The adjustments made to the reported income by TVV are summarized below:

| Year | Gross Receipts Reported by TVV | TVV Gross Receipts Belonging to HBC | TVV Interest Reported as Gross Receipts | Actual TVV Gross Receipts | TVV Business Expenses Claimed |
|---|---|---|---|---|---|
| 2010[2] | $174,369 | $171,285 | $0 | $3,084 | $331,145 |
| 2011[3] | $181,825 | $181,825 | $0 | $0 | $313,002 |
| 2012[4] | $190,579 | $185,119 | $1,419 | $5,460 | $354,855 |
| 2013[5] | $11,987 | $0 | $6,827 | $5,160 | $307,503 |

---

[1] At the conclusion of trial, Ms. Hughes indicated that this matter was not settled and still pending. Tr. 180:7-8. This is not correct. The IRS and Ms. Hughes stipulated to, and the Tax Court entered, an Order assessing additional taxes. This settled the amount of her tax liabilities. It appears that Ms. Hughes has conflated an offer in compromise likely related to collectability under 26 U.S.C. § 7122(c), as meaning that the Tax Court case was not settled. To be clear, the Tax Court case was in fact settled, as demonstrated by the Tax Court filings submitted as exhibits in this action.
[2] 2010 Sch. C, Ex. 14 at 6; Ex. 44 at 25; Lauren Testimony Tr. 50:13-51:1.
[3] 2011 Sch. C, Ex. 14 at 27; Ex. 44 at 25; Lauren Testimony Tr. 51:11-24.
[4] 2012 Sch. C, Ex. 14 at 54; Ex. 44 at 25; Lauren Testimony Tr. 52:2-22.
[5] 2013 Sch. C. Ex. 14 at 78; Ex. 44 at 25; Lauren Testimony Tr. 53:5-54:8.

| TOTAL | $558,760 | $538,229 | $8,246 | $13,704 | $1,306,505 |
|-------|----------|----------|--------|---------|------------|

During her audit interviews, Ms. Hughes initially blamed the misreporting of TVV gross receipts on a "posting" or "data-entry" error. Lauren Testimony Tr. 55:13-56:2. Later in the same interview with RA Lauren, she said that she did not think that these inaccuracies were a "big deal" because the income would "net out." *Id.* at 56:17-57:4. Ms. Hughes did not contest RA Lauren's recollection. But while Ms. Hughes may have reported all her income, she inflated TVV's gross receipts by shifting revenue from HBC's Schedule C onto the Schedule C for TVV. Ms. Hughes could thus conceal the fact that TVV was generating an average of only $3,246 in gross receipts per year while claiming more than $1.3 million in business expense deductions. As a result of these improper deductions, Ms. Hughes underreported her income tax liability by over $600,000.

Among the years at issue, 2013 is the only year where Ms. Hughes did not inflate TVV's gross receipts. Ms. Hughes' 2013 return was due on April 15, 2014 and was signed on April 10, 2014. The IRS notified Ms. Hughes that it was conducting an audit into her affairs in November 2013, approximately five months before her 2013 returns were filed. Once Ms. Hughes learned that the IRS was taking a closer look at her filings, she suddenly stopped reporting HBC gross receipts on the Schedule C for TVV.

**B.     False Businesses Addresses**

Ms. Hughes falsely reported U.S.-based addresses for TVV and CU. TVV's correct address is 59 Long Bay Road, Akaroa, New Zealand 7520. Hughes Testimony Tr. 120:13-17. From 2010 to 2012, Ms. Hughes reported TVV's address as 59 Long Bay Road, Takamatua Valley, NE 94107, using the state abbreviation for Nebraska and a San Francisco zip code. Ex. 14 at 6, 27, 54. Initially, Ms. Hughes dismissed this as a "typo." Hughes Testimony Tr. 120:21-121:13. She also indicated that she made this error in 2010 and it was subsequently carried over by Turbo Tax to her 2011 and 2012 returns. *Id.* In 2013, however, Ms. Hughes changed the address to 59 Long Bay Road, Takamatua Valley, *CA*, 94107, falsely representing that TVV is located in California.

When Ms. Hughes was confronted with this information, she suggested, perplexingly, that this was done in response to the IRS audit. Hughes Closing Tr. 174:6-12. She then claimed she did this

1   because TVV was registered in California. *Id.* at 174:13-22. But TVV was registered in New Zealand,

2   Ex. 20, and, in any event, there is no such place as "Takamatua Valley" in California. In short, Ms.

3   Hughes has no credible explanation for why she repeatedly represented that TVV was located in the

4   United States. In addition, Turbo Tax Forms Mode for each year at issue includes a specific field stating

5   "(do not enter State and Zip Code if foreign address)" with a drop-down menu allowing for the entry of

6   the foreign country's name. Ex. 47, 48, 49, 50; *see also* Appendix A (demonstrative showing Forms

7   Mode screen shots for 2010, 2011, 2012, 2013).[6]

8          Similarly, Ms. Hughes reported a false address for her other New Zealand business, Cuba

9   Uncorked. On the 2013 Schedule C for Cuba Uncorked, Ms. Hughes listed CU's address as "201 Cuba

10  Street, Wellington" and "201 Cuba Street, CA 94107." In fact, when CU was incorporated on September

11  17, 2013, its registered address was listed as "59 Long Bay Road, Akaroa, 7542, NZ." Cuba Uncorked

12  Incorporation Docs., Ex. 21.

13  **III.    FBAR Filings**

14         Ms. Hughes did not file timely FBARs in 2010-2013. Stip. Facts ¶ 30. Even though she reported

15  interest income on line 8a of Form 1040 in both 2010 (Ex. 14, p.1) and 2011 (Ex. 14, p. 22), which

16  directs filers to "Attach Schedule B if required", she did not file Form Schedule B in 2010 or 2011,

17  which she was required to do. Hughes Testimony Tr.124:12-14, 125:20-22. Schedule B to Form 1040

18  includes questions related to foreign financial accounts and FBAR filing requirements. Ex. 16 at 9, 11.

19  The instructions to Schedule B plainly state that it must be filed if the taxpayer "had a financial interest

20  in, or signature authority . . . over, a financial account in a foreign country . . . ." Ex. 16 at 10 (2010

21  Schedule B instructions), 12 (2011 Schedule B instructions). Ms. Hughes did not read the instructions to

22  Schedule B for 2010 or 2011. Hughes Testimony Tr. 124:12-14; 124:20-21. These instructions were

23  readily available online, at the IRS offices at the Federal Building in San Francisco, and via the "Help"

24  function in Turbo Tax's Forms Mode. Stip. Facts. ¶ 18 (indicating that Ms. Hughes had previously

25  picked up physical forms in person); Skelly Testimony Tr. 31:4-19.

26

27  ─────────────────
    [6] While not evidence, these demonstratives are screenshots taken from TurboTax Premier for 2010-
    2013, which is admitted into evidence as Exhibits 47-50. Some of the fields are filled in with TVV's
28  address for illustrative purposes only.

1   In 2012, Ms. Hughes did file a Schedule B as part of her income tax return. Ex. 14 at 51. In

2   response to the question at Line 7a regarding whether she had an interest in a foreign financial account,

3   she checked the "yes" box. *Id.*; Hughes Testimony Tr. 127:7-17. Then, when answering the following

4   question regarding whether she was "required to file Form TD F 90-22.1," she again checked the "yes"

5   box. Ex. 14 at 51; Hughes Testimony Tr. 128:4-15.

6   Finally, in 2013, Ms. Hughes filed a Schedule B and again checked "yes" when asked whether

7   she had an interest in a foreign financial account. Stipulated Facts ¶ 29, Ex. 14 at p. 75; Hughes

8   Testimony Tr. 129:23-124:10. This time, however, she checked "no" when asked if she was required to

9   file an FBAR, which, beginning with the 2013 year, was reported on FinCen Form 114. Ex 14 at 51;

10  130:12-21.

11  Despite the instructions on Schedule B referring taxpayers to the applicable FBAR forms for a

12  given year, Ms. Hughes told RA Lauren in August 2014 that she did not file FBARs because she thought

13  that by checking "yes" Turbo Tax would include the Form with the return. Ex. 26 ¶ 7. While Turbo Tax

14  did support the preparation of FBARs from 2010-2012 in the "Interview" mode, use of Forms Mode

15  required the user to search separately for the FBAR or, alternatively for 2012, actively select a link at the

16  bottom of Schedule B to prepare an FBAR. Skelly Testimony Tr. 19:18-20:7, 22:2-14; Ex. 47, 48, 49,

17  *see also* Appendix B (demonstrative).[7]

18  Previously, Ms. Hughes prepared her returns with the help of an accountant, Michael Gibbons,

19  who passed away in 2009. Hughes Testimony Tr. 119:15-17. She used separate tax advisors to prepare

20  her New Zealand tax returns. *Id.* at 120:24 to 121:1. At some point, Ms. Hughes approached Allison

21  Perry, the CPA who reviewed returns Ms. Hughes prepared for compensation, and asked her to review

22  one or more of the returns at issue. Hughes Testimony Tr. 146:18-22. Ms. Perry declined because of the

23  complexity of Ms. Hughes' returns. *Id.* During the years at issue, however, Ms. Hughes completed her

24  tax returns using the Forms Mode of TurboTax, printed her returns, and filed paper copies. Hughes

25

26

27

28

_____

[7] *Supra* note 6. The United States includes highlighting and text inputs for illustrative purposes only and not as evidence.

Testimony Tr. 131:18-20; Lauren Testimony Tr. 72:5-15. She alone was responsible for reviewing her returns' contents for accuracy and would have seen that, in fact, no FBAR was printed with her return.

Later, in the same interview, RA Lauren asked Ms. Hughes why she indicated in 2013 that she had a foreign financial account but no FBAR filing requirement. Ex. 26 at p. 3 ¶ 8. Ms. Hughes responded that the account balances at the time were below the $10,000 threshold. *Id.* However, her testimony was that she never reviewed the FBAR forms, the FBAR instructions, or the Schedule B instructions, which instructs filers that no FBAR is required only if the *aggregate* value of all reportable accounts remained below $10,000 throughout the relevant year. Hughes Testimony Tr. 150:19-151:1, 151:5-12. Schedule B does not reference the $10,000 limit. *See generally* Ex. 16 at 9, 11, 13, 23. Thus, Ms. Hughes' statement that she did not file because the value was less than $10,000 is inconsistent with her testimony that she never read the applicable instructions that would have informed Ms. Hughes of this threshold. Moreover, each account reported by Ms. Hughes on her 2013 FBAR has a balance higher than $10,000. Ex. 35.

During trial, Ms. Hughes offered multiple reasons as to why she did not file FBARs in 2012 and 2013 despite indicating on each Schedule B for those years that she had an interest in foreign accounts. She stated that she thought that by checking the boxes under Part III of the FBAR, she had met her filing requirement. When asked why she indicated she had a filing requirement in 2012 but not in 2013, Ms. Hughes first suggested that she made the change because she was under audit. Hughes Testimony 154:14-155:25. When pressed further, she testified that she made the change from 2012 to 2013 because her accounts were "secured accounts" and were under the $10,000 threshold. Hughes Testimony Tr. 156:9-23.

Again, it is unclear how Ms. Hughes would have known about the $10,000 threshold if she did not read the instructions to the FBAR form or otherwise educate herself about the FBAR requirements. And notwithstanding Ms. Hughes' alleged belief that her "secured" accounts did not need to be reported, she held a checking and a savings account at ANZ Bank with a total reported balance of $262,499 in 2012 and $153,800 in 2013. 2012 FBAR, Ex. 34 at 1-2; 2013 FBAR, Ex. 35 at 1-2. Moreover, she used these accounts for her personal, as well as business, expenses, meaning she was aware of their existence

1  and used them regularly. Hughes Testimony Tr. 135:23 to 135:25, Ex. 10,  at 100 to 125 (CU), Ex. 11

2  (TVV).

3         Finally, Ms. Hughes claimed at trial, apparently for the first time, that she did not file FBARs

4  because she had already paid New Zealand taxes on the interest income generated by the relevant

5  accounts and, without consulting any instructions, assumed that this excepted her from the FBAR

6  reporting requirement. Hughes Testimony 158:22-159:17. She claimed that her New Zealand tax

7  advisers determined that this exception applied, *Id.* at 161:7-17, even though she had previously testified

8  that these advisors never advised her on her U.S. tax obligations. *Id.* at 152:11-13.

9                                    **ARGUMENT**

10        Ms. Hughes had a wealth of tax and financial resources available to her during the years at issue,

11 yet she failed to leverage any of them. She never took even the slightest step to look at the FBAR form

12 instructions or inquire with the numerous tax professionals in her orbit. Meanwhile, she was playing a

13 shell game with her businesses' gross receipts, making TVV look more profitable than it was to skirt the

14 limitations on expense deductions for activities not engaged in for profit. She used fake addresses to

15 make TVV look like a U.S.-based company, and when it came to her FBAR reporting requirements,

16 Ms. Hughes stuck her head in the sand. She knew there was a grave risk that she was not meeting her

17 reporting requirement, and the evidence shows that she had multiple opportunities to learn about those

18 obligations.

19 **I.      Applicable Law**

20        As detailed in the United States' brief filed at Dkt. 131, the district court determines *de novo*

21 whether a defendant is liable for the penalty arising from a taxpayer's failure to meet the reporting

22 requirements applicable to foreign accounts. This includes determining whether Ms. Hughes' failure to

23 meet the reporting requirements was willful. Thus, the Court should weigh the evidence presented at

24 trial to determine whether Ms. Hughes' violation of the FBAR reporting requirements was willful. *See*

25 *United States v. Williams*, 2010 WL 3473311, at *1 (E.D. Va. Sept. 1, 2010), *rev'd on other grounds*,

26 489 Fed. Appx 655 (4th Cir. 2012); *United States v. McBride*, 908 F. Supp. 2d 1186, 1201 (D. Utah

27 2012); *Bedrosian v. United States*, No. 15-5853, 2017 WL 4946433, at *2 (E.D. Pa. Sept. 20, 2017).

28

In the civil context, willfulness covers "not only knowing violations of a standard, but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007); *see also, e.g.*, *United States v. Ill. Cent. R. Co.*, 303 U.S. 239, 242-43 (1938) (holding, in civil penalty context, that willfulness includes "careless disregard whether or not one has the right so to act"). Recklessness is an objective standard, "entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should have been known.'" *Safeco*, 551 U.S. at 68 (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)). As the Fourth Circuit discussed in *United States v. Horowitz*, "civil recklessness contrasts with criminal recklessness and willful blindness, as both of those concepts incorporate a subjective standard." 978 F.3d 80, 89 (4th Cir. 2020); *see also Farmer*, 511 U.S. at 836–37 (recognizing that the criminal law 'generally permits a finding of recklessness only when a person disregards a risk of harm of which he is aware'); *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011) (explaining that willful blindness requires a subjective belief that 'there is a high probability that a fact exists' and 'deliberate actions to avoid learning of that fact')."

Recklessness and, thus, willfulness is established if the defendant "(1) clearly ought to have known that (2) there was a grave risk that the filing requirement was not being met and (3) [s]he was in a position to find out for certain very easily." *Bedrosian v. United States*, 912 F.3d 144, 153 (2018) (cleaned up); *see also United States v. Horowitz*, 978 F.3d 80, 89 (4th Cir. 2020) (adopting the *Bedrosian* standard), *Norman v. United States*, 942 F.3d 1111, 1115 (Fed. Cir. 2019) (same).

"An improper motive or bad purpose is not necessary to establish willfulness in the civil context." *McBride*, 908 F.Supp.2d at 1204 (internal citations omitted). Moreover, direct evidence of intent is not required to establish a violation was willful—persons who fail to report foreign bank accounts on an FBAR are not likely to admit they knew of the reporting requirement and chose not to comply with it. *Id*. at 1205.

While the Ninth Circuit has not explicitly adopted this standard, district courts within the Ninth Circuit have done so. *See, e.g.*, *United States v. Goldsmith*, No. 3:20-cv-87-BEN-KSC, 2021 WL 2138520, at *15 (S.D. Cal. May 25, 2021); *United States v. de Forrest*, 463 F. Supp. 3d 1150, 1157-58 (D. Nev. 2020); *United States v. Zimmerman*, 2020 WL 6065333, *4 (C.D. Cal. Sept. 16, 2020); *United*

1   *States v. Baroon*, No. 4:18-cv-05191-SAB, 2020 WL 1558157, at *3 (E.D. Wash. Feb. 27, 2020);

2   *United States v. Bohanec*, 263 F. Supp. 3d 881, 889 (C.D. Cal. 2016). Moreover, the Ninth Circuit has

3   found reckless conduct to constitute "willful" violations in analogous contexts. For example, under 26

4   U.S.C. § 6672, employers are penalized for willful failures to pay over employee income withholdings

5   to the IRS. In this context "'reckless disregard' of whether taxes are being paid over, as distinguished

6   from actual knowledge of whether they are being paid over, may suffice to establish willfulness."

7   *Phillips v. United States Internal Rev. Serv.*, 73 F.3d 939, 942 (9th Cir. 1996). Given the weight of the

8   authority, the appropriate standard for "willfulness" under Section 5321 is an objective one that

9   encapsulates reckless failures to file timely FBARs.

10          Finally, the United States' burdens are tested under the preponderance of evidence standard. *See*

11  *United States v. Bohanec*, 263 F. Supp. 3d 881, 889 (C.D. Cal., Dec. 8, 2016) (holding that the

12  preponderance of the evidence standard applies), *United States v. de Forrest*, 463 F.Supp.3d 1150, 1156

13  (D. Nev., May 31, 2020). Based on the evidence presented at trial, the preponderance of evidence

14  standard, and including the objective reckless disregard standard within the meaning of civil willfulness,

15  the Court should conclude that Ms. Hughes was willful in her failure to disclose her interest in foreign

16  financial accounts, and find against Ms. Hughes and in favor of the United States on this issue.

17  **II.     Ms. Hughes' Conduct was Willful**

18          Ms. Hughes is a sophisticated taxpayer, with 30 years of experience in the financial services

19  industry. As a bookkeeper, she has overseen dozens of brokerage accounts, obtaining tax reporting

20  forms for her clients, and tracking partnership basis. *See* Ex. 26 at p. 1, ¶ 5, (she tracks basis for clients'

21  partnerships, but doesn't prepare 1065s for clients). She worked closely with a roster of tax

22  professionals. Together, they steered the billion-dollar Rosenberg Trust. Ms. Hughes had an accountant

23  on her payroll to review the returns that she prepared for compensation. She hired New Zealand

24  accountants to review her foreign tax filings. For at least four years, Ms. Hughes' personal returns were

25  the only ones that were not reviewed by a tax professional. And while not hiring an accountant is not *per

26  se* evidence of willfulness, in Ms. Hughes' case it is telling that someone with easy access to tax

27  professionals hired such professionals for all the tax returns she prepared except the U.S. returns where

28

1   she made numerous misrepresentations in her favor.

2       One of these professionals, her accountant Allison Perry, cautioned Ms. Hughes that her returns

3   were more complicated than average, yet she failed to even consult the instructions to the Form 1040 to

4   determine her reporting obligations. At various times, Ms. Hughes blamed her faults on the fact that her

5   longtime personal accountant, Michael Gibbons, passed away in late 2009. This is patently incredible.

6   Ms. Hughes' 2010 return, the first at issue, was due nearly 18 months later, in April 2011. It is simply

7   not believable that Ms. Hughes did not have time to find an accountant to review her 2010 return, let

8   alone the returns for 2011 through 2013.

9       Ms. Hughes knew when she prepared her own tax returns for the years at issue that she held

10  financial accounts in a foreign country. She knew those accounts had balances over $10,000 in

11  aggregate for each of the years at issue. She also knew she earned interest income from her foreign bank

12  accounts during each of the years at issue. She was directed to file Schedule B on Form 1040 (line 8a)

13  but chose to ignore the instructions to determine if she was required to file a Schedule B for each of the

14  years at issue. Even though she claims she never read the Schedule B instructions, she filed a Schedule

15  B in 2012 and 2013. She ignored the clear instructions under Part III of Schedule B directing filers to the

16  FBAR. In 2012, she even indicated that she *did* have an FBAR filing requirement, but, incredibly,

17  argues that it was reasonable for her to believe that she did not need to do anything further. And again,

18  she failed to read any of the relevant instructions for Form 1040, Schedule B, of the FBAR.

19      Moreover, Ms. Hughes knew that TVV and CU were located in New Zealand. Yet, in each of the

20  years at issue, she filed tax returns misreporting these facts. At best, Ms. Hughes ignored the obvious

21  risk of making these misrepresentations on her returns. At worst, however, she intentionally obscured

22  her businesses affairs, including her foreign accounts, to avoid scrutiny by the IRS and minimize her

23  personal tax obligations.

24      In addition to representing on her tax returns that TVV and CU were located in the United States,

25  Ms. Hughes blatantly misrepresented those entities' revenue in an apparent effort to claim over $1.3

26  million in business expense deductions. She manipulated the gross receipts reported by HBC and TVV,

27  taking gross receipts generated by HBC and reporting them as belonging to TVV. She minimized this

28

1   error, claiming it was not a "big deal" and would "net out," which, while incorrect, reflects Ms. Hughes'

2   accounting and tax knowledge. Moreover, these misrepresentations appear to have been intended to

3   make TVV look more profitable than it was. By attributing additional income to TVV, Ms. Hughes

4   sought to avoid the limitations on businesses not engaged in for profit on 26 U.S.C. § 183. Of course, the

5   IRS concluded that TVV was subject to § 183 limitations.

6          While this case is not about Ms. Hughes' income taxes, her repeated misrepresentations are

7   probative of her willfulness in failing to disclose her foreign financial accounts. If she had disclosed the

8   foreign financial accounts, it would have been a clue that would point the IRS in the direction of

9   discovering that Ms. Hughes mis- or underreported her affairs.

10          The evidence set forth at trial shows that, at a minimum, Ms. Hughes failed to take reasonable

11   steps to understand her reporting requirements when she was in a position to do so. She could have

12   sought out the instructions for Schedule B or the FBAR, via the IRS or via TurboTax. Other

13   misrepresentations aside, Ms. Hughes was warned by Ms. Perry, the accountant she used to verify tax

14   returns Ms. Hughes prepared, that her returns were more complicated than average. Ms. Hughes hired

15   accountants to review both the returns she prepared for others and her New Zealand tax filings.

16   Curiously, however, she did not ask anyone to review the returns at issue here. Ms. Hughes' failure to

17   seek tax advice, as she had done many times previously, is indicative of, at the very least, recklessness

18   or willful blindness.

19          Even if the Court gives credit to any testimony of Ms. Hughes regarding her lack of awareness of

20   her reporting obligations, under the objective standard set forth in *Safeco* and *Bedrosian*, among other

21   cases, Ms. Hughes clearly ought to have known that there was a grave risk that she was not meeting her

22   FBAR reporting obligations, and she was in a position to find out for certain very easily. First, her

23   accountant notified her that her returns were complicated. Second, she printed and mailed her returns; if,

24   as she told RA Lauren, she thought all of the requisite forms were generated by TurboTax, a review of

25   her filings would have made clear that was not the case. And finally, the instructions to Form 1040,

26   Schedule B, and the FBAR, state that someone in Ms. Hughes' position has a reporting requirement.

27          For over four years, however, Ms. Hughes refused to review these instructions. Ms. Hughes

28

1   recklessly disregarded her FBAR disclosure obligations during each of the years 2010, 2011, 2012 and

2   2013, given her sophistication, various other misrepresentations on her tax returns, and having been

3   specifically put on notice by a CPA that her returns required extra attention. Ms. Hughes ought to have

4   known that there was a grave risk that the filing requirement was not being met, and she was in a

5   position to find out for certain very easily given her sophistication and background. Ms. Hughes thus

6   was willful in this civil context.

7          The United States is entitled to recover and collect the $678,899.00 in assessed but unpaid civil

8   penalties from Ms. Hughes for her failure to timely report her interest in foreign bank accounts on an

9   FBAR for the years 2010, 2011, 2012, and 2013. In addition, pursuant to 31 U.S.C. § 3717(a)(1), the

10  United States is entitled to recover prejudgment interest accrued on Defendant's unpaid penalties and

11  accrued late-payment penalties under 31 U.S.C. § 3717(e)(2) to the date of entry of judgment. Post-

12  judgment interest on the FBAR penalty assessment shall accrue pursuant to 28 U.S.C. § 1961(a) and

13  post-judgment late-payment penalties shall accrue pursuant to 31 U.S.C. § 3717(e)(2) and 31 C.F.R. §§

14  5.5(a) and 901.9, until the judgment is paid in full. If the Court rules in its favor, the United States shall

15  file a motion for entry of judgment providing an updated outstanding balance with accrued late-payment

16  penalties and interest.

17         Based on the evidence presented at trial, the United States requests that the Court find that Ms.

18  Hughes' failure to meet her FBAR disclosure obligations was willful. Following a finding of willfulness,

19  the parties understand that the Court will allow an additional round of briefing regarding the Court's

20  review of the penalty amount determination and the relevant administrative record. Because the

21  pertinent statute gives the Secretary of the Treasury discretion as to the amount of the penalty, this Court

22  should review the assessment to determine whether the penalty's size is "arbitrary, capricious, an abuse

23  of discretion, or otherwise not in accordance with law." 5 U.S.C.§ 706(2)(A); s*ee also United States v.*

24  *Williams (Williams III)*, No. 1:09-cv-437, 2014 WL 3746497, at *1 (E.D. Va. June 26, 2014).

25         **WHEREFORE**, the United States requests that this Court find in favor of the United States and

26  against Defendant Timberly Hughes and find Ms. Hughes liable for willful FBAR penalties for the years

27  2010, 2011, 2012 and 2013.

28

1  DATED this 23rd day of June, 2021.

2
                               DAVID A. HUBBERT
3                              Acting Assistant Attorney General

4                              */s/* Boris Bourget
                               NITHYA SENRA
5                              BORIS BOURGET
                               Trial Attorneys, Tax Division
6                              U.S. Department of Justice
                               *Attorneys for the United States of America*
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## APPENDIX A

Forms Mode - 2010 Schedule C – Address Entry



Forms Mode - 2011 Schedule C – Address Entry



APPENDIX

Forms Mode - 2012 Schedule C – Address Entry



Forms Mode - 2013 Schedule C – Address Entry



APPENDIX

1

2013 Forms Mode – Schedule C – Address Entry with drop-down menu for foreign country information:

2

3

4



5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

APPENDIX

**APPENDIX B**

Forms Mode - 2012 Schedule B – QuickZoom to report on Form TD F 90.22-1



APPENDIX

2012 Schedule B – QuickZoom to report on Form TD F 90.22-1opens prompt to create Blank FBAR



Forms Mode – Blank 2012 TD F 90-22.1 opened via QuickZoom from Forms Mode Schedule B



2

APPENDIX