TIMBERLY E. HUGHES,
Plaintiffs *in Propria Persona*
59 Long Bay Road
Akaroa, New Zealand

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA

      PLAINTIFF

v.                                                          CASE NO.  3:18-cv-5931-JCS

TIMBERLY E. HUGHES

      DEFENDANT

_____/

## DEFENDANT'S POST-TRIAL BRIEF

### INTRODUCTION AND SUMMARY

This is a civil action regarding collection from Ms. Hughes for civil penalty assessments of FBAR penalties for the failure to timely report her financial interest in foreign bank accounts for the period 2010, 2011, 2012 and 2013.  Following two days of trial on June 8 – 9, 2021, hearing witnesses and receiving and reviewing various exhibits, the DOJ has failed to satisfy their burden of proof and have failed to prove the defendant acted in a willful or reckless disregard.  The DOJ has not been able to prove anything related to material facts, they only have attacks on the defendant's personal character, with absolutely no supporting facts and have proceeded to make false statements for the sole purpose of painting the defendant in a false light.  These points are irrelevant, impertinent and immaterial to the case, and are not supported by the facts.

The DOJ states that the defendant miss reported business revenues to get maximum tax deductions, reducing her personal tax bill, failing to take into account that the prior 13 years of filings had not been challenged before August of 2014, when the IRS deemed that the flow through entities were going to be treated as per se foreign corporations.  How could the defendant have known that she was filing incorrectly when her professional CPA's and

- 1 -

attorneys in both the US and New Zealand structured her companies as disregarded entities and flow through status applied to the prior 13 years

The DOJ continues to paint the defendant in a false light, stating that the addresses were false on the tax returns, please refer to Exhibit A, showing the original fax from the NZ tax attorney's files to Mike Gibbons, (See also the Court's Exhibit 101 – 109 (Bates Exhibit A 130-1– pages #1 – 16), letters from NZ Attorney and both the NZ and US Accountants and the IRD indicating all paperwork for the transparent entity was filed in 2001.  These clearly show that all the paperwork for the disregarded entity was filed and the address of the TVV entity located at tax payers address of 1459 18th Street, SF, CA 94107, a copy from the DOJ's own files of the bank statement from National Bank in 2010 with the US address, the acknowledgement from the ATF/TTB where TVV was recorded for import of wine at the 1459 18th Street, SF 94107 address, again confirming that TVV was an entity for profit, why would defendant spend the cost of labeling in the US for import, the time and energy to file and get clearance from the ATF/TTB if the entity was not for profit?  Also included in Exhibit A is a copy of the defendant's business card, clearly showing both addresses for TVV.  This again shows the intellectual dishonesty of the IRS auditor, he had all of this paperwork and the timeline showing the professional organizations she enrolled in, the licenses with alcohol distribution and NZ customs.  Clearly TVV was a for profit entity.  See attached Exhibit B, showing the timeline that was involved from the purchase of the Winery, a "Going Concern" which means in New Zealand an operating business at the start.  Mr. Lauren of the IRS was given a copy of this timeline during the audit, and Mr. Lauren testified at trial that he did not reach out to any NZ tax authority or speak with any of the defendant's professionals to con-firm how the businesses were treated.

In fact, the IRD, the NZ Tax Authority, where the businesses are actually located, recognizes both businesses as "a for profit company "since their inception, TVV at 2001 and Cuba at 2013.  How can the IRS argue that a business that started in September of 2013 was a not for profit business, when a commercial lease was signed, marketing and advertis-ing was undertaken, new employees were hired, separate bank accounts were set up, new tax ID numbers for payroll withholding and GST returns were set up with the IRD, so when it is a start-up and in its first quarter of operation how can they IRS state it is a not for profit company?  Cuba was set up as an avenue for TVV to generate sales, because of the forced

closure of TVV on-site sales and functions due to the damages sustained from the earth-quakes, TVV needed to be proactive to keep the business going.  The DOJ claims that the supposedly false addresses of both companies was to mislead the IRS, yet fails to acknowledge the year Cuba was set up, she had indicated that she had foreign accounts, and that Cuba was associated with TVV and would also go on the TVV import license with the ATF/TTB.

The DOJ then makes the claim that defendant stated that there was in fact a settle-ment reached with the US Tax Court.  This was because of Defendant's prior attorney's bad advice, because Defendant ran out of money to pay him to defend her, he advised her to settle.  Knowing now what the Defendant knows of her attorney, she would never have agreed to this settlement as the evidence proves that the IRS auditor was intellectually dis-honest and used her willingness to cooperate to get her to open up all years to 2001 so that they could assess the most penalties and use this against her to try to prove willfulness for the FBAR filings.  This matter is currently with the OIC and is working through a settlement offer.

As the Defendant stated, every year in January she would prepare her US returns for review with her US accountant, she would move a portion of her HBC Schedule C income that represented the approximate debt service amount for TVV to the TVV Schedule C, so she would be able to get an idea on how much tax she would need to budget for in April, and normally under the review, her US accountant would have her move it back before filing. This did not have any impact on tax as they were both flow through entities and would net together.  This was done for 13 consecutive years prior to the audit and the Defendant had no reason to believe there was anything different in how she had historically filed until the IRS auditor informed her that TVV was not going to be treated as a disregarded entity as he could not locate the paperwork.  Even though he was given a copy of the attached Exhibit A as well as a copy of the Attached Exhibit B, clearly showing that TVV was in fact an operating for profit business and all paperwork had been filed.  Although, conveniently he stated that he could not locate anything prior to 2008.  Clearly, the IRS auditor operated in bad faith.  While the defendant was under audit for 8 months prior to the due date of the filing of the FBAR's for 2013, neither auditor mentioned there were any issues with the prior 13 years of filing, or anything in regards to the FBAR filing requirements, both knowing there

were foreign accounts and not once mentioning anything.  Although it may not be their duty, however would that not be in the spirit of the law by doing the right thing?  Is it not strange that only 6 weeks after the 2013 FBAR filing date, the Defendant was informed of her requirements and then penalized.  There were many discussions in August of 2014 about the requirements and defendant asked the auditor for guidance on what to file and how to file as the instructions were not clear.  The IRS auditor testified at trial that he did not discuss with Defendant the loans or the collateral accounts and the Defendant was confused as to what accounts needed to be included in the reporting.  Mr. Lauren never indicated in these discussions in August of 2014 what exactly was to be included.  The DOJ claims that the IRS Auditor and Ms. Hughes discussed the $10,000 balances, yet this is not substantiated by any evidence and the IRS auditor did not testify to this statement at Trial and in fact did testify that he did not inform her what needed to be filed as his notes were not "verbatim" and indicated that the IRS had begun the FBAR audit many weeks prior to notifying her of the FBAR requirements in August of 2014, which substantiates that the auditor could have informed the Defendant in plenty of time to timely file her 2013 FBARs.

Once again the DOJ shows their intellectual dishonesty by claiming that they knew what transpired in a conversation between Ms. Perry, a CPA that was contracted to review the few simple 1040 and 1040A returns that Ms. Hughes prepared for her family and friends. Ms. Perry was not an employee of Ms. Hughes and was contracted for a few hours a year to do an annual review of simple returns.  How could the DOJ claim that Ms. Perry complained of the complexity of Ms. Hughes' returns, when they were not present at that conversation? How could they possibly know that Ms. Perry cautioned Ms. Hughes on the complexity of her return?  How can they say that she warned her?  These are blatant dishonest statements.  How can they testify that she was an accountant on payroll?  HBC never had any employees, which can easily be confirmed with the EDD.  There are no supporting facts to these claims and again, Ms. Hughes' character is attacked for the purpose of painting her in a false light.

Again, the DOJ's intellectual dishonesty claiming that Ms. Hughes was a sophisticated taxpayer with 30 years in the financial services industry.  Ms. Hughes is a bookkeeper, she holds no licenses in the financial services industry, she does not give any financial advice.  This is patently false, in fact, Ms. Hughes' primary client, the Rosenberg's,

were her largest client for nearly 30 years, and her main responsibilities entailed mostly personal assistant duties.  Ms. Hughes did pay all of their bills, and did work closely with their accountants and lawyers, collecting the statements and the K-1's of the various partnerships and entities, she did not do any accounting for any of these partnerships, she simply had a list of holdings and made sure that the yearend reports were either sent to Mr. Rosenberg or to the CPA's directly.

Regarding these matters, the DOJ has failed to produce any proof of material facts in dispute.  However, the penalties for 2010 are not timely and passed the statute of limitations on June 30, 2018.  This complaint was filed on September 27, 2018.  Therefore, the year of 2010 should be excluded.

The Defendant protests all penalties asserted by the IRS for the years 2010 to 2013 under 31 U.S.C. Section 5321(a)(5) with respect to the purported willful failure to furnish timely FBARs which total $678,900 ($32,845 for 2010, $205,545 for 2011, $167,316 for 2012 and $273,193 for 2013).  The Defendant further protests the IRS's alternative position that non-willful FBAR penalties are applicable which total $230,000 ($40,000 for 2010, $60,000 for 2011, $60,000 for 2012 and $70,000 for 2013).

The Defendant, Timberly Hughes, is a United States citizen, who is a dual US/New Zealand resident and is considered a tax resident of New Zealand.  She resided primarily in New Zealand until recently due to issues from the Pandemic, she has remained in Italy.  Ms. Hughes' primary business is managing Little LYNC preschool in San Francisco which operates as a Limited Liability Company and is the managing member.  Ms. Hughes' husband operates the New Zealand company full time and Ms. Hughes consults on the wine making.

On or about April 12, 2001, Ms. Hughes formed Akaroa Convention Centre (2000) Limited in New Zealand.  On or about July 21, 2003, the name of this entity was changed to Akaroa Winery Limited.  Subsequently, on or about November 30, 2005, the name of the entity was changed to Takamatua Valley Vineyards Limited (the entity, from inception, is referred to herein as "TVV").  TVV was created and operated to produce wine and host wedding receptions.  Ms. Hughes from inception was TVV's sole owner and director, until 2018, when an additional Director was brought on board.

On September 17, 2013, Ms. Hughes formed Cuba Uncorked Limited in New

Zealand.  Cuba was a wine bar in Wellington, New Zealand which was formed as a compliment to TVV and like TVV was solely owned by Ms. Hughes.

From 2001 to 2013, Ms. Hughes transferred cash to TVV and Cuba's bank accounts to fund the business operations.  TVV and Cuba held bank accounts at ANZ Bank New Zealand Limited and Ms. Hughes had signature authority over these accounts.

Ms. Hughes filed Forms 1040 for the 2010 to 2013 years which included on Schedule Cs the activities of TVV and Cuba (2013).  On her 2012 Form 1040, the Defendant reported on Schedule B $1,418.55 of interest from National Bank of New Zealand and indicated in part 7a that she had a financial interest in or signature authority over a foreign financial account and that she was required to file Form TD F 90-22.1.  The audit report notes that the Defendant also reported the interest from this bank account on TVV's Schedule C as gross receipts in 2012.  On her 2013 Form 1040, Schedule B, the Defendant also indicated her financial interest in or signature authority over a foreign financial account.  The Defendant included interest from the foreign bank accounts as part of the receipts on TVV's Schedule C for 2013.  The Defendant also included on her 2010 and 2011 Schedule C the TVV interest income from the New Zealand bank accounts.

The Defendant did not file FBARs for the 2010 to 2013 years until she was advised of the filing requirement during the IRS examination at which time she promptly filed the forms.  As indicated in her interviews with the auditor, the Defendant was not familiar with the FBAR form at the time she filed her 2010 to 2013 tax returns and did not understand the requirement to file the forms.

This case is important for the NZ/USA tax treaty, if the Court recognizes and accepts the IRS auditors stance that TVV was not a flow through entity and that it was operating as a business not engaged for profit, where will the lines be drawn for the IRS to be able to say your business is a hobby, based on what evidence and facts?  TVV was purchased as a "Going Concern" which means for NZ tax purposes, it is an operating business from the start.  Had the IRS auditor spoken directly to the IRD or the tax advisors in NZ, he would have understood this.  As you can see from the time line attached, Exhibit B, obviously this is a commercial venture with a goal to operate profitably.  The interpretation by the IRS of the US vs. the NZ Tax Treaty Agreement is very different and goes against the NZ Tax Authority's views.  How far reaching will this be for the treaty interpretations?  Why hire an at-

torney or an accountant if the IRS can simply move the goal posts.  What will this case set in motion?  The NZ/US tax treaty no longer applies if the IRS can simply change the way an entity is set up, and by who made that call?  Also, what about the penalties on the bank originated journal entries for non-taxable loans?  The penalties equate to nearly 50% of a loan?  This will ripple through the business industry in NZ for US residents if this stands.

## **ARGUMENT**

A.  <u>PLAINTIFF FAILED TO SATISFY ITS BURDEN OF PROOF</u>

    Plaintiff called their first witness from Intuit, Lisa Skelly, who testified that during the years 2010, 2011, 2012 and 2013, that there were between 20 – 30 different versions for each year that could be used to prepare taxes.  She also testified that there were two options to use the program, one using the interview mode that leads you through the use of the program and prompted the user to use specific forms and follow instructions.  She also testified that the use of the "Forms" mode, does not prompt the user to follow instructions and that you would need to seek out specific instructions.  Ms. Skelly also testified that she did not know what version of software the Defendant used and did not observe how the Defendant used the software.  She also testified that Turbo Tax updates in real time each year and could not possibly testify as to what version and how the Defendant used the software.  Once again the DOJ is showing their blatant intellectual dishonesty with the attached Turbo Tax pages, their own witness, Ms. Skelly of Intuit, testified that it was impossible to know which version of Turbo Tax was used, and how it was used.  How can the DOJ state that this is the version that was used and how it was used?  The fact that TVV was registered as a disregarded entity with the US address, and also registered with the ATF/TTB at the US address, proves that nothing was hidden or used to miss lead.  There are no supporting facts to support their claim that this was the version used, and once again the DOJ is trying to paint the Defendant in a false light.

    Plaintiff then called as their second witness, the IRS auditor, Jonathan Lauren.   Mr. Lauren testified that the audit began in November of 2013. Even though the Defendant was under audit from November of 2013, neither auditor, Anna Seymour nor Jonathan Lauren informed the Defendant of the FBAR requirements during the meetings in 2013 or January through June of 2014, both knowing that there was a foreign entity with foreign accounts involved, which would have allowed her to file her 2013 FBAR forms on time, and should have been instructed to extend her 2013 tax returns until the audit was finalized.   After being under audit for 6 months prior to filing her 2013 tax returns, it was an obvious presump-

tion that she had been filing things correctly for the prior 13 years, as neither auditor indicated otherwise.  The Defendant was not aware that there were any changes in how she filed her prior 13 years of taxes, and was not informed there were any substantial changes in the way she had previously filed, so the argument that Defendant failed to read instructions regarding filing an FBAR, when neither auditor said there was any issues with her prior years filings, certainly proves there was no reckless disregard in Ms. Hughes' failure to read the instructions to file an FBAR.  Certainly this shows that the IRS was operating in bad faith toward Ms. Hughes.  This harkens back to US vs. Tweel 550 F.2d 297 (5th Cir. 1977), the Fifth Circuit held that the government cannot affirmatively mislead a taxpayer into consenting to a search by agreeing to provide information during a civil audit by engaging in fraud, trickery, or deceit.  The Fifth Circuit emphasized that "[o]ur revenue system, is based upon the good faith of the taxpayers and the taxpayers should be able to expect the same from the government in its enforcement and collection activities. "

      Mr. Lauren also testified that the Defendant acted in bad faith by re-creating the tax forms from 2001 – 2007 as the IRS had no records prior to 2008, and assured Defendant that if she did not file and prepare these returns, monthly penalties of $150,000 per month would accrue until these forms were created.  The IRS then assessed penalties for failure to timely file and included penalties over $1 million on the 5471 and 926 forms, and said that they were unable to locate the disregarded entity paperwork filed in 2001, and used that to say that TVV was a foreign corporation.   If TVV had been allowed to be treated the way the NZ tax authority recognizes it as a fully transparent entity, the filings over the last 13 years would not have changed any taxes due, and the miss classification of income on the two schedule C's would have no change in net income or net tax.  Because of the IRS's view that TVV did not file a disregarded entity form in 2001, that it was a foreign corporation and the deductions were disregarded, this generated the tax as well as the imposing of 5471 and 926 penalties and also the charge of willful FBAR filings.  One has to ask, if the IRS did not have the tax filings from 2001-2007 and had the defendant recreate them, than how can the IRS say that the disregarded entity paperwork was not able to be located and did not exist?  Which is it?  If you do not create the returns for these years, you are fined until you do, and if you create them than you are assessed fines for forms 5471 and 926 for filing late, however it is convenient for the IRS that the disregarded entity paperwork could not be

located as they had no records prior to 2008?  See Court Exhibit 101 – 109 (Bates Exhibit A 130-1– pages #1 – 16), letters from NZ Attorney and both the NZ and US Accountants and the IRD indicating all paperwork for the transparent entity was filed in 2001.

Plaintiff then called the Defendant as their last witness.  Plaintiff asked Defendant if she was an Accountant, or held any certifications in accounting.  Defendant confirmed that she was merely a bookkeeper and worked with certified accountants for clients.  Plaintiff then produced a document for the TVV loan that Plaintiff signed as "Accountant" for the bank paperwork.  Defendant pointed out that in New Zealand, the small business owner of a company that handles the financial aspects of that company can be construed as the ac-countant of their own company.  This document was not signed as a Chartered Accountant or CPA.  There was no miss leading statement or attempt to conceal in this document.

Plaintiff then pointed to the Schedule B and the instructions that are attached to the form, however could not show that Defendant ever had the instructions and with the testi-mony form Ms. Skelly, there was no way to tell that Defendant had in fact, ever received the instructions nor read or understood them and what was required for filing an FBAR.  After being notified in August of 2014 by the IRS Auditor, Ms. Hughes had discussions regarding the filing requirements for the FBAR's, and Mr. Lauren testified that he did not give her any assistance or guidance as to what was required, even when she asked him about the loans, the collateral accounts and the $10,000 limit and time line on the balances.

Plaintiff then pointed to the addresses on the TVV Schedule C and that they were in-correct showing the state of Nebraska and the zip code for San Francisco, CA 94107, which is the same zip code as the main address for the tax return.  When setting up the new year in Turbo Tax, it draws from the prior year and auto fills the addresses that are input into the system.  TVV was registered with the ATF/TTB in 2005 as Defendant imported several cas-es of wine as a donation to the JCC in San Francisco for a fund raising event as well as im-porting wines into one of Defendant's company's, Jay's Deli.  The ATF/TTB required label certification for US distribution and Defendant registered TVV's mailing address located at 94107.  See attached Exhibit A, the disregarded entity paperwork filed in 2001, the ATF/TTB confirming the mailing address in the US as well as the Defendant's business card with both the US and NZ addresses.  The Schedule C address was simply an oversight, there was no attempt to hide or conceal anything.

Plaintiff's last point was that the property located at 7 Korminako Road, Days Bay, New Zealand was the personal residence of the Defendant after the damage sustained from the earthquakes.  Plaintiff asked if this personal loan was paid from the TVV checking account.  Defendant testified that the TVV checking account was the account that the bank funded the loan through and set up the payments to flow through that account.  This is the account that had the duplicate deposit and bank error that the IRS is charging an erroneous penalty on.  As TVV is considered a transparent entity in NZ, it is not unusual to pay personal accounts from a single member LLC account.

Ms. Hughes was not aware of 31 U.S.C. & 5314 or 31 C.F.R. & 1010.350(a) and the requirements of filing Forms TDF 90-22.1 or FBAR reports for financial accounts exceeding $10,000 during the previous calendar year.   Ms. Hughes hired accountants and lawyers in both New Zealand and the United states prior to investing in the business in New Zealand. Ms. Hughes was never informed by either her accountants or lawyers in both the United States and New Zealand that there were requirements to file these separate FBAR forms. Ms. Hughes relied on her accountants and lawyers to fulfill all her regulatory compliance and was not aware of these additional requirements until she was informed by the IRS Auditor, Jonathan Lauren in August 2014.  Ms. Hughes complied immediately after being informed of these requirements and filed her 2011, 2012 and 2013 FBAR forms directly to the IRS Auditor, Mr. Jonathan Lauren on August 26, 2014.  Ms. Hughes was then instructed in February of 2015 to file her 2010 FBAR's which she complied immediately.

B.  Failed to prove willfulness or reckless disregard

The dispute in this case concerns the proper interpretation of the civil penalty provided by 31 U.S. Code S 5321(a)(5) for a willful violation of the regulations.  The facts giving rise to this dispute are as follows:

Willfulness is conduct that is voluntary, rather than accidental or unconscious, and it can be established from conduct meant to conceal sources of income or other financial information. See Williams, 489 Fed. Appx. at 658; Sturman, 951 F.2d at 1476; McBride, 908 F. Supp. 2d at 1205. It is undisputed that Zwerner deliberately concealed his Swiss bank account for approximately 40 years. He readily admitted in his deposition that "this was a -- as far as I was concerned my secret account."...Of course, consistent with such an effort to keep the account a secret, Zwerner failed to report the account on an FBAR form for the

years at issue. Without ever mentioning the account to his own CPA, there would have been no way Zwerner could have reported the account to the government as required.

The undisputed facts therefore show that Zwerner deliberately engaged in "conduct meant to conceal or mislead sources of income or other financial information." Williams, 489Fed.Appx.at 658. This is enough to establish willfulness under 31 U.S.C. § 5321 regardless of whether Zwerner specifically knew of the FBAR reporting requirements. As discussed above, for a violation to be willful, the relevant inquiry is whether the failure to disclose the required information itself was purposeful rather than inadvertent, not whether the individual subjectively believed they [sic "he"] did possesses the legal duty to file an FBAR.  See Williams, 489 Fed. Appx. at  558-660; McBride, 908 F. Supp. 2d at 1204-1212.

Ms. Hughes filed her 2010 – 2013 returns using the forms provision in Turbo Tax. She followed the forms filed the prior years by her US accountant, Mike Gibbons.  Simply, pulling up the forms that were listed in the prior year returns. The prior years, Mr. Gibbons would net together all the income, including any sales or interest income and put them on Schedule C.   Ms. Hughes was also advised by Mr. Gibbons, that because both Ms. Hughes and her husband decided to forgo any salary, and take on all the duties for TVV, that they should file all costs related to travel and supplies as a COG for the company as it was the direct cost of production of their product.  Nothing was hidden or concealed, but simply filed on a different form.  The taxpayer attempted to properly file her Forms 1040 and in 2012 and 2013 she indicated on her Schedule B the existence of a New Zealand bank account. She believed that this satisfied any foreign reporting requirement. She also reported the income from the foreign bank accounts within the receipts for the related entities.  She was never referred to the FBAR filing requirements as Turbo Tax simply asks if you have a foreign account and if you are required to file an FBAR.  If you check the boxes, there are no further instructions of what you need to do past checking the boxes while working in the forms provision of the program.

During the last day of the trial, June, 9, 2021, Defendant discussed with the Judge the processes of filing her 2010 – 2013 tax returns.  During those years, there were multiple issues that arose that affected the defendant's state of mind, compounding careless errors in the preparation of the returns.  Those years were especially challenging, at the beginning of January, as per her usual habits, Defendant  input most of the data into her tax returns,

which would normally be reviewed sometime in March or early April by her US accountant. After dealing with deaths, two devastating earthquakes, damages, repairs, numerous insurance adjusters, two new start-up businesses and two lawsuits, April arrived and she simply filed the returns without review.  She was mentally and physically exhausted and was careless, and just wanted to get things filed in a timely fashion.  Her main concern was that all the income was reported (inadvertently miss classified on different schedule C forms).

The Defendant  simply did not pay attention or read any instructions.  It was her understanding that from the 13 prior years that everything she needed to do was taken care of and that her accountants would have informed her of any compliance that she needed to do.  She also missed many deductions, including property taxes and foreign tax withholding tax credits, however her main concern was to report all the income.  There was no attempt to conceal or hide any income, and based on the prior 13 years of filing, she was not aware that she was doing it incorrectly until Mr. Lauren of the IRS informed her that the IRS's stance on TVV was that it was not a disregarded entity for flow through purposes, but a foreign corporation, even though the New Zealand tax authority (IRD) recognizes it as a transparent entity with flow through status in their interpretation of the US/NZ tax treaty.  She relied on her attorneys, the NZ IRD and her accountant's advice based on the information they gave her on how to file.   A short summary outline of some of the challenges during these years are listed below:  (See Exhibit B for a full outline)

November 14, 2009 – Michael Gibbons – US Tax Accountant/Friend – passes away

March 7, 2010 – Defendant's mother passes away

July 19, 2010 – Defendant's mentor and client, Louise Rosenberg passes away

September 2010 – 1st NZ earthquake, devastating the property

September 2010 – March 2011 – living in a caravan on site

October 2010 – New tenant at 501 Connecticut Street

October 2010 – Claims for repairs to Insurance Co. in NZ

February 2011 – 2nd earthquake in NZ

March 2011 – Moved to Wellington and moved out of the caravan

August 2011 – Loss of wine shipment to London for Global Party event

August 2011 – 2 separate lawsuits start – Loss of Product by TNT, eviction of Tenant

January 2012 – On going claims and adjustor issues with EQ repairs in NZ

February 2012 repairs to start for EQ in NZ

March 2012 – Repairs stop for EQ in NZ – New Adjustor assigned

March 2012 – Change of Use at 501 Connecticut Street – Start-up of preschool

March 2012 – Eviction lawsuit settles

April 2012 – Public Hearing on Change of use for Preschool

April 2012 – TNT lawsuit settles

December 2012 – Mother in-law passes away

February 2013 – Start scouting sites for Cuba Uncorked to increase wine sales

March 2013 – Repairs start up for EQ damages/On site meetings with adjustor

April 2013 – Repairs stop for EQ – new adjuster assigned, meetings with attorney

November 2013 – IRS audit begins

Defendant has worked with several CPA firms over the years for different clients, and not any of these firms or individual accounts or clients had any foreign accounts or ever discussed an FBAR filing.  As they were professional relationships, it would have been overstepping the relationship to ask for any of these companies to review her returns.

Mr. Lauren, the IRS auditor stated that the Defendant had a 4 year degree in accounting, not only is this incorrect (See Court Exhibit 114, Bates Exhibit F – 130-6), as her degree is a B.B.A. in International Business, and a minor in Political Science, it is because of his intellectual dishonesty that paints the defendant and her businesses in a false light. He also stated that TVV was a business not engaged for profit.  As you can see from the timeline attached as Exhibit B, it was always a business engaged for profit.  TVV had several functions, weddings and private parties in the years prior to the earthquake.  In addition, Defendant planted a new vineyard, built a commercial winery, obtained organic certification, which entails an on sight audit annually.  She also obtained on and off sales licenses for alcohol sales, which is renewed annually with an on-sight inspection by the police, and a customs controlled licensed area for commercial production, to bottle and store alcohol, which is also annually inspected by NZ customs.  Unfortunately because of the earthquakes and the damages suffered, TVV was ordered by the health department to close to on-site sales or functions in September of 2010 until the EQ repairs were completed.  Mr. Lauren testified

that he never had any contact with anyone in New Zealand, and in fact, Mr. Lauren was given a copy of the attached timeline, so how can he interpret that TVV was a business not engaged for profit, when clearly it was, and is.

C.   Failed to Prove Substantial Loss or Harm

Ms. Hughes asks the court to review the penalties that the IRS has assessed as there are many errors in their calculations.

The 2010 penalties should be removed for they are out of time.  The penalties in relation to the loan advances that were a simple journal entry by the bank for the mortgage liability should be removed from the calculations as well as the double bank error counting the penalty twice in 2013.  Had the IRS auditors informed Ms. Hughes during the first 8 months under audit, Ms. Hughes could have filed her 2013 FBAR's by June 30, 2014, however was not informed until August, 6 weeks after the due date.

This audit and the FBAR litigation has been going on for over eight years, and Ms. Hughes has been embroiled with fighting this law suit as well as the audit issues.  Ms. Hughes has complied with every request that was outside of the normal time period for filing and was assured that there would be no penalties, and then was assessed penalties from 2001-2013.

Ms. Hughes was forced to sell her building in San Francisco to cover the mounting debt that she incurred from her attorney's fees to defend her in this litigation and the audit.  She was only able to cover a portion of the debt incurred from her attorney by the proceeds from the sale of the building.  So not only has Ms. Hughes been fighting the FBAR litigation, and the audit, but now she is fighting the pandemic with limited income, draconian lockdowns and limited access to the internet.  So who is harming whom?

Ms. Hughes disputes the amount of civil penalties assessed against her for the reason that the penalty statue, 31 U.S.C. 5321(a)(5)(c) does not apply to the facts in evidence and is unsupported by any evidence.  None of the funds in Ms. Hughes's accounts were from illegal activity.  Ms. Hughes has met the four thresholds described in the Internal Revenue Manual, in that she had no previous FBAR penalty assessments, the funds in the ANZ accounts were not derived from illegal sources or used for criminal purposes, the

taxpayer fully cooperated during the audit, and the IRS did not assert a civil fraud penalty with respect to the unreported income stemming from the ANZ accounts.

D.   Conclusion and Defense

In researching many other FBAR cases, one thing is clear and also irrefutably different from this case.  They all had millions of dollars in question and numerous accounts, they all underreported income earnings on these accounts as well as some were from illegal activities.  This case is unique in that there was only a little over $200,000 US value (all after tax monies), that was actually liquid and owned by Ms. Hughes.  Included in these amounts is an insurance payout for the earthquake damage of $46,000 that was held as collateral with the bank for the repairs to the building that they held the note on. $10,000 for a line of credit and $50,000 collateral for security on the loan.  The other amounts that Ms. Hughes is being penalized on were loan advances that Ms. Hughes never had access to and were only in her accounts for less than 24 hours.  The plaintiff has failed to prove necessary facts establishing that the plaintiff's conduct or failure to act were willful in violation of any reporting or disclosure obligations.  How can the DOJ justify a penalty 3 times the value in the accounts?

During the months prior to purchasing the business in New Zealand, Ms. Hughes hired attorneys and accountants in both New Zealand and the U.S. to structure the foreign company and set up the accounts for the business.  Ms. Hughes was able to secure a loan for the purchase of the New Zealand business from National Bank (now known as ANZ Bank) which was secured by the building and business in New Zealand.  These loan proceeds do not equate to income, even though you get the benefit of the building, you also get the liability, and the monthly requirement to pay the loan, with no change in net worth.

Ms. Hughes was never told by any of her accountants or lawyers that an FBAR was due. US vs. Sandra J. de Forrest.   Is this not sufficient to raise a material issue of fact over whether Ms. Hughes acted willfully?  What would be the motivation to not file, as it was clear Ms. Hughes was not hiding any foreign accounts.

Congress enacted the Bank Secrecy Act of 1970 ("BSA"), codified at 31 U.S.C. && 5311, in response to an increasing "unavailability of foreign and domestic bank records of customers thought to be engaged in activities entailing criminal or civil liability."  Cal. Bakers

Ass'n v. Shultz, 416 U.S. 21, 26 {33 AFTR 2d 74-1041} (1974).  "(T)he express purpose of the Act (was) to require the maintenance of records, and the making of certain reports, which have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." Id. (citations omitted).  As interpreted by the Shultz Court, "Congress was concerned about a serious and widespread use of foreign financial institutions, located in jurisdictions with strict laws of secrecy as to bank activity, for the purpose of violating or evading domestic criminal, tax, and regulatory enactments." Id.

For purposes of the civil FBAR willful penalty, willful includes both actual knowledge and reckless disregard, which is determined under an objective standard: a person acts with reckless disregard if he acts or fails to act "in the face of an unjustifiably high risk of harm that is either known or so obvious that I should be known."  This differs from criminal recklessness and willful blindness, both of which include an objective element.  Nor is reckless disregard negligence, since it requires "a high risk of harm, objectively assessed."

If you look to the language of  the willful penalty , which bases the amount of the penalty "in the case of a violation involving a failure to report the existence of an account or any identifying information required to be provided with respect to an account, the balance in the account at the time of the violation."  From this language, one can conclude that Congress intended the willful penalty to be applied on an account by account basis.

## LEGAL STANDARD

### A.  BURDEN OF PROOF

The legal standard for failing to disclose financial interests on an FBAR form is by a preponderance of the evidence; U.S. v. McBride, 908 F.Supp.2d 1186 at 1214.

### B.  NO EVIDENCE OF WILLFULLNESS

The Defendant does not dispute that she was in fact required to file FBARs for the 2010 to 2013 years.  As indicated above, as soon as she was made aware of the filing requirement she filed the required FBARs.  The Defendant's failure to timely file the FBARs was not, however, willful.  Accordingly, the willful penalty as asserted by the IRS should not apply.

In U.S. v. Ratzlaf, 510 U.S. 135 (1994), the Supreme Court addressed the meaning of willfulness in the context of a criminal violation of the structuring provision of the Bank

Secrecy Act (which also includes the FBAR rules).  The <u>Ratzlaf</u> court reversed the conviction holding that the defendant could not be convicted of a crime that required a showing of willfulness where the government did not show that the defendant was aware that his actions were illegal.  Similarly, in <u>U.S. v. Sturman</u>, 951 F.2d 1466 (6th Cir. 1991), the court noted that the test for willfulness is a "voluntary, intentional violation of a known legal duty."

In CCA 200603026, the IRS expressed its view of what the government would need to show to establish that an FBAR violation was willful, stating that "in order for there to be a voluntary intentional violation of a known legal duty, the accountholder would just have to have knowledge that he had a duty to file an FBAR, since knowledge of the duty to file an FBAR would entail knowledge that it is illegal not to file an FBAR.  A corollary of the principle is that there is no willfulness if the accountholder has no knowledge of the duty to file the FBAR."

Relying apparently on the IRS Manual, the audit report contends that the Defendant acted with "willful blindness."  According to the Manual, which is not binding legal authority, "willfulness may be attributed to a person who has made a conscious effort to avoid learning about the FBAR reporting and recordkeeping requirements."  IRM 4.26.16.5.3(6).

As with other civil penalties, the IRS must establish willfulness by "clear and convincing evidence."

The DOJ cannot sustain a finding of willfulness or willful blindness or reckless disregard in this case.  Ms. Hughes did not voluntarily, intentionally violate a known legal duty. As she has stated, she was unaware of the FBAR filing requirement and was not advised of the requirement by any of the professional advisors she consulted with regarding her US tax filings.  She clearly was not hiding the accounts in question as she attempted to report the interest from them and on at least her 2012 and 2013 tax returns indicated that she had foreign financial accounts.  Her indication that she had such interests makes clear that her failure to file the FBARs was due to confusion and mistake rather than willfulness.  The Defendant is a bookkeeper, not a professional return preparer, and she was certainly not familiar with the FBAR and other international filing rules and forms.

The 2010 penalties should be removed as they are out of time.  The penalties in relation to the bank originated journal entries for the loan advances should be removed from the calculations as well as the double bank error counting the penalty twice, and the 2013 pen-

alties could have been avoided if the auditor had informed her that the FBARS were due by June 30, 2014, eight months into the audit, and he was well aware of the foreign accounts. So the question is who is harming whom?

A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986). Substantive law identifies which facts are material. Id. The trial court "must resolve all reasonable doubts in favor of the party opposing the motion. Mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden. Rather, the Court requires "significant probative evidence" from the non-movant to dismiss. The Court must consider all of the evidence but "refrain from making any credibility determinations or weighing the evidence."  Turner v. Baylor Richardson Med. Ctr., 476 F. 3d 337, 343 (5 th Cir. 2007).

In the case US vs. Flume, having rejected the Government's contention that Flume had actual knowledge, the court then addressed the issue of whether Flume acted with reckless disregard. It rejected the Williams and McBride holdings that a taxpayer is deemed to have "constructive knowledge" of the FBAR requirement from the fact that he signed an income tax return. The court gave three grounds for finding this theory unpersuasive: 1) it ignores the distinction between willful and non-willful violations since, if every taxpayer by signing a return is presumed to know of the need to file an FBAR "it is difficult to conceive of how a violation could be non-willful"; 2) it would require the court to presume that Flume had examined his returns and thus knew of the FBAR requirement, which it would not do on summary judgment; 3) the theory is "rooted in a faulty policy argument" since constructive knowledge means that even though a person does not have actual knowledge, the law pretends you do for policy reasons.

Although Flume admitted he did not read the FBAR instructions, the court gave two reasons why this may not have been reckless: a) 1 Flume may have relied on his CPA to read the instructions and b) since the instructions stated that there were exceptions, Flume might have believed his CPA determined an exception applied. Another aside, are the courts wrong in treating "reckless" conduct as willful? Reckless and willful are not treated as identical by Congress. Sec. 6662(c), which imposes a negligence penalty, states "the term

'disregard' includes any careless, reckless, or intentional disregard." Congress clearly distinguished intentional conduct from reckless conduct.

## C.   REASONABLE CAUSE

In sum, the Defendant had reasonable cause for failing to file the FBARs and in light of her prompt filing upon being made aware of the filing requirement, no penalties should apply.

Ms. Hughes had reasonable cause for untimely filing FBAR forms.  Ms. Hughes requests that this court take judicial notice of the "Criteria for Relief From Penalties" in the Internal Revenue Manual (IRM) Penalty Handbook Part 20.1.1.3 (10-19-2020) and Part 20.1.1.3.2 (11-21-2017) and Part 20.1.1.3.2.2 (02-22-2008).  "Any reason that establishes a taxpayer exercised ordinary business care and prudence but nevertheless failed to comply with the tax law may be considered for penalty relief."

The plaintiff has previously argued that the court, in analyzing the "reasonable cause" defense for FBAR purposes, should consider case law, regulations, and other guidance addressing the concept of "reasonable cause" in the context of delinquency penalties under 26 USC Section 6651; see, Moore v. U.S., (DC WA 2015) 115 AFTR 2d ¶2015-591.

Ms. Hughes was not properly advised by her accountants.  Her US accountant had died in November 2009.  Ms. Hughes suffered two devastating earthquakes in September 2010 and February 2011.  Ms. Hughes did timely disclose accounts and amounts, but without using the FBAR forms.  Upon receiving notice from the IRS, Ms. Hughes promptly filed the FBAR disclosures.  Ms. Hughes also requests this court to take judicial notice of the IRM Penalty Handbook, Part 20.1.1.3.2.2.1 (11-25-2011) as it pertains to situations involving "Death, Serious Illness, or Unavoidable Absence" and Part 20.1.1.3.2.2.2 (10-19-2020) as it pertains to situations involving "Fire, Casualty, Natural Disaster, or Other Disturbance-Reasonable Cause".

## D.   NO SUBSTANTIAL LOSSES

In recent years, the injury rule has come under assault, increasingly honored in the breach.  Courts have permitted plaintiffs to employ various work-arounds to end-run the time-honored injury requirement. The result is a blurring of the line between actionable and

non-actionable wrong, fuzziness in the application of torts and warranty law in environmental litigation and beyond, and a tug of war between those courts guarding the courthouse doors and others willing to open them wide.

Holding Firm on Injury. The injury requirement serves important social, legal, and political functions. For one, injury separates courtroom resolution from the work of expert regulatory agencies, which are free to make social policy decisions and regulate products untethered to the personal circumstances of any given claimant. Courts lax on injury often wind up taking on de facto the role of such regulatory bodies, blurring the line between the branches of government.

Requiring injury also helps ensure that courts act like courts, resolving genuine cases and controversies and matters ripe for resolution, by "defin[ing] the class of persons who actually possess a cause of action" and "provid[ing] a basis for the factfinder to determine whether a litigant actually possesses a claim." Caronia, 22 N.Y.3d at 446. Insisting on injury also safe guards against "frivolous and unfounded" lawsuits, conserving the courts' resources for disputes that are ripe and ready for adjudication. Id. Moreover, allowing the uninjured to recover may lead to inequitable division of resources, with fewer funds available to the injured. See Metro-N. Commuter R.R. Co. v. Buckley, 521 U.S. 424, 442-44 (1997); Caronia, 22 N.Y.3d at 451.

In determining if Ms. Hughes acted willfully, one can look at the Courts ruling in McBride, following the United States Supreme Court's reasoning in Herman & MacLean v. Huddleston, determined that the preponderance of the evidence standard was appropriate when only money, rather than the taxpayers' "particularly important individual interests or rights," were at issue. This means that the government can support a willful FBAR penalty with a lower standard of evidence than is needed to prove a civil fraud penalty. What is important to note here is that Ms. Hughes's interests and rights are being infringed based on the penalties on non-taxable loan proceeds which are a liability to Ms. Hughes, not an asset.

What amount did the plaintiff suffer? Nothing, there were no tax obligations for the loan in foreign currency. The loans are not considered income and therefore there would be no tax liability. The interest earnings had tax withholding on them. In fact, the harm is the cost

the Government has incurred on this litigation and proceedings to garnish loan proceeds as income, far outweighing any actual harm to the US.    All interest earnings were reported on the Schedule C for 2010, 2011 and 2013, and on Schedule B for 2012.   The NZ Tax Authority withheld all tax due on the interest earnings and Ms. Hughes would have received a US tax credit on these amounts.   The United States was not prejudiced nor did it suffer harm or substantial harm or losses.   In fact, the largest losses suffered by the United States were due to the complaint being filed by the DOJ and the protracted litigation.   Ms. Hughes did try to settle this with a legitimate offer in November 2018, which was rejected by the DOJ.

**CONCLUSION**

The government FBAR penalty really has nothing to do with an apparent noble effort to prevent money laundering, the purpose of these disclosure forms and rules is to punish and abuse people such as Ms. Hughes.   She hired an attorney who exacerbated the dispute over a seven year period that cost Ms. Hughes over $200,000 in legal fees, than confessed his incompetence to continue defending her by suggesting that she default against the complaint when Ms. Hughes ran out of money to pay his fees.

The IRS tax system is a difficult system to get a fair and impartial review as the entire process has been weaponized against the average American who is just trying to operate within their legal boundaries, however those goal posts keep moving within the system, making it impossible to comply with all the rules.   With the intellectual dishonesty of the IRS auditor, the Defendant was painted as a person who committed fraud, as the IRS auditor used the excuse that they had no record of the disregarded entity paperwork filed in 2001 to claim that TVV was not structured according to US Tax regulations, which had been structured by professional lawyers and accountants in NZ and the US as a flow through transparent entity, using that fact to open up 13 years of tax returns and impose penalties because the Defendant did not file a form required for foreign corporations.   The IRS then stated that if TVV was determined to be a disregarded entity, he would then treat TVV as a hobby and a not for profit business, and disallow all deductions, which then triggered tax and penalties.   Where is the documentary evidence for this?   As you can see from the timeline, Exhibit B, this was always a for profit entity.

Not only the cost, time and energy of fighting these allegations have been enormous, this process is to force people like the Defendant into bankruptcy, not only to pay the legal bills, but the penalties.  This process destroys people's lives based on completely false allegations and the intellectual dishonesty of the IRS Auditor Jonathan Lauren, and the DOJ knowing that their process destroys countless lives, for what, a pre-crime?  Based on the assumption that you should have known the obscure rules, and should have filed the forms, which are constantly changing, and if you do not file the correct forms, you show reckless disregard, even though there is no intent, it does not matter, this process is simply there to destroy.  Not one penny of the amounts she is being penalized on was from ill-gotten gains.  In fact, as the evidence has shown, the spikes in the accounts were from bank originated journal entries of loan advances and pay downs all secured by the business.  None of these loans are taxable, and there was no harm suffered by the US.

What is the Defendant's motivation for not filing the FBAR forms?  These monies that the US and DOJ are penalizing Ms. Hughes on are not from any ill-gotten gains.   These funds are also being counted more than once as they were moved around to the accounts, so further calculation errors for penalties exist.  The other funds that she is being penalized on are bank originated journaled loans that were only in her account for less than 24 hours for settlement by the bank, and she never had access to these funds, and this is still an existing liability.  The DOJ has failed to show any evidence that Ms. Hughes was willful in failure to report the FBAR filings.  Where is the liability of non-taxable loans to the IRS?  What damage did the IRS suffer from the non-reporting of the non-taxable loans?  Where is the harm?  Ms. Hughes understood her obligation to disclose her foreign accounts, and checked the boxes on the Schedule B indicating a foreign account, however, did not realize that she had to go an extra step in filing an actual FBAR form.  Ms. Hughes truly understood that her obligation to disclose the accounts was all that was required, and that the tax was paid to New Zealand on these earnings.

Quoting from the third Circuits opinion, "A person commits a reckless violation of the FBAR statute by engaging in conduct that violates an objective standard: action entailing an unjustifiably high Risk of harm that is either known or so obvious that it should be known."

Ms. Hughes followed the guidance of her prior US tax advisor and netted the amounts together in all the years, and included it twice in 2012, both on the Schedule B and

again netting it out on the Schedule C, as she had done the prior 9 years with him.  How could she presume there was harm in doing it the way she always had, how could she have anticipated that by not filing on the correct form or not filing an FBAR form would cause great harm to the US?

Unlike in US vs. Bedrosian, Ms. Hughes did everything possible to cooperate fully with the IRS:  She fully cooperated during the audit and opened all her files, including assisting them all the way back to 2001 – 2013 – well beyond anything normally required by any taxpayer and then was assessed penalties for all the years for not filing a 5471 or 926 after the auditor indicated that the formation of the company was incorrect as a single member LLC and was a foreign corporation, not consulting with any NZ Tax authority, and then assured Ms. Hughes there would be no penalties assessed, and then assessed over $1M in penalties;  Ms. Hughes disclosed all of the accounts to the IRS, with copies of every year that was requested;  Ms. Hughes sought professional advice in both countries (New Zealand and the US) to make sure that she complied with all requirements and was never told by any of the professional people that she was required to file an FBAR, nor any indication from either auditor before the 2013 filings were due.  She did not have any history of tax fraud, and no prior FBAR penalties, and none of these funds were from ill-gotten gains. What is the motivation for willfulness?  These funds were not from ill-gotten gains. Nothing was hidden.

The Government feels the need to penalize Ms. Hughes for not timely filing the FBAR even though it is clear that the fines should be based on the money that she actually had access to.  Every step of the way Ms. Hughes complied with the IRS Auditor and is still being harassed by them.  So how can Plaintiff argue that she was taking an "unjustifiably high risk" in not reading everything closely?  The warning on Schedule B to consult the separate FBAR instructions explicitly states that exceptions exist, and she might "understandably have reasoned" that she had no FBAR filing duty because the NZ accountants had already determined that an exception applied.  Also, that neither auditor expressed there was any issue with her past filings, from November 2013, with many meetings and interviews, both auditors knew of the foreign entity and foreign accounts, not once mentioning in the 8 months during the audit before the 2013 FBAR filing deadline, that there were any problems with her previous filings.  Also, Line 7a of Schedule B to Form

1040, which was drafted by the IRS, creates ambiguity because it instructs taxpayers to report that financial interest or signature authority on the foreign account and to see the instructions for filing requirements and exceptions to those requirements and then instructs you to question 7b to write the name of the "foreign country" in which taxpayers have an account.  As a result, she "might reasonably have thought that she was not required to file as neither accountant in NZ or the US informed her that she had to file.  A reasonable factfinder could determine that she did not recklessly disregard her FBAR duties, such that a genuine factual dispute remains.  She did not hide any of the accounts and did report all the interest income, in 2010, 2011 and 2013 by following the prior 9 years of filing, using the forms version of Turbo Tax that does not offer any instructions on individual forms, and everything was disclosed, and netted out on the Schedule C.  Nothing was concealed or hidden, however, these earnings were just reported on different forms, and the fact is that the Government has made numerous mistakes in the calculation of the penalties.  In the end, why should anyone who is in business bother hiring attorneys or accountants when the IRS can simply move the goal posts to suit them?  When you are a business person, you hire professionals to advise you in areas you are not an expert in, so you can jump in and take care of running the business and managing your employees, not worrying about the details that you don't understand, that's why you hire experts. The IRS did nothing to indicate there were any errors in the prior 13 years of filing in the 8 months prior to Ms. Hughes filing her 2013 returns, again this harkens back to US vs. Tweel, the IRS did everything it could to get to the maximum penalties and used Ms. Hughes' compliance against her to open up 13 years of returns, knowing full well their intentions were to get the most penalties.

WHEREFORE, the Defendant respectfully prays that this Court:

Enter Judgment in favor of the Defendant.   The Defendant requests that this court dismiss the complaint and for other relief and deemed appropriate by the court.

*Timberly E. Hughes*

Timberly E. Hughes, Affiant

TIMBERLY E. HUGHES,
Defendant *in Propria Persona*
59 Long Bay Road
Akaroa, New Zealand

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA

      PLAINTIFF

v.                               CASE NO.  3:18-cv-5931-JCS

TIMBERLY E. HUGHES

      DEFENDANT

_____/

## CERTIFICATE OF SERVICE

      I Timberly E. Hughes hereby certify that a true and correct copy of the foregoing was duly served upon the plaintiff's attorney of record, David L. Anderson and Nithya Senra, at the address of P. O. Box 683, Ben Franklin Station, Washington, DC  20044, via first class mail and online this  7th  day of July 2021.

By: Timberly E. Hughes