UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>        v.<br><br>TIMBERLY E. HUGHES,<br><br>                    Defendants. | Case No.  18-cv-05931-JCS<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING WILLFULNESS** |

## I.     INTRODUCTION

1.      Plaintiff the United States of America brought this action seeking to enforce civil penalties against Defendant Timberly Hughes, pro se, for failure to report foreign bank accounts by filing a report commonly known as an "FBAR."  The Court held a bench trial by videoconference on June 8 and 9, 2021.[1]

2.      This document addresses the facts of the case and the question of whether the United States has shown "willful" violations of the Bank Secrecy Act's requirement to file FBARs.  Any challenge to the penalty assessed by the United States for such violations is reserved for resolution after further briefing.

3.      For the reasons discussed below, the Court finds that Hughes's failure to file FBARs in 2012 and 2013 was "willful" within the meaning of the statute, but that the United States has not shown willfulness as to her failure to file FBARs in 2010 and 2011.

4.      The Court finds the following facts by the preponderance of the evidence and makes the following conclusions of law under Rule 52(a)(1) of the Federal Rules of Civil

---

[1] The parties have consented to the jurisdiction of a magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

Procedure.  To the extent that any finding of fact is better characterized as a conclusion of law, or any conclusion of law is better characterized as a finding of fact, the Court adopts it as such.

5.      The parties shall file either a stipulation or separate proposed schedules for briefing the issue of penalties no later than October 27, 2021.

## II.      FINDINGS OF FACT

### A.      Stipulated Facts

6.      The facts in this subsection are taken directly from paragraphs 1 through 30 of the United States' proposed pretrial order (dkt. 132).  The parties stipulated to these facts at the pretrial conference.  *See* Civil Minute Order (dkt. 147).

7.      Ms. Hughes was born in the state of Nevada in 1964.  She has been a U.S. Citizen since birth.  She presently possesses a U.S. passport.

8.      Ms. Hughes earned  her undergraduate degree in 1986 from Gonzaga University in Spokane, Washington.  She earned a Bachelor of Business Administration (B.B.A.) degree with a major in International Business and a minor in Political Science.

9.      From approximately January 1987 to August of 1987, Ms. Hughes sold ad space for a phone book publisher in Anacortes, Washington.

10.     In September 1987, Ms. Hughes moved to San Francisco to work as an assistant at Metro Park, a parking facility company, where she did all the administrative work for one of the principals, primarily processing claims for damage to cars that were parked in the facilities.

11.     Ms. Hughes left Metro Park to work at Security Pacific Capital Leasing, where she worked as an administrative assistant for about 6 or 7 months.  Next, she worked at Rodde McNellis in 1989, a real estate development firm specializing in strip malls and commercial real estate.

12.     At Rodde McNellis, Ms. Hughes' job responsibilities included writing checks to pay bills relating to managing the commercial real estate, such as utilities, garbage, water, mortgage payments, real estate taxes and insurance

13.     By 1991, Ms. Hughes transitioned to a role as an independent contractor with Rodde McNellis and provided bookkeeping services for the firm after being trained by the

2

1    bookkeeper at Rodde McNellis.

2       14.    That same year, she started Hughes Bookkeeping Company. Her first clients

3   included Rodde McNellis, as well as a real estate broker who shared office space with Rodde

4   McNellis.

5       15.    Ms. Hughes grew her bookkeeping business answering part-time bookkeeping ads,

6   and from word of mouth referrals.  As a bookkeeper, she prepared the accounts payable and check

7   registers for businesses and gathered documents necessary for tax return preparation.  She would

8   provide the client's documents to the client's CPA for tax return preparation.

9       16.    In 1991 she began to work with the CPA firm Seiler LLP, having been introduced

10   to them by one of her first clients.

11       17.    In 1991 or 1992 Seiler asked Ms. Hughes to work with Claude and Louise

12   Rosenberg to provide bookkeeping services for the family and work closely with the couple's tax

13   attorneys and tax people.

14       18.    Ms. Hughes would pay all of the Rosenbergs' bills and kept track of payments in a

15   ledger that she would submit to the Rosenbergs' CPA at Seiler every month.

16       19.    Claude and Louise Rosenberg owned many properties through a revocable trust.

17   The revocable trust was also a partner in 97 partnerships and had a number of brokerage accounts.

18   Ms. Hughes would organize and keep track of tax-related documents for each of the trust's

19   partnerships, including Forms K-1.  Ms. Hughes also kept track of property tax statements for

20   properties Claude and Louise Rosenberg owned through the trust.  She would follow up with

21   partnerships to obtain missing K-1s and convey the documents to the CPAs at Seiler & Co. for tax

22   return preparation.

23       20.    As a personal bookkeeper for Claude and Louise Rosenberg, Ms. Hughes also kept

24   track of paying personal bills, including household utilities, household help, credit card bills, and

25   expenses related to the Rosenbergs' children and grandchildren.

26       21.    She provided bookkeeping services for the revocable trust after the deaths of

27   Claude Rosenberg (2008), and Louise Rosenberg (2010), and saw a significant increase in her

28   revenue from work for the trust due to increased work in keeping each of the Rosenbergs' four

children informed of the trust's operations.

22.     The assets in the Rosenbergs' revocable trust exceeded one billion dollars in value at the time of Louise Rosenberg's death in 2010.

23.     Ms. Hughes did not prepare tax returns for the Rosenbergs, but she did prepare tax returns for her own mother, sisters, brothers and approximately three to five friends over the years.[2]

24.     Ms. Hughes used TurboTax to prepare tax returns for herself and others.  Prior to using TurboTax, Ms. Hughes would fill out tax returns by hand.  She obtained blank copies of tax forms from the IRS by mail, and on at least one occasion, visited the Federal Building in San Francisco to pick up copies of blank tax forms to fill out by hand for her family and friends

25.     For the years 2010, 2011, 2012 and 2013, Ms. Hughes purchased TurboTax CDs to use for preparing her own tax returns.

26.     In 2001, Ms. Hughes formed Akaroa Convention Centre (2000) Limited in New Zealand.  In 2003, the name of this entity was changed to Akaroa Winery Limited.  Subsequently, in 2005, the name of the entity was changed to Takamatua Valley Vineyards Limited ("TVV" or "Takamatua").  From inception, Ms. Hughes has been TVV's sole owner and director.  TVV is located in Akaroa, New Zealand.

27.     On September 17, 2013, Ms. Hughes formed Cuba Uncorked Limited ("CU") in New Zealand.  CU operated a wine bar in Wellington, New Zealand that is now closed.  CU is solely owned by Ms. Hughes.

28.     As sole owner of TVV and CU, Ms. Hughes had a financial interest in, and signature authority over, TVV's and CU's bank accounts at ANZ Bank New Zealand Limited for each of the following years:

| Year | Account Name | Account numbers ending in |
|------|--------------|---------------------------|
| 2010 | Takamatua Valley Vineyards (TVV) | -1000, -1004, -0600, -0625 |

---

[2] At trial, the United States acknowledged that the tax returns that Hughes prepared for others were simple, and there is no evidence that she prepared tax returns for anyone else that involved Schedule B, Schedule C, or FBAR forms.  Trial Tr. Vol. II (dkt. 156) at 167:2–12.

| 2011 | Takamatua Valley Vineyards (TVV) | -1005, -1000, -1004, -1006, -0600, -0625 |
|------|-----------------------------------|--------------------------------------------|
| 2012 | Takamatua Valley Vineyards (TVV) | -1005, -1000, -1004, -1006, -0600, -0625 |
| 2013 | Takamatua Valley Vineyards (TVV) | -1005, -1000, -1004, -1006, -0600, -0625 |
|      | Cuba Uncorked (CU)                | -4400 |

29.     During each of the years at issue, the aggregate value of the financial accounts at ANZ Bank exceeded $10,000 in U.S. currency, and Ms. Hughes was required to timely file an FBAR for each of the years at issue in this action.

30.     The TVV and CU accounts at ANZ Bank earned interest income in the total amounts of $3,822.88, $5,090.61, $1,418.55, and $6,826.62 in taxable years 2010, 2011, 2012, and 2013, respectively.

31.     Ms. Hughes failed to report any of the interest income for taxable years 2010 and 2011, as she failed to attach a Schedule B, Interest and Ordinary Dividends, to her Forms 1040 for taxable years 2010 and 2011.

32.     On her 2012 Schedule B, Ms. Hughes reported interest income from "National Bank of New Zealand" and answered "Yes" to the first question on line 7a of Part III, Foreign Accounts and Trusts ("At any time during 2012, did you have a financial interest in or signature authority over a financial account (such as a bank account, securities account, or brokerage account) located in a foreign country? See instructions."), indicating that she had a foreign account.

33.     On her 2012 Schedule B, Ms. Hughes also answered "Yes" to the second question on line 7a ("If 'Yes,' are you required to file Form TD F 90-22.1 to report that financial interest or signature authority? *See* Form TD F 90-22.1 and its instructions for filing requirements and exceptions to those requirements"), indicating that she was required to file an FBAR for the 2012 reporting period; and wrote "NZ New Zealand" on line 7b ("If you are required to file Form TD F 90-22.1, enter the name of the foreign country where the financial account is located").

34.     Even though she answered affirmatively that she was required to file an FBAR for 2012, and was referred to the FBAR filing requirements, Ms. Hughes did not timely file an FBAR

United States District Court
Northern District of California

1 for the 2012 calendar year.

2   35. On her 2013 Schedule B, Ms. Hughes answered "Yes" to the first question on line

3 7a indicating that she had a foreign account, but answered "No" to the second question on line 7a

4 indicating that she was not required to file an FBAR for the 2013 reporting period, even though

5 she had a reportable interest in foreign bank accounts, and the aggregate balance in her foreign

6 bank accounts exceeded $10,000; Ms. Hughes did not timely file an FBAR for the 2013 calendar

7 year.

8   36. Ms. Hughes never filed an FBAR prior to the Internal Revenue Service's August

9 21, 2014 issuance of an informal document request for her delinquent FBARs for the 2011,2012,

10 and 2013 calendar years. In response, Ms. Hughes filed delinquent FBARs for the 2011, 2012, and

11 2013 calendar years on September 11, 2014. On January 1, 2015, an informal document request

12 was issued requesting an FBAR for the 2010 calendar year. Ms. Hughes filed her delinquent

13 FBAR for the 2010 reporting period on February 1, 2015.

14  **B.** **Witness Testimony**

15   **1.** **Lisa Skelly**

16   37. Lisa Skelly is a principal tax content analyst for Intuit, where she has worked for

17 fifteen years.

18   38. In that role, Skelly is responsible for the analysis of tax law to ensure that Intuit's

19 TurboTax product complies with federal and state tax law for each year the product is released.

20   39. Skelly is certified as an "enrolled agent" with the IRS, and has a master's degree in

21 taxation.

22   40. Skelly is familiar with TurboTax for the years 2010 through 2013, and helped

23 prepare Intuit's response to the United States' subpoena in this case, which included the desktop

24 version of TurboTax Premier for each of those years.

25   41. Intuit offers different "levels" of the TurboTax program.  "Premier" is the highest

26 level of the program.

27   42. Skelly was not certain how many versions of TurboTax existed for each tax year,

28 but estimated that ten to thirty versions would be released each year, depending on how many

1   times it was updated.

2       43.     Skelly authenticated the filenames listed in exhibits 47 through 50 as representing

3   the TurboTax Premier product for individuals for each year from 2010 through 2013, which Intuit

4   produced to the United States in response to a subpoena.

5       44.     Skelly testified that IRS Form 1040 is used by individuals to report individual

6   income to the IRS, and that Form Schedule B is required at certain interest levels or dividend

7   levels, including to report foreign accounts and foreign trusts.

8       45.     Skelly is familiar with the instructions that TurboTax provided regarding Form

9   1040 and Schedule B for the years at issue.

10      46.     Skelly is familiar with FinCen Form 114, also known as an FBAR, and with the

11  instructions that TurboTax provided for that form for the years at issue.

12      47.     Skelly testified that the instructions TurboTax provided regarding foreign interest

13  and account reporting were the same in each of the years at issue.

14      48.     TurboTax supported the preparation of FBARs in 2010, 2011, and 2012, but not in

15  2013.  Skelly testified that the change occurred because the government created a portal for direct

16  reporting of FBARs in 2013.

17      49.     TurboTax offers an "interview mode," in which the program asks users questions

18  and uses the user's response to prepare relevant forms.

19      50.     TurboTax also offers a "forms mode," a different user interface in which forms are

20  presented to users to complete.

21      51.     Using "forms mode" in the 2010 version of TurboTax, a user could find Schedule

22  B or the FBAR form by typing in particular prompts to an "Open Form" field, such as "td 90" to

23  find the option to add the TD F 90 FBAR form or "Schedule B" to find Schedule B.  The process

24  was substantially the same in 2011 and 2012.  The 2013 version did not support the FBAR form

25  but still supported Schedule B using a similar process.

26      52.     TurboTax offers functionality to check a user's tax return for errors.  A user may

27  nevertheless print and submit a tax return with unresolved errors.

28      53.     The "forms mode" would not necessarily prompt a user to add a form the user

7

United States District Court
Northern District of California

needed to file.  In some circumstances it would prompt a user to add forms depending on their responses to certain questions.  Skelly testified that a user checking a box indicating a foreign account in Schedule B would not cause the program automatically to prompt the user to add an FBAR form, but the Schedule B form would instruct the user to file an FBAR.  Skelly testified that the program might return an error if the user checked for errors and had not added an FBAR.

54.     Schedule B, which is published by the IRS, includes a statement that if the taxpayer answers "yes" to having a foreign bank account, the user should see the instructions on the reverse side of that form as to whether they are required to file an FBAR.  All versions of TurboTax for a given year displayed that same statement on Schedule B.

55.     Skelly testified that in TurboTax "forms mode," the instructions (i.e., the reverse side of Schedule B) are not displayed with the form, and the user would need to use the "help" feature to locate the instructions.

56.     In "forms mode," a user would need to seek out the FBAR form.  There is not an automatic prompt to do so when the user checks the box of Schedule B indicating that the user has a foreign bank account.

57.     Skelly did not testify that the program would automatically check all printed returns for errors, or that it would automatically flag a user's need to submit an FBAR form.  *See* Trial Tr. Vol. I (dkt. 155) at 27 ("Q: Right.  So if you don't electronically file and you physically print out the forms, there's no way it's going to prompt you.  Correct?  A: Correct.").

58.     Skelly was not familiar with Hughes's use of TurboTax specifically.

### 2.     Jonathan Lauren

59.     Jonathan Lauren is a revenue agent of the IRS, and has held that role since March 15, 2010.  He is a certified public accountant and has a master's degree in business administration with a focus in accounting.

60.     Lauren was assigned to Hughes's case in April of 2014.  He reviewed the existing paper and electronic case files when he was assigned to the case.  The IRS had opened investigations (also known as audits) into both Hughes's income tax returns and her FBAR filings.

61.     The IRS had initially opened an investigation into Hughes's 2011 income tax

return, in which an auditor first contacted Hughes in 2013.  The scope was later expanded to include Hughes's Form 1040 for 2007 through 2013, failure to file Form 927 from 2001 to 2013, failure to file Form 5471 from 2001 through 2013, and failure to file FBARs from 2010 through 2013.

62.     At the conclusion of the FBAR investigation, the IRS proposed as its primary position a willful penalty for Hughes's failure to file FBARs, and in the alternative, a non-willful penalty.

63.     Lauren authenticated Exhibit 44 as "Letter 3709," the letter he prepared to Hughes proposing the willful FBAR violation.  The letter included attachments summarizing the IRS's position, including Form 886.

64.     Lauren prepared the Form 886 attached to the letter.  Its purpose was to explain why the government was proposing a particular action.

65.     Lauren interviewed Hughes several times during the investigation by telephone, and once in person.  The last formal interview was in August of 2014.  There may have been later telephone calls where Lauren asked a question of Hughes or her representative.

66.     The information in Form 886 relies in part on statements that Hughes made to Lauren.

67.     Hughes told Lauren that her professional background included some type of degree in accounting, and that in the early to mid-1990s she got into bookkeeping and built up a bookkeeping business.  In the years at issue, Hughes's largest client was named Rosenberg or the Rosenberg Trust, which primarily accounted for Hughes's bookkeeping income.  Hughes told Lauren that the Trust had a large number of partnerships and brokerage accounts that needed reconciliation, which Hughes completed.  Hughes told Lauren that she also completed "court reporting" or "court accounting" for the Rosenberg Trust, which Lauren described as "some kind of bookkeeping needed for court proceedings."

68.     Lauren asked Hughes if she ever prepared tax returns for fees for 2011, 2012, and 2013.  Hughes told Lauren that she prepared approximately ten tax returns for fees in each of those years, primarily for friends, clients, and relatives.  That conversation took place in a 2014

9

interview, at which time Lauren had not yet opened an investigation into the 2010 FBAR.

69.    Hughes told Lauren that she had a CPA review each of those tax returns that she prepared for fees.  Lauren did not recall asking Hughes whether she had a CPA review her own tax returns.

70.    According to Lauren, Takamatua Valley Vineyards is a foreign corporation that Hughes set up in 2001 in New Zealand, which previously had other names.

71.    According to Lauren, Cuba Uncorked is a New Zealand limited company set up by Hughes, which is a bar or wine bar.

72.    Hughes had also reported owning a deli business during the years of the income tax investigation, and another business in San Francisco that had something to do with childcare and was reported on a partnership return.

73.    Lauren asked Hughes how she tracked profits and losses for her businesses, and she stated that for Takamatua and Cuba Uncorked, she used Peachtree software.  Hughes used some type of software to track her profits and losses for her bookkeeping business, but Lauren was not sure which software.

74.    Lauren reviewed profit and loss statements for Takamatua for the years available, and Hughes Bookkeeping for 2011 and 2012.

75.    The books for Hughes's businesses were kept separate for the years Lauren reviewed.

76.    Lauren does not recall asking Hughes how she prepared her tax returns, although he discussed with Hughes how she prepared her Schedule B and Schedule C for some of the years at issue.

77.    For 2010 through 2013, Hughes reported her bookkeeping business and Takamatua, Cuba Uncorked, and Jay's Deli on a Schedule C, and her childcare business on a Schedule E and Form 1065.

78.    Lauren explained that Schedule C is intended to report sole proprietorship deductions.  In Part I, the taxpayer reports gross profit and gross income; in Part II, the taxpayer reports expenses; and the taxpayer then subtracts expenses from gross income to determine net

profit or loss.

79.    Lauren determined that from 2010 to 2012, Hughes did not accurately report her gross income from Hughes Bookkeeping and Takamatua, because a significant amount of income that should have been reported for the bookkeeping business was instead reported for Takamatua.

80.    In Table B of the Form 886 that Lauren prepared for the FBAR investigation, the third column primarily indicates amounts that Hughes should have reported for her bookkeeping business but instead reported for Takamatua, as well as relatively small amounts of interest.

81.    Lauren does not recall specifically the amount of income that Takamatua had in the years at issue, but stated that it was not a significant amount as compared to the income improperly reported for it that in fact derived from Hughes's bookkeeping business.

82.    In 2010, for example, Hughes reported approximately $174,000 in gross receipts for Takamatua, of which Lauren determined that approximately $171,000 should have been attributed to the bookkeeping business.

83.    In 2011, Hughes reported $181,825 for Takamatua, the entire amount of which, according to Lauren, actually came from the bookkeeping business.  In 2012, Hughes reported $190,579 gross receipts for Takamatua, of which Lauren determined $185,119 actually came from either the bookkeeping business or interest—$1,419 was interest improperly reported on Schedule C, the rest was from Hughes's bookkeeping work.

84.    In 2013, Hughes reported $11,987 in gross receipt for Takamatua, of which Lauren determined that $6,827 was interest earned from foreign bank accounts in New Zealand improperly reported on Schedule C.  2013 was the only year of 2010 through 2013 in which Hughes did not improperly reported bookkeeping income as Takamatua income.

85.    Hughes told Lauren that she did not know why she reported bookkeeping income at Takamatua income.  She told him that she used "Lily's Bookkeeping Service" and it might have been a data entry error.  Hughes confirmed that she used the same profit and loss statements that Lauren had for her businesses to prepare her returns.

86.    Hughes told Lauren that she may not have thought it was a big deal because the results would "net out."

United States District Court
Northern District of California

87.     Lauren testified that the results of all Schedule C forms are added together on the Form 1040, so shifting income between entities would not affect the result with respect to Hughes's income tax liability, to the extent that it was properly reported on any Schedule C to begin with.

88.     The IRS determined that Takamatua was a foreign corporation, and thus could not report either income or expenses on Hughes's U.S. tax returns.

89.     In the alternative, the IRS would have concluded that Takamatua was an activity not engaged in for profit, and therefore was subject to limitations on how expenses can be claimed. Generally, a not-for-profit venture may only deduct expenses up to the amount of its gross receipts

90.     One factor the IRS considers in whether a business is engaged in for profit is its income.  The fact that Takamatua did not actually generate substantial gross receipts informed the IRS's conclusion that Hughes did not engage in it for profit, and that significant expenditures she reported for Takamatua therefore were not properly claimed as offsets to her income.

91.     At the time Lauren interviewed Hughes on August 15, 2014, the investigation encompassed the 2011 through 2013 tax years.  That was not the first time Lauren spoke to Hughes, but it was the first time he advised her that the IRS was conducting an FBAR examination.  He had spoken to her previously regarding income tax matters.

92.     In Part III of Hughes's 2012 Schedule B, Hughes indicated "yes" as to whether she had an interest in or signature authority over a foreign bank account, and as to whether she was required to file Form TD F 90-22.1 (i.e., an FBAR).  In the August 2014 interview, Lauren asked why Hughes did not file an FBAR that year.  Hughes said that she believed it would have been part of the return, and that checking the box indicated "yes" satisfied her obligation.

93.     In Part III of Hughes's 2013 Schedule B, Hughes indicated "yes" as to whether she had an interest in or signatory authority over a foreign bank account, but "no" as to whether she was required to file an FBAR.  In the August 2014 interview, Lauren asked Hughes why she stated that she was not required to file an FBAR.  Hughes responded that her account balances were under the relevant threshold at the time she filed the return.

94.     Lauren asked Hughes if she was aware of the FBAR filing requirement in 2011,

12

2012, and 2013, and Hughes responded "something about Schedule B to the effect that Schedule B kind of satisfies that." Hughes stated she had never heard of the FBAR form and did not know of the requirement.

95. Hughes filed her income tax returns for 2010, 2011, 2012, and 2013 on paper as opposed to electronically, most likely by mail.

96. Lauren was not entirely certain what the term "FBAR" stands for, but believed it stands for "foreign bank account reporting."

97. Lauren recalled meeting Hughes in person on July 7, 2014, and speaking to her by telephone before then in March and April. He did not inform Hughes in those earlier calls that she was required to file an FBAR.

98. When Lauren later informed Hughes of the FBAR filing requirement and provided the relevant forms to her, he did not tell her to include bank-originated journal entries.

99. Hughes was under examination at the time she filed her 2013 Form 1040 tax return. The 2013 FBAR was due June 30, 2014.

100. Lauren testified that he was prohibited as a matter of policy from discussing an FBAR with Hughes before obtaining permission from a superior at the IRS. He would have been permitted to discuss whether Hughes had a foreign account, what its balance was, and related questions, but would not have been permitted to ask about the FBAR form.

101. The FBAR examination for the 2011, 2012, and 2013 tax years was opened sometime after April of 2014 and before August 15, 2014. Lauren informed Hughes that it was open in August of 2014. He did not inform Hughes of the FBAR filing requirement before then.

102. Lauren could not say with certainty what the tax rate would be on Hughes's interest income, but thought it would be in the approximate range of twenty to thirty percent.

103. Lauren testified that, generally, a taxpayer would receive credits against their U.S. tax liability for foreign taxes paid, but that it is a complex matter he does not fully understand.

104. Lauren recalled using the word "inadvertent" with respect to Hughes's reporting income on her Schedule C forms, but declined to characterize that as a conclusion regarding her intent.

United States District Court
Northern District of California

105.   Lauren at one point had a discussion with Hughes's representative Katz in which Lauren stated that the IRS would not be pursuing a willful FBAR penalty because substantially all of Hughes's income was reported, albeit incorrectly.  At that time and into 2015, Lauren expected that the penalty would be for a non-willful violation.  At the time, Lauren was not aware of the concept of "willful blindness."

106.   Lauren ultimately changed his mind as to whether penalties for a willful violation were appropriate, based on the facts developed during the investigation and learning more about the concept of "willful blindness."

107.   Lauren is not aware of any tax violations by Hughes before the years at issue, or of facts indicating that the money at issue was from an illegal source or used for an illegal purpose.

108.   Hughes was generally cooperative during Lauren's investigation in the sense that she responded to his questions and inquiries and was pleasant to deal with.  Lauren observed, however, that when he asked for historical Takamatua records and income tax returns, Hughes testified that she no longer had them, but when the IRS issued a formal letter for delinquent filings, much of that information was included with Hughes's response.

109.   Lauren testified that Hughes told him about an earthquake that affected her business and her records in 2010.

110.   The IRS assessed income tax of more than $600,000 that Hughes initially failed to pay for the tax years 2010 through 2014, and

111.   The income tax assessment was the subject of a tax court case that, to the best of Lauren's knowledge, resulted in a settlement.

112.   The IRS also assessed penalties for failure to file Form 5471 and Form 926.  Form 5471 has a $10,000 penalty for failure to file.  Form 926 has a penalty of 10% of money sent to foreign corporations.  The IRS assessed penalties for failure to file Forms 5471 and 926 for years 2010, 2011, and 2013, which were reduced by fifty percent on appeal.

### 3.   Defendant Timberly Hughes

113.   Hughes has not taken many accounting classes and has not been certified as an accountant.

14

114.    In signing as a surety for TVV on bank documents, Hughes listed her occupation as an accountant.

115.    Following Mrs. Rosenberg's death in July of 2010, Hughes worked with the trustee of the Rosenberg trust in the years 2010, 2011, 2012, and 2013.  The trustee was an attorney.  Hughes also worked with accountants at Seiler in San Francisco for her work with the trust.

116.    Hughes had an accountant named Mike Gibbons who died in 2009.  Gibbons was not alive to help Hughes with her 2009 or 2010 taxes.  Hughes did not use any CPA in the United States for her personal taxes from 2009 through 2013.

117.    Hughes worked with an accountant named Alison Perry for her clients' tax returns.

118.    TVV is a foreign corporation, located in New Zealand.  The New Zealand address Hughes previously provided to the Court in this case as her own—59 Long Bay Road, Akaroa, New Zealand—is the same address where TVV is located.

119.    Hughes's Form 1040 Schedule C for 2010 listed an address for TVV as "59 Long Bay Road, Takamatua Valley, NE 94107."  Hughes testified that the "NE" and the use of her San Francisco zip code were erroneous.  Hughes's 2011 and 2012 Schedule C forms listed the same erroneous address for TVV.  Hughes's 2013 Schedule C used the same address for TVV except that "CA" replaced "NE."

120.    Hughes reported taxable interest of $128 on line 8A of her 2010 Form 1040.  An instruction included on line 8 instructs the taxpayer to "attach Schedule B if required."

121.    The "General Instructions" for Schedule B instruct the taxpayer to use Schedule B if any of several conditions apply.  Two of those conditions include if the taxpayer had over $1,500 of taxable interest or ordinary dividends, or if the taxpayer "had a financial interest in, or signature authority (or other authority that is comparable to signature authority) over, a financial account in a foreign country."  Ex. 16 at USA001056.

122.    Hughes did not review the instructions for Schedule B in preparing her 2010 tax return, and did not file Schedule B with that return.

123.    In 2011, Hughes reported $11 in taxable interest.  The instructions for Schedule B were substantially similar.  Hughes did not review those instructions in preparing her 2011 tax

United States District Court
Northern District of California

return, and did not attach Schedule B.

124.    In her 2012 return, Hughes reported $1,436 in taxable interest.  She attached a Schedule B to that return.  Part III of Schedule B, labeled "Foreign Accounts and Trusts," instructs the taxpayer to "see instructions on back."  Hughes did not look at those instructions.

125.    On her 2012 Schedule B, Hughes answered "yes" to the question of whether at any time in 2012 she had an interest in or signatory authority over a foreign account, and to whether she was required to file an FBAR.  The former question included an admonition to "see instructions."  The latter instructed the taxpayer to see Form TD F 90-22.1 (the FBAR form) and its instructions.

126.    Hughes did not read the FBAR form or its instruction.

127.    Hughes does not know why she filed a Schedule B in 2012 but not in 2010 or 2011.

128.    In her 2013 tax return, Hughes reported $107 in taxable interest.  Hughes attached a Schedule B to that year's tax return.

129.    The 2013 Schedule B included substantially similar instructions regarding foreign account reporting.  Hughes answered "yes" to having an interest in or signatory authority over a foreign account, but "no" to having to file an FBAR form.  Hughes testified that she was "unclear of [her] obligations."  She did not look at the instructions for the FBAR form.

130.    Hughes used "forms mode" in TurboTax to prepare her tax returns for 2010, 2011, 2012, and 2013.

131.    A TurboTax explanation of "forms mode" explained that it was not recommended, because a taxpayer could miss relevant information, but that it was available for "adventurous" users.  Although Hughes offered that explanation into evidence, she had not seen it at the time she prepared the relevant returns.

132.    Hughes used "forms mode" because she was copying earlier returns she had filed with the assistance of her now-deceased accountant Gibbons.

133.    For most of the years at issue, TVV did not produce very much wine—on the order of hundreds of bottles per year.  TVV was also used as a venue for weddings and other events.

134.    Hughes's mortgage payments for her personal residence were paid out of the TVV

business account.  Hughes testified that her mortgage loan was originated to that account.

135.    Hughes sought advice of counsel in 2001 when setting up the TVV business as a "loss attributing qualifying company" with the intent that losses from TVV could offset personal income for tax purposes under New Zealand law.

136.    None of Hughes's U.S. or New Zealand accountants or lawyers advised her that she needed to file an FBAR.

137.    Hughes testified that she filed the same tax return forms in 2010 through 2013 as she had when her accountant had been alive to prepare her taxes in previous years.  That statement was not entirely accurate, as Hughes acknowledges in other testimony that she filed Schedule B in 2012 and 2013 but not in previous years.

138.    Alison Perry, the CPA who reviewed Hughes's clients' tax returns, did not want to review Hughes's own tax returns because she did not want to deal with "any business aspects" beyond Form 1040 or 1040A.

139.    Hughes testified that she signed bank documents as an "accountant" because in New Zealand, the owner of a business who handles the financials is considered the accountant. She did not represent that she was certified as an accountant.

140.    Hughes testified that the discrepancies as to TVV's address was a typographical error.  She stated that the error carried over across multiple years' tax returns because TurboTax pulls data from a previous return.  This testimony does not explain why the address changed from "NE" to "CA"—neither of which is accurate—in 2013, or why she included her San Francisco ZIP Code.  Hughes's testimony about the reason for these inaccurate addresses is not credible.

141.    Hughes testified that she did not receive advice regarding her U.S. tax obligations from any accountant or lawyer in 2010 through 2013.

142.    Asked why she did not read the instructions for Schedule B and the FBAR forms, Hughes said "there was a lot going on" at the time and she was in a rush.

143.    Hughes's routine for completing her tax returns was to pull together information in January, fill in what she could, and then turn back to it later.

144.    Hughes testified that she assumed that by checking the boxes, she had completed

her legal obligations.

145. In 2010 and 2011, she completed her taxes the same way as in prior years.

146. Hughes testified that in 2012, an account matured so Hughes felt she should declare her interest income differently.

147. Asked by the Court why she changed her answer between 2012 and 2013 as to whether she was required to file an FBAR, Hughes testified that she was under audit, had no guidance, and was confused. She testified that another difference in 2013 was that she did not understand that secured or collateral accounts had to be declared, because she did believe she had control over those. She had more money in her accounts in 2012 that she believed she had control over.

148. Asked by the Court what she understood the FBAR language in 2012 to mean, Hughes testified that she thought an exception applied because her New Zealand interest income already had New Zealand taxes withheld.

149. Hughes testified that the form indicated that some exceptions apply. She did not read the instructions explaining what those exceptions were. She testified that if she "had read the instructions, and taken the time to understand, [she] would have filed the FBARs."

150. Hughes relied on the competence of her New Zealand accountants. She testified that New Zealand accountants "had already determined that an exception applied" to her, but acknowledged that they did not give advice as to her U.S. tax obligations.

151. Hughes testified that she has no previous history of tax violations, FBAR violations, or Bank Secrecy Act violations, and that she cooperated with the IRS investigation.

152. Hughes's husband works full time for TVV, and Hughes and her husband have sought to make TVV profitable. TVV was closed for almost a decade due to earthquake damage, from 2010 to 2019.

153. TVV hosted a private party for a hospital function in 2014, and participated in a "global party" to raise money for charity. That event required a special permit and the use of tents because the facilities were still damaged.

United States District Court
Northern District of California

18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**C.   Inferences and Factual Conclusions**

154.   There is no evidence that Hughes reviewed Schedule B at any time before she filed her 2010 and 2011 tax returns, and thus no evidence that she saw its questions about foreign bank accounts and FBAR obligations at that time.

155.   There is no other evidence that Hughes was aware of the FBAR filing requirement when she filed her 2010 and 2011 tax returns.

156.   There is no evidence that TurboTax ever prompted Hughes to complete and file an FBAR.

157.   In preparing her 2012 tax return, Hughes reviewed and completed Schedule B, including its questions regarding foreign bank accounts and the FBAR filing requirement.

158.   In light of the fact that Hughes checked the box indicating that she was required to file an FBAR that year, her testimony that she thought she was *not* required to file an FBAR that year because her interest income had already been subject to New Zealand taxes is not credible.

159.   In preparing her 2013 tax return, Hughes again reviewed and completed Schedule B, including its questions regarding foreign bank accounts and the FBAR filing requirement.

160.   Hughes has provided no credible explanation for why she believed she was not required to file an FBAR with her 2013 return after checking the box indicating she was required to file an FBAR with her 2012 return.  Her testimony that she believed her assets did not exceed the $10,000 threshold is inconsistent with her testimony that she did not read the instructions that addressed the threshold, and also inconsistent with her actual assets, including multiple unsecured accounts that exceeded that threshold.  *See* Ex. 35.

161.   In preparing her 2012 and 2013 returns, Hughes saw the admonitions on Schedule B to read the instructions regarding FBAR requirements, but did not do so.

162.   In light of the fact that Hughes printed and filed paper tax returns, it is not credible that she believed TurboTax automatically included the FBAR form in 2012.  Hughes had a paper copy of the full return and could readily determine that it did not include the FBAR.

**III.   CONCLUSIONS OF LAW**

163.   Under 31 U.S.C. § 5314(a), a provision of the Bank Secrecy Act, the Secretary of

1    the Treasury must require the filing of reports of foreign financial accounts.  The Secretary has

2    implemented that statute by requiring individuals to file FBARs under certain circumstances.  *See*

3    *United States v. Boyd*, 991 F.3d 1077, 1081–82 (9th Cir. 2021).

4            164.    The penalty for a violation of that requirement varies depending on whether the

5    violation was willful or non-willful.  The penalty for a non-willful violation cannot exceed

6    $10,000.  31 U.S.C. § 5321(a)(5)(B)(i).  The penalty for a "willful" violation cannot exceed the

7    greater of $100,000 or half of the balance of the account at the time of the violation.  *Id.*

8    § 5321(a)(5)(C)(i).

9            165.    To assess penalties for a "willful" violation of the requirement to file an FBAR, the

10   United States must show that: "(1) [the defendant] was a 'U.S. Person,' who (2) had an interest in

11   or authority over the subject foreign accounts, which (3) had an aggregate value of $10,000.00 or

12   more, and (4) that [s]he willfully failed to file an FBAR Form for the accounts."  *United States v.*

13   *Pomerantz*, No. C16-689 MJP, 2017 WL 4418572, at *2 (W.D. Wash. Oct. 5, 2017) (citing 31

14   U.S.C. § 5321(a)(5); 31 C.F.R. § 1010.350).  Only the final element is disputed in this case.  *See*

15   Def.'s Post-Trial Br. (dkt. 158) at 16 ("The Defendant does not dispute that she was in fact

16   required to file FBARs for the 2010 to 2013 years.").

17           166.    In a civil action, the United States' burden of proof to show a willful violation is

18   the preponderance of the evidence.  *See United States v. Garrity*, 304 F. Supp. 3d 267, 270 (D.

19   Conn. 2018) ("[E]very court that has answered the question . . . has held that the preponderance of

20   the evidence standard governs suits by the government to recover civil FBAR penalties.").  That

21   standard requires the United States to "provide evidence establishing that it is 'more likely than

22   not'" that the elements are satisfied.  *See Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398, 404

23   (9th Cir. 1996) (addressing the "preponderance of the evidence" standard in the separate context

24   of showing the amount in controversy for removal).

25           167.    Most courts to consider the issue have held that, for the purpose of *civil* FBAR

26   penalties, either recklessness or willful blindness can suffice to show a willful violation.  *E.g.*,

27   *United States v. Horowitz*, 978 F.3d 80, 88 (4th Cir. 2020); *Bedrosian v. U.S. Dep't of the*

28   *Treasury, Internal Revenue Serv.*, 912 F.3d 144, 153 (3d Cir. 2018); *United States v. Williams*,

489 F. App'x 655, 658 (4th Cir. 2012); *United States v. Flume* ("*Flume II*"), 390 F. Supp. 3d 847, 854 (S.D. Tex. 2019); *United States v. Goldsmith*, __ F. Supp. 3d __, No. 3:20-cv-00087-BEN-KSC, 2021 WL 2138520, at *15 (S.D. Cal. May 25, 2021), *appeal docketed*, No. 21-55793 (9th Cir.); *United States v. Bohanec*, 263 F. Supp. 3d 881, 889 (C.D. Cal. 2016).

168.    The cases finding recklessness to be sufficient trace that holding to the Supreme Court's decision in *Safeco Insurance Company of America v. Burr*, 55 U.S. 47 (2007), a case considering the Fair Credit Reporting Act, which held that "where willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well."  551 U.S. at 58.  Recklessness, as used in *Safeco*, turns on "an objective standard: action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'"  *Id.* at 68 (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)).  A plaintiff must show that a defendant's action was "not only a violation under a reasonable reading of the statute's terms," but instead that the defendant "ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless."  *Id.* at 69.

169.    A handful of cases have held or implied that the higher standard of a defendant's "'knowledge that his conduct was unlawful,' meaning he intentionally violated 'a known legal duty,'" applies equally in criminal and civil cases addressing failure to file FBARs.  *Pomerantz*, 2017 WL 4418572, at *3 (applying this higher standard on a motion to dismiss and holding that it was satisfied, while citing cases that applied the lower recklessness standard, without addressing the discrepancy); *United States v. Zwerner*, No. 13-22082-CIV, 2014 WL 11878430, at *3 & n.3 (S.D. Fla. Apr. 29, 2014) (declining to resolve which standard applies, but noting that the civil and criminal statutes addressing FBARs use the same word, and that a "'term appearing in several places in a statutory text is generally read the same way each time it appears'" (quoting *Ratzlaf v. United States*, 510 U.S. 135, 143 (1994))).

170.    As far as this Court is aware, the Ninth Circuit has not addressed the issue of whether recklessness is sufficient to show a "willful" failure to file an FBAR.  *See Goldsmith*, 2021 WL 2138520, at *20 ("The Ninth Circuit, although recently issuing an opinion on non-

1    willful Section 5314 violations, *see Boyd*, 991 F.3d at 1078, has not yet addressed the standard for

2    civil penalties for willful violations.").

3         171.    Hughes does not dispute that applicable standard encompasses recklessness.  *See*

4    Def.'s Pretrial Br. (dkt. 130) at 2 ("As several courts have held, a defendant willfully violates the

5    FBAR requirement when she 'either knowingly or recklessly fails to file an FBAR.'" (citation

6    omitted)); Def.'s Post-Trial Br. at 16.

7         172.    Particularly in the absence of argument to the contrary, this Court finds the cases

8    applying a recklessness standard to be better reasoned and consistent with the Supreme Court's

9    guidance in *Safeco*.

10        173.    There is evidence that could perhaps support an inference that Hughes

11   misrepresented the country in which TVV was located or the revenue it received in order to reduce

12   her tax liability, and portions of the United States' briefing are devoted to those issues.  Assuming

13   for the sake of argument that is so, it does not tip the scales as to the separate issue of whether

14   Hughes's failure to file FBARs in any particular year was intentional or reckless, as opposed to

15   merely negligent.  Even if Hughes fraudulently misrepresented other aspects of her tax returns,

16   that does not preclude the possibility that her omission of the particular forms at issue in this case

17   was a result of negligence rather than recklessness or willful disregard.

18        174.    Hughes's post-trial brief includes arguments as to whether TVV should be treated

19   as a pass-through entity, but that issue is not relevant to the question here—whether Hughes's

20   failure to file FBARs was willful.

21        175.    The IRS's failure to specifically apprise Hughes of the requirement to file an FBAR

22   before the deadline for her to do so similarly has no bearing on whether her failure was willful.

23        176.    Hughes's testimony that she believed an exception applied simply because she had

24   paid New Zealand taxes on her interest income, without taking any steps to determine whether that

25   was actually one of the exceptions to the FBAR requirement, Trial Tr. Vol. II at 158:10–159:17,

26   despite Schedule B instructing her to "[s]ee Form TD F 90-22.1 and its instructions for filing

27   requirements and exceptions," Ex. 14 at HUGHES_PROD-000066, evinces an "unjustifiably high

28   risk of harm that is . . . so obvious that it should be known,'" *Safeco*, 551 U.S. at 68.  Her

United States District Court
Northern District of California

testimony that she believed an exception applied is also inconsistent with her having checked the box on her 2012 return indicating that she was required to file an FBAR.  *See* Ex. 14 at HUGHES_PROD-000066.

177.    Hughes also suggested that she believed checking the box indicating that she was required to file an FBAR with her 2012 satisfied her obligations, and perhaps that TurboTax would take the necessary steps to include the form.  This position is inconsistent with the manner in which Hughes prepared and filed her returns: using the unassisted "forms mode" of TurboTax, and printing her returns to file as hard copies.  Using that method, Hughes would have been aware that she never completed an FBAR form, and that the paper return she filed did not include such a form.  To the extent her testimony suggests otherwise, it is not credible.[3]

178.    Hughes acknowledged that if she had taken the minimal step of reading the instructions—as Schedule B instructed her to do—she "would have filed the FBARs."  Trial Tr. Vol. II at 159:19–21.  There is no basis to conclude that the need to file FBARs was anything less than obvious for any reason other than her failure to read the instructions.

179.    Hughes relies in part on the Southern District of Texas's decision in *United States v. Flume* ("*Flume I*"), No. 5:16-CV-73, 2018 WL 4378161 (S.D. Tex. Aug. 22, 2018).  That decision was a denial of the United States' motion for summary judgment; it was enough that the defendant's "self-serving testimony" that he was unaware of his obligations created a disputed issue of material fact.  *See id.* at *2.  After a bench trial, where—as here—the court was required to determine the facts as they actually occurred, the court concluded that the defendant at least recklessly failed to file FBARs, thus satisfying the willfulness standard for civil penalties.  *Flume II*, 390 F. Supp. 3d at 857.

---

[3] In *United States v. Clemons*, No. 8:18-CV-258-T-36SPF, 2019 WL 7482218, at *8 (M.D. Fla. Oct. 9, 2019), the Middle District of Florida denied summary judgment for the United States on the issue of willfulness where a taxpayer claimed to have inadvertently failed to file an FBAR because TurboTax did not prompt him to do so.  It is not clear from that decision whether the defendant used TurboTax's "interview mode," where he might reasonably have expected the software to complete the necessary forms, or (like Hughes here) "forms mode," where such an expectation would be inconsistent with the basic operation of the software.  There is no indication that, like Ms. Hughes, he filed a paper tax return where the omission of a necessary form should have been obvious.

United States District Court
Northern District of California

180.     Setting aside its distinct procedural posture, the facts of *Flume I* are distinguishable with respect to Hughes's tax returns in 2012 and 2013.  In *Flume I*, the court relied on "evidence that Flume never saw the Schedule B instruction about filing an FBAR form."  2018 WL 4378161, at *6. Here, Hughes plainly saw at least the basic instructions on the face of Schedule B, because in her 2012 return she checked the box accompanying those instructions indicating that she was required to file an FBAR.  She also saw those instructions in her 2013 return, where she answered that question differently (and inaccurately).

181.     In the alternative, the *Flume I* court held that even if the defendant saw those instructions, there was evidence "he assumed he was not required to file the form because his tax-return preparer did not prepare one for him," *id.*, and that he "might understandably have reasoned that he did not have to file an FBAR because his preparer had determined that one of [the] exceptions applied," *id.* at *9.  Here, in contrast, Hughes did not engage a U.S. tax preparer for any of the years at issue.  Her assertion that she believed her New Zealand accountants identified an exception, Trial Tr. Vol. II at 161:13–17, is not credible in light of her separate testimony that she did not obtain U.S. tax advice from her New Zealand accountants, or from any other accountant or lawyer for the years at issue, *id.* at 152:11–22.

182.     The Court concludes that Hughes's failure to file FBARs with her 2012 and 2013 tax returns was at least reckless, and thus constituted "willful" violations of the filing requirement for those years.

183.     Some courts have held that a taxpayer's signature on a tax return, "thereby declaring under penalty of perjury that [the taxpayer] had 'examined this return and accompanying schedules and statements,'" establishes constructive notice as to the instructions on Schedule B regarding the FBAR requirement.  *E.g.*, *Williams*, 489 F. App'x at 659; *United States v. McBride*, 908 F. Supp. 2d 1186, 1206 (D. Utah 2012).  Other decisions have rejected that view as undermining the statutory distinction between willful and non-willful violations.  *Flume I*, 2018 WL 4378161, at *7; *United States v. Schwarzbaum*, __ F. Supp. 3d __, No. 18-CV-81147, 2020 WL 1316232, at *8 (S.D. Fla. Mar. 20, 2020).  More recent decisions have disagreed with *Flume I* and *Schwarzbaum*.  *E.g.*, *Goldsmith*, 2021 WL 2138520, at *25–26; *United States v. Gentges*, __

United States District Court
Northern District of California

24

1   F. Supp. 3d __, No. 18-CV-7910 (KMK), 2021 WL 1222764, at *11–12 (S.D.N.Y. Mar. 31,

2   2021); *Jones v. United States*, No. SACV 19-00173 JVS (RAO), 2020 WL 4390390, at *6 (C.D.

3   Cal. May 11, 2020).

4          184.    This Court need not resolve the significance of Hughes's signature on her returns.

5   With respect to her 2012 and 2013 returns, there is no doubt that Hughes saw the questions about

6   filing an FBAR, because she answered them (and in 2012, stated that she was required to file one).

7   In 2010 and 2011, Hughes's returns did not include Schedule B, so the certification that she

8   "examined this return and accompanying schedules and statements" does not encompass that

9   schedule and its admonitions about the FBAR.  The United States has identified nothing in

10  Hughes's 2010 or 2011 returns *as actually filed* that, if "examined" as she certified, would have

11  put her on notice of the FBAR requirement.

12         185.    The circumstances of Hughes's 2010 and 2011 tax returns differ from 2012 and

13  2013.  Unlike those later years, there is no indication that Hughes reviewed Schedule B, with its

14  instructions regarding the FBAR requirement, in preparing her 2010 and 2011 returns or any time

15  before she did so.  In the absence of any evidence that Hughes was aware of the FBAR filing

16  requirement when she completed her returns for those years, or that she was presented with any

17  information that should have put her on notice of that requirement, the United States has not met

18  its burden to show that her failure to file FBARs in those years was anything more than negligent.

19  The United States therefore cannot assess penalties for "willful" violations for those years.

## IV.    CONCLUSION

21         186.    For the reasons discussed above, the Court concludes that Hughes's failure to file

22  FBARs for 2012 and 2013 was "willful" within the meaning of 31 U.S.C. § 5321(a)(5)(C)(i).

23         187.    For the reasons discussed above, the United States has not met its burden to show

24  that Hughes's failure to file FBARs for 2010 and 2011 was willful.

25         188.    The parties shall meet and confer regarding a briefing schedule for the separate

26  issue of assessing penalties for Hughes's violations.  If the parties can agree to schedule, they shall

27  / / /

28  / / /

United States District Court
Northern District of California

1    file a stipulation no later than October 27, 2021.  If they cannot agree to a schedule, they shall file

2    separate proposed schedules, without argument, by the same date.

3        **IT IS SO ORDERED.**

4    Dated: October 13, 2021

5    _____

6    JOSEPH C. SPERO
     Chief Magistrate Judge

United States District Court
Northern District of California