TIMBERLY E. HUGHES,
Plaintiffs *in Propria Persona*
59 Long Bay Road
Akaroa, New Zealand

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA

     PLAINTIFF

v.                                  CASE NO.  <u>3:18-cv-5931-JCS</u>

TIMBERLY E. HUGHES

     DEFENDANT
_____/

## DEFENDANT'S RESPONSE AND REPLY BRIEF FOR PENALTY ASSESMENT

## INTRODUCTION AND SUMMARY

     This is a civil action regarding collection from Ms. Hughes for civil penalty assessments of FBAR penalties for the failure to timely report her financial interest in foreign bank accounts for the period 2010, 2011, 2012 and 2013.

     The Court's ruling that the years 2010 and 2011 were not willful and that the years 2012 and 2013 were deemed as "reckless" and therefore willful now brings into focus the erroneous calculations of penalties by the IRS for all years involved.

     The penalties for 2010 are not timely and passed the statute of limitations on June 30, 2018. The complaint was filed on September 27, 2018. Therefore, the year of 2010 should be excluded.

     The Defendant protests all penalties asserted by the IRS for the years 2010 to 2013 under 31 U.S.C. Section 5321(a)(5) with respect to the purported willful failure to furnish timely FBARs which total $440,509 ($167,316 for 2012 and $273,193 for 2013).  The Defendant further protests the IRS's alternative position that non-willful FBAR penalties are applicable which total $230,000 ($40,000 for 2010, $60,000 for 2011, $60,000 for 2012 and $70,000 for 2013).

The Defendant wishes to point out that the penalties for FBAR's were set in place to stop terrorism, money laundering and tax evasion. All of the funds in question, aside from the bank originated entries and the $46,000 NZ insurance advance for repairs for the damage to her home and building suffered in the 2010 Christchurch earthquake, that are being assessed penalties are from "after" tax income that was transferred from the US to cover legal operating business and living expenses in New Zealand and have been proved to not be from any illegal activity.  Not only is the IRS assessing penalties on non-taxable loan advances (only to maximize penalties on the Defendant) which are clearly non-taxable funds based on the IRS guidelines, "a loan that is not forgiven is not considered taxable", these amounts should be backed out of the calculations as Defendant had no direct access to any of these funds at any time and were simply "bank originated entries" to show the advance and pay down of the ANZ Bank loans. The Court should also take into account that three of the accounts were held as collateral by the bank and Defendant had no access to these funds, including the insurance advance for the damages that the Defendant sustained in the 2010 Christchurch earthquake which destroyed the Defendant's home and business.

Please see attached EXHIBIT A, showing the high account balances in each account, and a letter from ANZ Bank confirming that accounts ending in #1000 and #1004 were collateral, and were liened by the bank.  Also noting that account ending in #1006 was the insurance settlement from the EQC Commission for repairs to the home and building sustained in the earthquake, and the 2013 TVV checking account showing the loan originated entry and the bank error in the duplication of the loan, these are the amounts the DOJ continually refers to in relation to the $1.35M balance, which clearly shows the amount was doubled and backed out on the same day. The IRS is disingenuous, and the auditor, Jonathan Lauren, and the DOJ are operating under intellectual dishonesty to get the most penalties out of the Defendant, by knowingly calculating an erroneous duplicated bank originated entry to get a 100% penalty on a loan, which is not taxable.

The DOJ falsely claims that the Defendant was a sophisticated accountant that handled several billionaire's accounting and financial matters. That is simply not true. The Defendant did not handle any financial matters, she was a bookkeeper, not an accountant, her degree is in International Business with a minor in Political Science.  She worked as a personal assistant and bookkeeper for a private family with a high net worth, however there was never any financial advice given by her, she simply paid their bills, gathered their mail and documents and when their accountants and lawyers requested copies of specific documents, she sent them the documents that were requested.

During the years in question, the Defendant prepared her own returns, as her US tax advisor had passed away. She simply followed the prior year's filings using Turbo Tax. In preparing the taxes for filing, when you go to print the return, you get an instruction page on what you want to print, and there is a box to check that signifies that everything needed to be filed will be printed. See Exhibit B attached. The DOJ argues that the Defendant was reckless when reviewing her return before sending it in that the FBAR filings were not included, when clearly from the instructions, she thought all required pages were attached to her filings. The DOJ again is being intellectually dishonest claiming that there was fraud and therefore the penalties were calculated accordingly. The tax court dismissed all accusations of fraud and reversed all fraud penalties. This is simply another tact to prejudice the Defendant in this Court.

It was strange that the Defendant had been under audit for over 8 months, prior to the 2013 FBAR filing due date of June 30, 2014, and neither auditor ever indicated there were any issues in the prior filings.  In fact, the first auditor indicated no changes at all, then once she left on maternity leave, it was sent to Jonathan Lauren, and at that point in time Defendant had not been informed that there were any changes to her taxes, no errors or filing status changes.  So how could she have known there were any issues in her prior filings, and she simply followed the prior 13 years when filing her 2013 tax returns on April 15, 2014.  Why would she not have filed the FBARS when the IRS's own employees did not inform her of any changes, or any additional forms?

In fact, neither auditor ever mentioned anything about the FBAR filing requirements, and a mere 6 weeks after the filing deadline, the IRS Auditor, Jonathan Lauren, assessed the largest penalty for the 2013 FBAR which also includes a duplicate bank error which is

clearly stated on the bank statement. The government claims that the defendant was hiding millions of dollars, yet admits it never recovered the money, so is the government lying or just incompetent?  Is the so-called "law" actually about preventing money laundering or is it just about taking people's money for not filling out forms correctly?  The DOJ is claiming that loans (which are not taxable) equate to harm to the US. What harm has the US suffered from non-taxable loan advances? The liability still exists. The DOJ then claims that the insurance funds that were advanced to pay for the damage the Defendant suffered from the 2010 Christchurch earthquake are taxable as well. Clearly this confirms the intellectual dishonesty by both the IRS and the DOJ claiming these funds should be included in the penalty calculations even though the Defendant did not have access to any of these funds.  The FBAR regulations are to stop money laundering and to catch people who are operating illegal activities. How can the DOJ justify including non-taxable funds in the calculations of the penalties?  All the other funds were transferred from her US accounts after taxes were paid to fund the legal operations and cover the costs to repair her home from the earthquake damages. By the time the Defendant was under audit by the IRS all of these funds had been spent to cover the repairs, if there were millions of dollars hidden, where are they, did the IRS find any funds? No, there were no funds to find, so they simply made them up conveniently using the bank originated entries to justify these types of penalties, even including bank errors.  One has to ask why they are intent on applying penalties on these non-taxable funds and bank originated entries.  Is it to create a new precedence to tax loans and to punish the entrepreneurial spirit?  The whole regulatory framework is just a scam to steal money from hard-working Americans.  They are hiding behind the FBAR rules of finding people who are evading taxes, yet there was nothing here that was taxable or hidden.

It's peculiar that the Defendant is being penalized for actually complying with the law. The Defendant confirmed that there were international accounts in existence, however the miss-understanding of the additional forms and additional filing that were required beyond filing the regular Schedule B forms required by the IRS which are attached to the 1040, and that an extra step to file the FinCEN directly to them on a different due date and different return altogether is what is required to comply. It should be noted that Turbo Tax prompts the filer to print out "all required forms to file", so how can the court argue that the Defendant

was reckless when she printed out the return, as instructed by Turbo Tax and mailed in the return. See Exhibit B

There is no legal standard by which the Court could use the fact that the Defendant failed to read the instructions on Schedule B as "reckless", where is this statute? It's human nature to not read instructions when the person already believes they are doing things correctly, again 8 months into the audit and there was no indication that anything was not correct from the prior years.   Because the Defendant failed to read the instructions on the Schedule B for the years 2012 and 2013, the Court deems this as "reckless". However, this case is different than US vs. McBride, in that Ms. Hughes declared that she did have foreign accounts.   One could confer from the Court's ruling that what is the point to try to comply when not filing the Schedule B forms for 2010, and 2011 were considered non-willful, yet to find the years the Defendant tried to comply, although incorrectly, were found to be "reckless".  One must recognize that Congress set forth these guidelines to "catch" people laundering money for terrorism and tax evasion, not a person simply transferring funds to cover legitimate business activities with "after tax" funds. How did the Defendant harm the US with regular business operations, by not filing a form to declare funds that were already taxed that were moved to a NZ account to sustain the Defendant's legitimate business?

The Defendant is being penalized for disclosing documents using the government forms.  These penalties are not in the spirit of the law, none of these funds were from money laundering, tax evasion or illegal activities.

The Defendant, Timberly Hughes, is a United States citizen, who grew up in a law enforcement family in Nevada.  Her father was a Sheriff that taught her to always follow the law and to seek legal advice when in doubt.  She hired expert lawyers and accountants in both the US and New Zealand to guide her in the required compliance and structure of her company in New Zealand, and she followed all of their recommendations to legally set up the companies in compliance with all regulations.  Is it not curious that the IRS auditor did not even ask anyone in the IRD (the New Zealand Inland Revenue Department, the equivalent to the IRS in the US) about the structures of her business, and he felt that he could simply change the structure of her business in order to get the most penalties?  One has to ask why on earth would anyone setting up a business consult with attorneys and accountants if the IRS can simply change a structure of a business in order to take assets

from hard working Americans.  What is the point of trying to legally set everything up properly yet can just be changed by a simple auditor?

The Defendant is a dual US/New Zealand resident and is considered a tax resident of New Zealand.  She resided primarily in New Zealand until recently due to issues from the Pandemic, she has remained in Italy.  Ms. Hughes is unable to return to New Zealand because the New Zealand government will not allow anyone back in unless they can quarantine at one of their MIQ's facility which has over 30,000 people waiting to enter.  Ms. Hughes is not allowed to return to her home or business, yet has to continue to pay the mortgage, taxes and insurance.  Ms. Hughes' husband normally operates the New Zealand company full time and Ms. Hughes consults on the wine making, however due to the pandemic he is also unable to return to their home and business as well.

The Defendant did not file FBARs for the 2010 to 2013 years until she was advised of the filing requirement during the IRS examination at which time she promptly filed the forms.  As indicated in her interviews with the auditor, the Defendant was not familiar with the FBAR form at the time she filed her 2010 to 2013 tax returns and did not understand the requirement to file the forms.  The Defendant was not informed by either her US tax advisor or her New Zealand tax advisors that an FBAR filing was due.

## **ARGUMENT**

A.   **2010 – 2011 Non-Willful Penalties should not apply as the taxpayer had reasonable cause for the failure to file the FBAR's.**

31 U.S.C. Section 5321(a)(5)(B) provides that no FBAR penalty shall apply if the failure to file the FBAR at issue was due to reasonable cause and the amount of the transaction or the balance in the account at the time of the transaction was properly reported.

As discussed above, the taxpayer was not aware of the FBAR filing requirement until she was advised of it by the auditor.  She had an accountant review her returns annually and was never advised that FBARs were required.  Once she was made aware of the reporting requirement, the taxpayer promptly filed the required FBARs.  In sum, the taxpayer had reasonable cause for failing to file the FBARs and in light of her prompt filing upon being made aware of the filing requirement, no penalties should apply.

In the US. Vs. Bittner case, the District Court correctly held that the maximum penalty for non-willfully filing an FBAR late form is $10,000 per form, not per bank account.    The Court's opinion expressly disagrees with another decision out of the Central District of California, U.S. v. Boyd, CV 18-803-MWF, 019 WL 1976472, which held that the non-willful FBAR penalty should be imposed on a per account basis.  The Court's Opinion also discusses the rule of lenity and its potential application to non-willful FBAR penalty cases.

B.  <u>Statutory and Regulatory Framework</u>

Under 31 U.S.C. § 5321(a)(5)(A), "[t]he Secretary of the Treasury may impose a civil money penalty on any person who violates, or causes any violation of, any provision of section 5314."  Under the next subsection, "the amount of any civil penalty imposed under subparagraph (A) shall not exceed $10,000."  31 U.S.C. § 5321(a)(5)(B)(i).  Thus, read together, the Court surmised that the statute provides for a singular civil monetary penalty, capped at $10,000, that attaches to each violation of section 5314.  According to the Court, the "violation" referenced in section 5321(a)(5)(A) was the failure to file an annual FBAR under the governing regulations.

However, to determine whether the violation resulted in a single violation for failure to report, or whether each foreign financial account not properly or timely reported on an FBAR constituted a separate reporting violation, the Court looked to the willfulness and reasonable cause exceptions in section 5321.

Under section 5321, the willfulness provision provides a penalty for willful FBAR violations in an amount equal to the greater of $100,000 or 50% of either "the amount of the transaction" or "the balance in the account at the time of the violation."  31 U.S.C. § 5321(a)(5)(D)(i)-(ii).  The Court determined that based on the willfulness penalty provision, "Congress clearly knew how to make FBAR penalties account specific."  Moreover, the Court noted that the willfulness provision was part of the statutory scheme well before Congress amended the Bank Secrecy Act in 2004 to add the non-willfulness provision.  Given these facts, the Court found it persuasive evidence that Congress intended for the non-willful penalties to not relate to specific accounts.

The Court also felt its reasoning was buttressed by the reasonable cause exception under 31 U.S.C. § 5321(a)(5)(B)(ii).  Under that exception, an individual who commits a non-willful FBAR violation is not assessed a civil penalty if that violation was due to reasonable cause and "the amount of the transaction or the balance in the account at the time of the transaction was properly reported."  Given the statutory language, the Court noted:

Congress therefore related the reasonable cause exception to 'balance in the account' and could have done the same when defining the non-willful FBAR violation and penalty. But it did not.  Tellingly, Congress passed the non-willful civil penalty provision – § 5321(a)(5)(B)(i) – and the reasonable cause exception together.  They are part of the exact same statutory scheme, passed by the exact same Congress at the exact same time.  Congress knew what it was doing when it drafted the non-willful civil penalty without any reference to 'account' or 'balance in the account,' and the Court will presume that Congress acted intentionally in doing so.

The Court also concluded that the taxpayer's interpretation of the non-willful FBAR penalty to impose penalties on the basis of the reporting obligation alone made "sense in light of the overall statutory and regulatory scheme."  First, the BSA is a reporting statute that aims to "avoid burdening unreasonably a person making a transaction with a foreign financial agency."  31 C.F.R. § 5314(a).  Thus, individuals who are required to file an FBAR file only one report per year.  This is the case regardless of whether the individual maintains 5, 25, or 500 accounts—instead, the triggering of the filing requirement itself is whether the aggregate balances of the accounts exceed $10,000.  Thus, it would make little sense that Congress intended the non-willful FBAR penalty to be imposed on a per account basis when such a determination has no bearing on the individual's obligation to file an FBAR in the first place.

Moreover, the Court noted that accepting the government's interpretation of the statute could lead to absurd results that Congress would not have intended.  For example, assume two individuals had 20 foreign accounts.  The first individual maintained an aggregate foreign financial account balance of $180,000 and willfully failed to file an FBAR.  The second individual maintained an aggregate foreign financial account balance of $100,000 and non-willfully failed to file an FBAR.  Under the government's interpretation of the statute, the first

individual would be subject to a $100,000 penalty, and the second individual would be sub-ject to a $200,000 penalty.  This is despite the fact that Congress would have likely intended to punish or deter the conduct of the first individual for willful conduct as opposed to the con-duct of the second individual who was only non-willful.

C.   The Rule of Lenity.

The taxpayer also argued that the rule of lenity supported the position that the non-willful FBAR penalty should be imposed on a per reporting obligation.  The Court summarized the rule of lenity as follows:

> The rule of lenity is a principle of statutory construction that 'applies primarily to the interpretation of criminal statutes.'  Kasten v. Saint-Gobain Performance Plastics Corp., 563 U.S. 1, 16 (2011).  It dictates that courts resolve ambiguities in criminal statutes in favor of defendants.  See Crandon v. United States, 494 U.S. 152, 168 (1990).  Although the paradigmatic application of the rule of lenity occurs in the con-text of criminal statutes, it can 'apply when a statute with criminal sanctions is applied in a noncriminal context.'  Id. (citing Leocal v. Ashcroft, 543 U.S. 1, 11 n.8 (2004)).  The rationale behind the rule of lenity is that 'fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed.' Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or., 515 U.S. 687, 704 n.18 (1995) (citations omitted).  In other words, courts are to interpret statutes with civil and criminal applications consistently so that defendants have fair notice of what conduct the statute prohibits.

> Given the current law, the Court noted at the outset that it was "dubious as to whether the non-willful civil penalty in the BSA is even the kind of statutory provision to which the rule of lenity applies."  Although the BSA provides criminal penalties, see 31 U.S.C. § 5322, those criminal penalties apply only to violators who acted willfully (and not, as here, where the conduct is non-willful).  Moreover, the Court found that under the rule of lenity, it would be required to "simply guess as to what Congress [had] intended," but that in

this case, the Court had concluded that the text, structure, and purpose of the statute unambiguously pointed to the conclusion that the non-willful civil penalty applies per FBAR reporting violation rather than per account.  In any event, the Court found that "to the extent the rule of lenity is applicable in this context, it supports Mr. Bittner's proposed interpretation of the non-willful civil penalty."

In addition, the Court noted its general awareness of cases that "stand for the general proposition that tax statutes imposing penalties are to be strictly construed."  See Commissioner v. Acker, 361 U.S. 87, 91 ("The law is settled that penal statutes are to be construed strictly, and that one is not subjected to a penalty unless the words of the statute plainly impose it.") (quotations omitted); Bradley v. United States, 817 F.2d 1400, 1402-03 (9th Cir. 1987) ("A tax provision which imposes a penalty is to be construed strictly; a penalty cannot be assessed unless the words of the provision plainly impose it.").  The Court also concluded that this principle should not be dispositive because the statute was unambiguous but stated this notion, to the extent applicable, supported Mr. Bittner's interpretation of the statute.

Ms. Hughes has met all four criteria for penalty mitigation. These consist of the following: (i) The taxpayer had no history of criminal tax or Bank Secrecy Act convictions for the preceding 10 years and no history of FBAR penalty assessments; (ii) No money passing through any of the unreported foreign accounts was from an illegal source or used to further a criminal purpose; (iii) The taxpayer cooperated during the examination, which means that the IRS was not obligated to issue a Summons, the taxpayer responded to reasonable requests for documents, meetings, and interviews, and the taxpayer filed all necessary returns and FBARs; and (iv) The IRS did not determine a civil fraud penalty against the taxpayer for an income tax underpayment for the year in question due to the failure to report income related to a foreign account.

In US vs. Bittner, the government argued that the Court should find the decision in United States v. Boyd (C.D. Cal. Apr. 23, 2019) persuasive on the issue of whether the non-willful FBAR penalty should be applied on a per account or per reporting obligation.  However, the Court explicitly disagreed with the reasoning and outcome in Boyd, which had relied, in large part, on the language to the reasonable cause exception.  Specifically, the Court reasoned:

It goes without saying that the outcome in Boyd is not binding precedent on this Court.  But beyond that, the Court respectfully disagrees with the reasoning and outcome in Boyd.  As the Court has already discussed, supra, the language of the reasonable cause exception is not a sound basis for reading a word into the penalty provision that is not there.  Congress knew how to use the word 'account,' as it did so elsewhere in the statute. Its inclusion in certain provisions and its exclusion elsewhere must have meaning, but the Government's proposed interpretation, and the Boyd court's acceptance of that interpretation, require the Court to ignore that meaning.

The court is weary of creating conflicts with its sister district courts—even those in other circuits. It is particularly hesitant to do so when interpreting a federal statute, which theoretically should have uniform meaning nationwide.  But the Boyd court's analysis fails to provide adequate guidance as to how it reached the conclusion it did.  After a careful analysis of the statute's text and purpose, the Court is left with no choice but to respectfully disagree with the outcome in Boyd and reach the opposite conclusion.

D.   Reasonable Cause.

The government also moved for summary judgment on the issue of whether Mr. Bittner had reasonable cause in failing to file FBARs.  In his pleadings and motions, Mr. Bittner's main argument for application of the reasonable cause defense was he was unaware of his FBAR filing obligations.   However, the Court noted that "[a]s a general rule, ignorance of the law is no excuse."  United States v. Int'l Minterals & Chem. Corp., 402 U.S. 558, 562 (1971).  Thus, the Court concluded that Mr. Bittner did not qualify automatically for the reasonable cause safe harbor merely by claiming that he "had never heard of FBAR forms, much less that as a naturalized U.S. citizen living abroad he was required to file them."

Mr. Bittner also raised additional facts in support of his reasonable cause defense.  In the Opinion, the Court summarizes this argument as:

He claims that because he was educated outside of the United States; had no instruction or education in accounting, tax law, or finances; had no close contact with the United States during the relevant period; and took prompt steps to correct his mistake after learning of his compliance failure, there is a genuine issue of material fact as to the applicability of the reasonable cause exception.

In support of his position, Mr. Bittner cited to the Eastern District of Texas' decision in Congdon v. United States, No. 4:09-CV-289, 2011 WL 3880524 (E.D. Tex. Aug. 11, 2011), where the court had held that reasonable cause may be established if the taxpayer can show ignorance of the law in conjunction with other facts, such as the taxpayer's education, if the taxpayer has been previously subject to the tax, if the taxpayer has been penalized before, if there were recent changes in the tax forms or law which the taxpayer could not reasonably be expected to know, and the levy of complexity of a tax or compliance issue. But the Court was not persuaded.

Specifically, the Court noted that in Congdon there was a "genuine dispute regarding whether Plaintiff acted with ordinary business care and prudence" based on the plaintiff having argued that he "spent a reasonable time and effort preparing Form 5471, included all income and expenses of the foreign corporation on his tax return (Form 1040), paid the correct and appropriate tax, and spent over 200 hours each year collecting information."  Conversely, in Bittner, the Court noted that the taxpayer had admitted in his filings that he "did not take affirmative steps to learn about" his FBAR reporting obligation.

The District Court correctly held that the maximum penalty for a Non-Willful Failure to Timely File an FBAR is $10,000 in accordance with the Plain Language of § 5321.

The Term "Account" in the Reasonable Cause Exception does not support the Government's Position.

The fact that the amount of a willful violation is calculated based on the balance in accounts not reported does not support the Government's position.  The balances for Ms. Hughes include loans which were in the accounts for less than 24 hours and are not income and therefore not considered taxable income as they are a debt not an asset.

The Legislative History of Section 5321 confirms that the Maximum Penalty is $10,000 per Form.  Statutes Imposing Penalties Are Strictly Construed Against the Government and the Rule of Lenity Requires that any Ambiguity be Resolved in the Defendant's Favor

The Government has failed to show that there is no genuine factual issue whether Ms. Hughes lacked reasonable cause for filing FBARS late.

In sum, the Defendant had reasonable cause for failing to file the FBARs and in light of her prompt filing upon being made aware of the filing requirement, no penalties should apply.

Ms. Hughes had reasonable cause for untimely filing FBAR forms.  Ms. Hughes requests that this court take judicial notice of the "Criteria for Relief From Penalties" in the Internal Revenue Manual (IRM) Penalty Handbook Part 20.1.1.3 (10-19-2020) and Part 20.1.1.3.2 (11-21-2017) and Part 20.1.1.3.2.2 (02-22-2008).  "Any reason that establishes a taxpayer exercised ordinary business care and prudence but nevertheless failed to comply with the tax law may be considered for penalty relief."

The plaintiff has previously argued that the court, in analyzing the "reasonable cause" defense for FBAR purposes, should consider case law, regulations, and other guidance addressing the concept of "reasonable cause" in the context of delinquency penalties under 26 USC Section 6651; see, Moore v. U.S., (DC WA 2015) 115 AFTR 2d ¶2015-591.

Ms. Hughes was not properly advised by her accountants.  Her US accountant had died in November 2009.  Ms. Hughes suffered two devastating earthquakes in September 2010 and February 2011.  Ms. Hughes did timely disclose accounts and amounts, but without using the FBAR forms.  Upon receiving notice from the IRS, Ms. Hughes promptly filed the FBAR disclosures.  Ms. Hughes also requests this court to take judicial notice of the IRM Penalty Handbook, Part 20.1.1.3.2.2.1 (11-25-2011) as it pertains to situations involving

"Death, Serious Illness, or Unavoidable Absence" and Part 20.1.1.3.2.2.2 (10-19-2020) as it pertains to situations involving "Fire, Casualty, Natural Disaster, or Other Disturbance-Reasonable Cause".

E.   Reckless thus constitutes "Willfulness in 2012 and 2013".

The dispute in this case concerns the proper interpretation of the civil penalty provided by 31 U.S. Code S 5321(a)(5) for a willful violation of the regulations.

The Defendant simply did not pay attention or read any instructions.  It was her understanding that from the 13 prior years of filing that everything she needed to do was taken care of and that her accountants would have informed her of any compliance that she needed to do.  There was no attempt to conceal or hide any income, and based on the prior 13 years of filing, she was not aware that she was doing it incorrectly until Mr. Lauren of the IRS informed her that the IRS's stance on TVV was that it was not a disregarded entity for flow through purposes, but a foreign corporation, even though the New Zealand tax authority (IRD) recognizes it as a transparent entity with flow through status in their interpretation of the US/NZ tax treaty

F.   Failed to Prove Substantial Loss or Harm

Ms. Hughes asks the court to review the penalties that the IRS has assessed as there are many errors in their calculations.

The 2010 penalties should be removed for they are out of time. The 2011 non-willful penalties should follow the US vs. Bittner ruling and what Congress intended as a one penalty per form not per account.

The IRS penalty mitigation guidelines indicated that the FBAR penalty would be calculated using the following three levels:

■ The Level I penalty applies in situations where the maximum aggregate balance for all unreported foreign accounts did not exceed $50,000 at any time during the relevant year. The Level I penalty equals $500 per violation, not to exceed $5,000 for all FBAR violations for a particular year.

■ The Level II penalty applies to each unreported foreign account whose balance did not exceed $250,000 during the relevant year. The Level II penalty equals 10 percent of the highest balance in the unreported account during the year, not to exceed $5,000.

■ The Level III penalty applies in to each unreported foreign account whose balance was more than $250,000 during the relevant year. The Level III penalty equals $10,000 per account.

As evidenced in Exhibit A, the only accounts that exceeded a balance of $50,000 US was the checking and savings account, because they included the bank originated loan entries and the same funds being transferred between the two accounts to cover over drawn balances.

The penalties for 2012 and 2013 in relation to the loan advances that were a simple bank originated journal entry for the mortgage liabilities should be removed from the calculations as well as the double bank error counting the penalty twice in 2013.  Had the IRS auditors informed Ms. Hughes during the first 8 months under audit in 2014, Ms. Hughes could have filed her 2013 FBAR's by June 30, 2014, however, she was not informed until August 2014, 6 weeks after the due date that she failed to file.  The year 2013 is the largest year for penalties, calculated by the IRS, which includes the duplicate bank error included in Exhibit A.  This is bad faith conducted by the IRS and should not be relied upon, and the Court and should reject these amounts.

This audit and the FBAR litigation have been going on for over eight years, and Ms. Hughes has been embroiled with fighting this lawsuit as well as the audit issues.  Ms. Hughes has complied with every request that was outside of the normal time period for filing and was assured that there would be no penalties, and then was assessed penalties from 2001-2013.

Ms. Hughes was forced to sell her building in San Francisco to cover the mounting debt that she incurred from her attorney's fees to defend her in this litigation and the audit. She was only able to cover a portion of the debt incurred from her attorney by the proceeds from the sale of the building.  So not only has Ms. Hughes been fighting the FBAR litigation, and the audit, but now she is fighting the pandemic with limited income, draconian lockdowns and limited access to the internet.  So, who is harming whom?

Ms. Hughes disputes the number of civil penalties assessed against her for the reason that the penalty statue, 31 U.S.C. 5321(a)(5)(c) does not apply to the facts in evidence and is unsupported by any evidence.  None of the funds in Ms. Hughes's accounts were from illegal activity.  Ms. Hughes has met the four thresholds described in the Internal Revenue Manual, in that she had no previous FBAR penalty assessments, the funds in the ANZ Bank accounts were not derived from illegal sources or used for criminal purposes, the taxpayer fully cooperated during the audit, and the IRS did not assert a civil fraud penalty with respect to the unreported income stemming from the ANZ Bank accounts.

In recent years, the injury rule has come under assault, increasingly honored in the breach.  Courts have permitted plaintiffs to employ various workarounds to end-run the time-honored injury requirement. The result is a blurring of the line between actionable and non-actionable wrong, fuzziness in the application of torts and warranty law in environmental litigation and beyond, and a tug of war between those courts guarding the courthouse doors and others willing to open them wide.

Holding Firm on Injury. The injury requirement serves important social, legal, and political functions. For one, injury separates courtroom resolution from the work of expert regulatory agencies, which are free to make social policy decisions and regulate products untethered to the personal circumstances of any given claimant. Courts lax on injury often wind up taking on de facto the role of such regulatory bodies, blurring the line between the branches of government.

Requiring injury also helps ensure that courts act like courts, resolving genuine cases and controversies and matters ripe for resolution, by "defin[ing] the class of persons who actually possess a cause of action" and "provid[ing] a basis for the factfinder to determine whether a litigant actually possesses a claim." Caronia, 22 N.Y.3d at 446. Insisting on injury also safeguards against "frivolous and unfounded" lawsuits, conserving the courts' resources for disputes that are ripe and ready for adjudication. Id. Moreover, allowing the uninjured to recover may lead to inequitable division of resources, with fewer funds available to the injured. See Metro-N. Commuter R.R. Co. v. Buckley, 521 U.S. 424, 442-44 (1997); Caronia, 22 N.Y.3d at 451.

In determining if Ms. Hughes acted willfully, one can look at the Courts ruling in McBride, following the United States Supreme Court's reasoning in Herman & MacLean v. Huddleston, determined that the preponderance of the evidence standard was appropriate when only money, rather than the taxpayers' "particularly important individual interests or rights," were at issue. This means that the government can support a willful FBAR penalty with a lower standard of evidence than is needed to prove a civil fraud penalty.  What is important to note here is that Ms. Hughes's interests and rights are being infringed based on the penalties on non-taxable loan proceeds which are a liability to Ms. Hughes, not an asset.

What amount did the plaintiff suffer?  Nothing, there were no tax obligations for the loan in foreign currency.  The loans are not considered income and therefore there would be no tax liability.   The interest earnings had tax withholding on them. In fact, the harm is the cost the Government has incurred on this litigation and proceedings to garnish loan proceeds as income, far outweighing any actual harm to the US.    All interest earnings were reported on the Schedule C for 2010, 2011 and 2013, and on Schedule B for 2012.  The NZ Tax Authority withheld all tax due on the interest earnings and Ms. Hughes would have received a US tax credit on these amounts.  The United States was not prejudiced, nor did it suffer harm or substantial harm or losses.  In fact, the largest losses suffered by the United States were due to the complaint being filed by the DOJ and the protracted litigation.  Ms. Hughes did try to settle this with a legitimate offer in November 2018, which was rejected by the DOJ.

G.   Conclusion and Defense

        In researching many other FBAR cases, one thing is clear and also irrefutably different from this case.  They all had millions of dollars in question and numerous accounts, they all underreported income earnings on these accounts as well as some were from illegal activities.  Ms. Hughes was not doing any of that.  This case is unique in that there was only a little over $250,000 US value total of all accounts (all after tax monies), that was actually liquid and owned by Ms. Hughes.  Included in these amounts is an insurance payout for the earthquake damage of $46,000 that was held as collateral with the bank for the repairs to the building that they held the note on. $10,000 for a line of credit and $50,000 collateral for security on the loan.  The other amounts that Ms. Hughes is being penalized on were loan

advances that Ms. Hughes never had access to and were only in her accounts for less than 24 hours.  How can the DOJ justify a penalty nearly 2 times the value in the accounts?

Congress enacted the Bank Secrecy Act of 1970 ("BSA"), codified at 31 U.S.C. && 5311, in response to an increasing "unavailability of foreign and domestic bank records of customers thought to be engaged in activities entailing criminal or civil liability."  Cal. Bakers Ass'n v. Shultz, 416 U.S. 21, 26 {33 AFTR 2d 74-1041} (1974).  "(T)he express purpose of the Act (was) to require the maintenance of records, and the making of certain reports, which have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." Id. (citations omitted).  As interpreted by the Shultz Court, "Congress was concerned about a serious and widespread use of foreign financial institutions, located in jurisdictions with strict laws of secrecy as to bank activity, for the purpose of violating or evading domestic criminal, tax, and regulatory enactments." Id.

If you look to the language of the willful penalty, which bases the amount of the penalty "in the case of a violation involving a failure to report the existence of an account or any identifying information required to be provided with respect to an account, the balance in the account at the time of the violation."  From this language, one can conclude that Congress intended the willful penalty to be applied on an account-by-account basis.

In U.S. v. Ratzlaf, 510 U.S. 135 (1994), the Supreme Court addressed the meaning of willfulness in the context of a criminal violation of the structuring provision of the Bank Secrecy Act (which also includes the FBAR rules).  The Ratzlaf court reversed the conviction holding that the defendant could not be convicted of a crime that required a showing of willfulness where the government did not show that the defendant was aware that his actions were illegal.  Similarly, in U.S. v. Sturman, 951 F.2d 1466 (6th Cir. 1991), the court noted that the test for willfulness is a "voluntary, intentional violation of a known legal duty."

Ms. Hughes did not voluntarily, intentionally violate a known legal duty.  As she has stated, she was unaware of the FBAR filing requirement and was not advised of the requirement by any of the professional advisors she consulted with regarding her US tax filings. She clearly was not hiding the accounts.  The Defendant is a bookkeeper, not a professional return preparer, and she was certainly not familiar with the FBAR and other international filing rules and forms.

The 2010 penalties should be removed as they are out of time.  The penalties in rela-
tion to the bank originated journal entries for the loan advances should be removed from the
calculations as well as the double bank error counting the penalty twice, and the 2013 pen-
alties could have been avoided if the auditor had informed her that the FBARS were due by
June 30, 2014, eight months into the audit, and he was well aware of the foreign accounts.
So, the question is who is harming whom?

Another aside, are the courts wrong in treating "reckless" conduct as willful? Reckless
and willful are not treated as identical by Congress. Sec. 6662(c), which imposes a negligence
penalty, states "the term 'disregard' includes any careless, reckless, or intentional disregard."
Congress clearly distinguished intentional conduct from reckless conduct.

The government FBAR penalty really has nothing to do with an apparent noble effort
to prevent money laundering, the purpose of these disclosure forms and rules is to punish
and abuse people such as Ms. Hughes.  She hired an attorney who exacerbated the dispute
over a seven-year period that cost Ms. Hughes over $200,000 in legal fees, than confessed
his incompetence to continue defending her by suggesting that she default against the
complaint when Ms. Hughes ran out of money to pay his fees.

The IRS tax system is a difficult system to get a fair and impartial review as the entire
process has been weaponized against the average American who is just trying to operate
within their legal boundaries, however those goal posts keep moving within the system,
making it impossible to comply with all the rules.

Not only the cost, time and energy of fighting these allegations have been enormous,
this process is to force people like the Defendant into bankruptcy, not only to pay the legal
bills, but the penalties.  This process destroys people's lives based on completely false
allegations and the intellectual dishonesty of the IRS Auditor Jonathan Lauren, and the DOJ
knowing that their process destroys countless lives, for what, a pre-crime?  Based on the
assumption that you should have known the obscure rules, and should have filed the forms,
which are constantly changing, and if you do not file the correct forms, you show reckless
disregard, even though there is no intent, it does not matter, this process is simply there to
destroy.  Not one penny of the amounts she is being penalized on was from ill-gotten gains.
In fact, as the evidence has shown, the spikes in the accounts were from bank originated

journal entries of loan advances and pay downs all secured by the business.  None of these loans are taxable, and there was no harm suffered by the US.

What is the Defendant's motivation for not filing the FBAR forms?  These monies that the US and DOJ are penalizing Ms. Hughes on are not from any ill-gotten gains.   These funds are also being counted more than once as they were moved around to the accounts, so further calculation errors for penalties exist.  The other funds that she is being penalized on are bank originated journaled loans that were only in her account for less than 24 hours for settlement by the bank, and she never had access to these funds, and this is still an existing liability.    Where is the liability of non-taxable loans to the IRS?  What damage did the IRS suffer from the non-reporting of the non-taxable loans?  Where is the harm?  Ms. Hughes understood her obligation to disclose her foreign accounts and checked the boxes on the Schedule B indicating a foreign account.

Unlike in US vs. Bedrosian, Ms. Hughes did everything possible to cooperate fully with the IRS:  She fully cooperated during the audit and opened all her files, including assisting them all the way back to 2001 – 2013 – well beyond anything normally required by any taxpayer and then was assessed penalties for all the years for not filing a 5471 or 926 after the auditor indicated that the formation of the company was incorrect as a single member LLC and was a foreign corporation, not consulting with any NZ Tax authority, and then assured Ms. Hughes there would be no penalties assessed, and then assessed over $1M in penalties;  Ms. Hughes disclosed all of the accounts to the IRS, with copies of every year that was requested;  Ms. Hughes sought professional advice in both countries (New Zealand and the US) to make sure that she complied with all requirements and was never told by any of the professional people that she was required to file an FBAR, nor any indication from either auditor before the 2013 filings were due.  She did not have any history of tax fraud, and no prior FBAR penalties, and none of these funds were from ill-gotten gains.   These funds were not from ill-gotten gains. Nothing was hidden.

The Government feels the need to penalize Ms. Hughes for not timely filing the FBAR even though it is clear that the fines should be based on the money that she actually had access to.  Every step of the way Ms. Hughes complied with the IRS Auditor and is still being harassed by them.  So how can Plaintiff argue that she was taking an "unjustifiably high risk" in not reading everything closely?   Also, that neither auditor expressed there was

any issue with her past filings, from November 2013, with many meetings and interviews, both auditors knew of the foreign entity and foreign accounts, not once mentioning in the 8 months during the audit before the 2013 FBAR filing deadline, that there were any problems with her previous filings.  Nothing was concealed or hidden; however, these earnings were just reported on different forms, and the fact is that the Government has made numerous mistakes in the calculation of the penalties.   The IRS did nothing to indicate there were any errors in the prior 13 years of filing in the 8 months prior to Ms. Hughes filing her 2013 returns, again this harkens back to US vs. Tweel, the IRS did everything it could to get to the maximum penalties and used Ms. Hughes' compliance against her to open up 13 years of returns, knowing full well their intentions were to get the most penalties.

.   In conclusion these penalties are unjust, under the circumstances of this case, and not in the spirit of the law.  All the funds in question were not from any illegal activities, evasion of tax or related to money laundering and all taxes were paid on the earnings.  The US has failed to demonstrate any material facts establishing any loss, harm, injury or other damages suffered by the Plaintiff.

WHEREFORE, the Defendant respectfully prays that this Court:

Waives the penalties from this complaint and for other relief and deemed appropriate by the court.

*Timberly E. Hughes*

Timberly E. Hughes, Affiant

TIMBERLY E. HUGHES,
Defendant *in Propria Persona*
59 Long Bay Road
Akaroa, New Zealand

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA
     PLAINTIFF

v.                         CASE NO.  3:18-cv-5931-JCS

TIMBERLY E. HUGHES
     DEFENDANT
_____/

## CERTIFICATE OF SERVICE

     I Timberly E. Hughes hereby certify that a true and correct copy of the foregoing was duly served upon the plaintiff's attorney of record, David L. Anderson and Ty Halasz, at the address of P. O. Box 683, Ben Franklin Station, Washington, DC  20044, via first class mail and online this 15th  day of December 2021.

By:  *Timberly E. Hughes*