UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>TIMBERLY E. HUGHES,<br><br>Defendants. | Case No. 18-cv-05931-JCS<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING PENALTY** |

## I. INTRODUCTION

1. Plaintiff the United States of America brought this action seeking to enforce civil penalties against Defendant Timberly Hughes, pro se, for failure to report foreign bank accounts by filing a report commonly known as an "FBAR." The Court held a bench trial by videoconference on June 8 and 9, 2021.[1]

2. In a previous Findings of Fact and Conclusions of Law, the Court found that the United States failed to carry its burden to show that Hughes's failure to file FBARs in 2010 and 2011 was "willful" within the meaning of the Bank Secrecy Act ("BSA"), but carried its burden to show that her failure to file FBARs in 2012 and 2013 was "willful" based on a standard of recklessness. *See generally* Findings of Fact & Conclusions of Law re Willfulness ("1st FFCL," dkt. 162).[2] That previous order reserved the question of whether the United States assessed valid penalties to be decided after further briefing, which the parties have now submitted.

3. This order incorporates by reference all findings of fact and conclusions of law

---

[1] The parties have consented to the jurisdiction of a magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).
[2] *United States v. Hughes*, No. 18-cv-05931-JCS, 2021 WL 4768683 (N.D. Cal. Oct. 13, 2021).

stated in the Court's previous order, even if not specifically repeated here.

4. The Court finds the following facts by the preponderance of the evidence and makes the following conclusions of law under Rule 52(a)(1) of the Federal Rules of Civil Procedure. To the extent that any finding of fact is better characterized as a conclusion of law, or any conclusion of law is better characterized as a finding of fact, the Court adopts it as such.

5. For the reasons discussed below, the Court holds that the United States abused its discretion in setting the penalties at issue, and that the matter must be remanded for further administrative proceedings to calculate a valid penalty.

## II.  PROCEDURAL HISTORY

6. The Court held a bench trial on June 8, 2021 and June 9, 2021, and issued findings of fact and conclusions of law on the question of whether Hughes's failure to file FBARs for the years 2010 through 2013 was willful. The Court "conclude[d] that Hughes's failure to file FBARs for 2012 and 2013 was 'willful' within the meaning of 31 U.S.C. § 5321(a)(5)(C)(i)," but that "the United States [did not meet] its burden to show that Hughes's failure to file FBARs for 2010 and 2011 was willful." 1st FFCL ¶¶ 186–87.

7. The Court explained at the pretrial conference that the trial covered both contested issues—willfulness and penalties—and that while the latter would be addressed on a second round of briefing, the parties must present all relevant evidence during trial:

> The only contested elements of the claim that are left is the whether or not the failure to file the FBAR claim was willful—the plaintiff asserts that it was willful; the defendant asserts that it was not willful. That's what we're trying at trial and what I'll decide after the—at the trial: the willfulness.
>
> The second element that is contested is the amount of the penalties, if any. As to that element, I want you to put in whatever evidence you've got during the trial, but we're going to decide it on post-trial briefing.[3]

8. Consistent with that pretrial instruction, the Court's previous findings of fact and conclusions of law addressing willfulness invited the parties to stipulate to a schedule for further

---

[3] Since neither party ordered an official transcript of the pretrial conference to be prepared by a Court reporter, no such transcript currently exists. The Court has transcribed this passage from the recording of the pretrial conference. The passage at issue occurred at a timestamp of approximately 10:14 AM in that recording.

*briefing* on the issue of penalties, not further evidence. *See* 1st FFCL ¶ 188.

9. The parties' stipulated briefing schedule, which the Court adopted, did not alter the pretrial instruction to submit post-trial briefs addressing evidence submitted at trial. *See* dkts. 164, 165.

10. Despite that structure having been set by the Court, neither party has followed it in their present post-trial briefing regarding penalties. Both parties submit new evidence with their briefs that was not presented at trial. Neither party specifically cites trial exhibits or testimony.

11. The United States, despite captioning its filing as a post-trial brief, recites the standard for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. That rule provides that, "[u]nless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). That default deadline has long passed. No local rule or Court order allows for a later summary judgment motion in this case. To the contrary, when the United States previously failed to satisfy the Court before trial that summary judgment motions would be useful in this case, the Court specifically forbade the parties from filing such motions. *See* Mar. 26, 2021 Civil Minute Order (dkt. 119).

12. Much of Hughes's brief strays from the issue at hand—the validity of the penalties assessed by the IRS for her willful violations in 2012 and 2013. *See generally* Def.'s Br. (dkt. 167). Instead, she seeks to relitigate the question of whether her violations were willful (which the Court has already decided and declines to reconsider) and whether recklessness can meet that standard (which she conceded in the previous round of briefing), addresses the appropriate penalties for non-willful violations in 2010 and 2011 (which the United States is not pursuing,[4] instead seeking confirmation of only the 2012 and 2013 penalties), and argues that the Court should not hear this case when the United States has not shown injury as a result of Hughes's failure to timely file her FBARs (in a passage copied without citation from an ABA newsletter

---

[4] "The United States does not seek nonwillful penalties against Ms. Hughes for 2010 and 2011, though the United States reserves its right to appeal the Court's willfulness determination as to 2010 and 2011." Pl.'s Reply (dkt. 168) at 2

addressing environmental law). Much of her present brief is duplicative of her previous post-trial brief on the issue of willfulness (dkt. 158).

13. The Court limits its review here to the issue it instructed the parties to brief: whether the penalties assessed by the IRS are valid in light of the evidence presented at trial and the Court's previous finding that Hughes willfully failed to filed FBARs in 2012 and 2013. Since the United States has not pursued any penalties for 2010 and 2011, the Court limits its review to the penalties assessed for 2012 and 2013. In keeping with the instructions at the pretrial conference, the Court further limits its review to evidence presented at trial, as well as materials properly subject to judicial notice. The Court's review is conducted under Rule 52, governing findings and conclusions of a court after a bench trial.

## III.   FINDINGS OF FACT

14. The IRS's October 2015 letter to Hughes explaining penalties proposed for her alleged FBAR violations (Trial Ex. 44) listed the following years, accounts, maximum balances, and penalties:

| Year | Account No. | Maximum Balance (NZD) | Maximum Balance (USD) | Penalty (USD) |
|---|---|---|---|---|
| 2010 | -1000 | $10,799 | $9,828 | $8,212 |
| 2010 | -1004 | $84,472 | $76,877 | $8,211 |
| 2010 | -0600 | $30,469 | $48,249 | $8,211 |
| 2010 | -0625 | $37,906 | $28,288 | $8,211 |
| 2011 | -1005 | $50,755 | $39,314 | $34,258 |
| 2011 | -1000 | $13,751 | $10,651 | $34,258 |
| 2011 | -1004 | $45,023 | $42,512 | $34,258 |
| 2011 | -1006 | $45,000 | $34,857 | $34,257 |
| 2011 | -0600 | $61,350 | $47,521 | $34,257 |
| 2011 | -0625 | $1,093,124 | $846,726 | $34,257 |
| 2012 | -1005 | $52,371 | $43,068 | $27,886 |

| Year | Account No. | Maximum Balance (NZD) | Maximum Balance (USD) | Penalty (USD) |
|---|---|---|---|---|
| 2012 | -1000 | $14,174 | $11,656 | $27,886 |
| 2012 | -1004 | $56,508 | $46,470 | $27,886 |
| 2012 | -1006 | $46,413 | $38,169 | $27,886 |
| 2012 | -0600 | $714,215 | $587,348 | $27,886 |
| 2012 | -0625 | $127,517 | $104,866 | $27,886 |
| 2013 | -1005 | $53,831 | $44,269 | $39,028 |
| 2013 | -1000 | $14,377 | $11,823 | $39,028 |
| 2013 | -1004 | $58,217 | $47,875 | $39,028 |
| 2013 | -1006 | $46,897 | $38,566 | $39,028 |
| 2013 | -4400 | $26,744 | $21,993 | $39,027 |
| 2013 | -0600 | $1,372,375 | $1,128,598 | $39,027 |
| 2013 | -0625 | $78,644 | $64,674 | $39,027 |
|  |  |  | **Total Penalty:** | **$678,899** |

Trial Ex. 44 at 658–61, 686.[5]

15. The penalties assessed for the six accounts at issue in 2012 and seven accounts at issue in 2013—the two years for which the Court previously upheld the IRS's determination of willfulness—add up to a total of $440,509.[6]

16. On September 28, 2016, the IRS Appeals Office declined to disturb the penalty as assessed. Trial Ex. 18. A manager certified the assessments on September 30, 2016. Trial Ex. 42. The IRS sent Hughes a demand for payment the same day. Trial Ex. 43.

17. At least some of those account balances used to calculate the penalties are supported by evidence. For example, account statements in Trial Exhibits 11 and 13 reflect the

---

[5] Citations herein to page numbers of trial exhibits refer to Bates numbers, omitting the leading letters and zeros.
[6] Values in this order presented with the symbol "$" represent U.S. dollars except where they are specifically indicated as New Zealand dollars.

5

stated maximum values for the -0600, -1000, -1005, and -1006 accounts in 2011, as well as the -1000, -1004, -1005, and -1006 accounts in 2012 and 2013.

### A. Errors Regarding 2010 and 2011 Balances (-1000 and -1004 Accounts)

18. Values listed for certain other accounts are not supported by the record. For example, the record indicates that the -1000 account had a balance of $13,169.91 NZD in 2010 (which is greater than the $10,799 NZD listed), Trial Ex. 13 at 493–95, the -1004 account had a balance of $103,015.01 NZD in 2010 (which is greater than the $84,472 NZD listed), *id.* at 505–07, and the -1004 account had a balance of $54,883.13 NZD in 2011 (which is greater than the $45,023 NZD listed), *id.* at 512–13.

19. At the time these penalties were calculated, the IRS's determination of FBAR penalties was governed by a May 13, 2015 memorandum titled "Interim Guidance for Report of Foreign Bank and Financial Accounts (FBAR) Penalties," control number SBSE-04-0515-0025, which is currently available at https://www.irs.gov/pub/foia/ig/spder/SBSE-04-0515-0025[1].pdf (the "Interim Guidance") (brackets appear in the original URL and do not indicate a change). The Court takes judicial notice of that memorandum as a matter of public record whose authenticity is not reasonably subject to dispute.

20. The Interim Guidance provides that, in "most cases" involving willful violations over multiple years, "the total penalty amount for all years under examination will be limited to 50 percent of the highest aggregate balance of all unreported foreign financial accounts during the years under examination," allocated across the years "based upon the ratio of the highest aggregate balance for each year to the total of the highest aggregate balances for all years combined, subject to the maximum penalty limitation in 31 U.S.C. § 5321(a)(5)(C) for each year." Interim Guidance, attach. 1 at 1. Examiners retain discretion to "recommend a penalty that is higher or lower than 50 percent of the highest aggregate account balance of all unreported foreign financial accounts based on the facts and circumstances." *Id.*, attach. 1 at 2.

21. Substantially identical guidance was later incorporated into the Internal Revenue

1  Manual ("IRM").  IRM § 4.26.16.6.5.3 (Nov. 6, 2015).[7]  The equivalent provision in the current

2  version of the IRM appears at § 4.26.16.5.5.3(4)(a).

3      22.    Based on that guidance, which the IRS applied to determine Hughes's penalties, the

4  understatement of several account balances in 2010 and 2011 has resulted in a detriment to

5  Hughes because they resulted in allocating a smaller portion of the total penalty to those years for

6  which the United States failed to carry its burden to show a willful violation, and thus a greater

7  allocation for the years where the United States is entitled to collect such penalties.

    **B.**    **Error Regarding 2013 Maximum Balance (-0600 Account)**

    23.    The maximum balance of $1,372,375 NZD for the -0600 account in 2013 is based on the following series of March 25, 2013 transactions appearing in a bank statement (with columns not relevant to the Court's analysis omitted):

| Date | Description | Withdrawals | Deposits | Balance |
|---|---|---|---|---|
| 25 Mar | VANGIONI'S LTD | | 300.00 | 1,040.56 |
| 25 Mar | LOAN DRAWDOWN | | 685,409.03 | 684,368.47 |
| 25 Mar | LOAN PAYMENT REVERSAL | | 688,006.31 | **1,372,374.78** |
| 25 Mar | LOAN PAYMENT | 688,006.31 | | 684,368.47 |
| [five miscellaneous small transactions on March 25 and 26, reducing the balance to 684,439.81] | | | | |
| 26 Mar | LOAN PAYMENT | 688,006.31 | | 3,566.50 OD[8] |

Trial Ex. 11 at 292 (emphasis added).

    24.    Other than the bank statement itself, which was admitted into evidence by stipulation before trial and not specifically discussed by any witness, neither party offered evidence at trial regarding this series of transactions.  Hughes referred in her testimony briefly to "a duplication error from the bank in March of 2011," in the context of testimony focused on

---

[7] "The IRS uses the IRM in determining a taxpayer's ability to pay a delinquent tax liability." *See In re Ransom*, 577 F.3d 1026, 1028 (9th Cir. 2009), *aff'd sub nom. Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61 (2011).  "The Internal Revenue Manual does not have the force of law and does not confer rights on taxpayers." *Fargo v. Comm'r*, 447 F.3d 706, 713 (9th Cir. 2006).
[8] The Court understands "OD" as meaning "overdraft," and indicating that the account has a negative balance.

7

disputing the United States' position that she had improperly used business funds for a personal home loan. Trial Tr. Vol. II (dkt. 156) at 161:21–22.

25. The revenue agent who determined the amount of the penalty assessed, Jonathan Lauren, testified at trial, but did not address how he determined the specific amount of the penalty, nor did he address the March 2013 bank statement. *See* Trial Tr. Vol. I (dkt. 155) at 32–114.

26. Lauren states in a declaration filed with the United States' present reply brief that although Hughes's representative told him during the FBAR examination that the balance at issue was an error by the bank and that the bank statement itself made that clear, Hughes failed to provide supporting documentation as to the nature of the transaction besides the bank statement itself, and Lauren concluded that since all other entries on the statement are listed in chronological order, the order in which these transactions were listed must also be chronological and must reflect an actual balance of $1,372,375 NZD briefly held in Hughes's account. Lauren Reply Decl. (dkt. 168-1) ¶¶ 9–13. Lauren also states that he rejected Hughes's position that amounts only held in her accounts for a short period of time should not be considered in determining a maximum balance, in part because the evidence showed that Hughes was using her accounts to conduct her businesses. *Id.* ¶ 14–15.

27. The Court declines to consider these statements, which were not offered at trial and subject to cross-examination. If the Court were to consider Lauren's belated declaration, the Court would find Lauren's statements credible as to how he assessed the transaction at issue during the examination, but that his decision was patently unreasonable, and the outcome would be the same.

28. Transactions are not generally reversed before they occur. The appearance of two separate "loan payment" entries for identical amounts, one on the same day as the reversal transaction and another the next day, supports the view that the transaction labeled as a "reversal" was in fact a reversal of the first loan payment entry on the same day.

29. In the absence of evidence to the contrary, the Court finds as a matter of fact that the listing of the "loan payment reversal" before (rather than after) an entry for a "loan payment" for an identical value the same day on the March 2013 statement—one day before another "loan payment" entry for an identical amount that was not reversed—reflected an error by the bank, and

that its nature as an error is obvious from the face of the statement.

### C. The IRS's Determinations of Violations

30. The IRS's October 2015 letter to Hughes noted that the finding of willfulness was based "at minimum" on a theory of willful blindness, and that Hughes committed other tax reporting violations purportedly "due to fraud." Trial Ex. 44 at USA-000669–73. The IRS determined in a parallel audit of Hughes's income tax returns and payments that she had failed to pay slightly more than $600,000 that she owed for the years 2010 through 2013, and that she owed penalties for failure to file certain forms other than the FBARs at issue here. Trial Tr. Vol. I at 63:6–15, 103:13–105:3. Those penalties and delinquencies are not directly at issue in this case. Some portion of Hughes's other tax disputes reached a settlement in tax court proceedings. *Id.* at 108:7–17.

## IV. CONCLUSIONS OF LAW

31. This order is confined to the question of whether the IRS's assessment of penalties for 2012 and 2013 is valid in light of the Court's conclusion that Hughes "willfully" failed to file FBARs for those years. The time for presenting evidence and argument regarding willfulness was at trial, and in the parties' previous round of briefs immediately following the trial. The Court declines to reconsider its conclusion as to that issue.

### A. Legal Standard for Reviewing FBAR Penalties

32. The BSA provides for maximum penalties of the greater of $100,000 or fifty percent of an account balance for willfully failing to file an FBAR. 31 U.S.C. § 5321(a)(5)(C)–(D). Hughes does not dispute the United States' position that the $100,000 maximum applies per account and per year, resulting in a statutory maximum penalty of $1,300,000 for the six accounts at issue in 2012 and seven accounts at issue in 2013—well above the penalty actually assessed. The question, then, is not whether the IRS exceeded its authority under the BSA, but whether it abused its discretion in setting the particular penalties it assessed.

33. In reviewing assessments of penalties pursuant to the Administrative Procedures Act, which is the applicable mechanism to consider FBAR penalties, courts will "set aside an agency's penalty selection only if it was arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with the law." *Kimble v. United States*, 991 F.3d 1238, 1242 (Fed. Cir.), *cert. denied*, 142 S. Ct. 98 (2021). "Agencies have broad discretion to select the amount of a sanction to enforce programs within their jurisdiction." *Landa v. United States*, 153 Fed. Cl. 585, 601 (2021). "Even if the evidence is susceptible of more than one rational interpretation, the court must uphold the agency's findings." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (cleaned up). "'While the scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency, the agency nevertheless must examine the relevant data and articulate a satisfactory explanation for its action. In reviewing that explanation, a court must consider whether the decision was based on a consideration of the relevant factors and whether there was a clear error of judgment.'" *Jones v. United States*, No. CV 19-04950 JVS (RAOx), 2020 WL 2803353, at *8 (C.D. Cal. May 11, 2020) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30–31 (1983)).

34. "'If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.'" *Id.* (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)).

35. Some cases have affirmed FBAR penalties with minimal scrutiny so long as they were imposed in accordance with IRS guidelines. *E.g.*, *Kimble*, 991 F.3d at 1243–44; *Landa*, 153 Fed. Cl. at 601–02.

36. Other cases have remanded to the IRS to recalculate penalties where the IRS had assessed penalties based on a balance from a time other than the June 30th reporting deadline when the violation technically occurs. *United States v. Gentges*, 531 F. Supp. 3d 731, 753–54 (S.D.N.Y. 2021); *Jones*, 2020 WL 2803353, at *8; *United States v. Schwarzbaum*, No. 18-cv-81147, 2020 WL 1316232, at *13 (S.D. Fla. Mar. 20, 2020).

10

37. In *Schwarzbaum*, the error was fairly clear, and appears to have been to the detriment of the defendant: although the IRS asserted in correspondence with the defendant that it calculated penalties based on the June 30th reporting deadline for each year at issue, evidence at trial indicated that it instead used the *highest* account balance for each year at issue. 2020 WL 1316232, at *13. The defendant in that case had thirteen foreign bank accounts and failed to report at least some of them in each of four tax years. *Id.* at *3–5. The opinion does not make clear whether the court considered the $100,000 per-violation maximum as a potential basis to uphold the IRS's decision.

38. In *Gentges*, the effect of the error was not entirely clear. For one of the accounts at issue, the IRS used a December 2007 account balance because the appropriate balance from June 2008 was "unavailable." 531 F. Supp. 3d at 754. The court held that the IRS's use of that "arbitrary expedient" in lieu of following its own guidance was impermissible, and remanded for recalculation of penalties for that account. *Id.* This case predated the IRS's adoption of the Interim Guidance setting the maximum aggregate balance method of calculation penalties at issue here, and it appears from the court's decision that the guidance in use at the time called for using the balance at the June 30th violation date for any calculation of penalties. *See id.* at 752.

39. *Jones* is perhaps closest to the facts at issue here. There, the aggregate balance of the accounts at issue was $2,970,499 on June 30, 2012 and $3,043,880 on June 30, 2013. 2020 WL 2803353, at *3. The IRS assessed a total penalty of $1,521,940—half of the June 2013 balance—prorated across the two years at $751,685 for the 2011 tax year and $770,255 for 2012. *Id.* Later, in litigation, the United States conceded that the defendant was not liable for failing to file an FBAR in 2012, leaving only the 2011 violation. *Id.* at *4. The defendant in *Jones* argued that her *total* penalty of $1,521,940 was calculated improperly because it exceeded the maximum penalty for 2011 (which would have been $1,485,249.50) by $36,660.50. *Id.* at *8. It is not entirely clear from the court's decision whether the IRS was pursuing the full penalty of $1,521,940 after dropping its claim to penalties from 2012, or instead sought only the $751,685 it had apportioned for 2011. The Court held that although the penalty actually assessed for the remaining violation in 2011 was only twenty-five percent of the statutory maximum, it was

11

arbitrary and capricious on account of being "based on inappropriate data that should not have been considered in assessing the penalty," and thus would require remand to the agency for recalculation if the IRS prevailed in showing willfulness at trial. *Id.* at *8.

### B. Errors Regarding 2010 and 2011 Balances (-1000 and -1004 Accounts)

40. Here, as a relatively small but straightforward error, some of the account maximums listed in the IRS's explanation for its penalty assessment are lower than the maximum balances reflected in the underlying bank documents in the record—including at least the amounts listed for the -1000 account in 2010 and the -1004 account in 2010 and 2011, as discussed above in the Court's findings of fact. As noted above, no explanation has been presented for those discrepancies, and by weighting the total penalty away from the years where the United States has now failed to show willfulness, the discrepancies (doubtlessly unintentionally) increased the penalties assessed for 2012 and 2013.

41. There could perhaps be a valid explanation for these discrepancies. For example, under the latest FBAR penalty calculation guidance, calculating the "highest aggregate balance" requires can require deducting the amounts of transfers between the accounts at issue if their inclusion would double-count the same funds. IRM 4.26.16.1.6(1); *see* 4.26.16.5.5.3(4)(a). It is not clear whether any equivalent guidance existed at the time Hughes's penalties were assessed, but the IRS might reasonably have taken a similar approach. That said, there is no evidence in the record to indicate that the IRS applied such deductions in reaching the per-account maximum balances on which it based its calculations, and the United States has not shown that taking such an approach would yield the values that it used.

42. Along the same lines, if the account statements revealing the discrepancies were not available to the IRS at the time it assessed penalties, it might reasonably have relied on more limited evidence available, but the record here includes the account statements and does not include any evidence to suggest they were unavailable when the IRS determined the amount of Hughes's penalties, or that there is any other reasonable explanation for the discrepancies.

43. Accordingly, based on the record available, the Court concludes that the penalty as assessed by the IRS was "based on inappropriate data that should not have been considered"

regarding the highest values for at least some of the accounts at issue, *see Jones*, 2020 WL 2803353, at *8, and that the penalty is inconsistent with the agency's explanation for how it reached the figure at issue. While the total penalty fell well within the IRS's statutory authority, its method of the determining the penalty was arbitrary, thus requiring remand to the agency for reconsideration or recalculation.

### C.  Error Regarding 2013 Maximum Balance (-0600 Account)

44. The Court also finds that the IRS abused its discretion with respect to the 2013 maximum balance in the -0600 account, which makes up the bulk of the 2013 aggregate maximum balance on which the overall penalty is based. As discussed above in the Court's findings of fact, the relevant bank statement, indicating a $688,006.31 NZD loan payment reversal occurring immediately before a $688,006.31 NZD loan payment the same day (and another loan payment in the same amount one day later), plainly reflects an error by the bank. Hughes asserted as much during the examination, and there is no evidence in the record to the contrary.

45. It is not entirely clear whether the error was purely in the preparation of the bank statement, or if the bank perhaps executed instructions in reverse order such that the excess funds were briefly present in Hughes's account. Either way, the IRS abused its discretion in basing the penalty on the higher balance that reflects that transaction.

46. If the error was purely in preparation of the statement, the extra funds never would have been present in the account, and thus would provide no basis for calculation a penalty under the IRS's internal procedures.

47. If the error was in the order of executing the transactions, such that the extra funds were briefly present in the account, basing a penalty on that inflated balance would nevertheless be an abuse of discretion. IRS guidance has at all relevant times granted examiners discretion to recommend penalties higher or lower than the baseline of half the highest aggregate balance if circumstances so warrant. *See, e.g.*, Interim Guidance, attach. 1 at 2; IRM § 4.26.16.6.5.3(2)–(3) (Nov. 6, 2015). Funds momentarily held in an account due to a bank error have no meaningful relationship to an accountholder's ability to pay, the potential for improper tax avoidance or money laundering, or any other rational basis for penalties. Based on the error plainly apparent

from the face of the bank statement, Hughes's statement during the examination that it was an error, and the lack of any evidence to the contrary, the IRS's decision to use that balance as the basis for penalties "was a clear error of judgment," and thus an abuse of discretion. *See Motor Vehicle Mfrs.*, 463 U.S. at 31.

48. To the extent Hughes argues more broadly that funds held for a short a period of time or associated with a loan or other obligation should not be considered in assessing penalties, the Court is not persuaded. *See* Def.'s Br. at 20 ("[I]t is clear that the fines should be based on the money that she actually had access to."). Hughes cites no authority for that proposition. The BSA refers only to the "balance" of a given account to determine the maximum penalty for a willful violation. 31 U.S.C. § 5321(a)(5)(D)(ii). The IRS's internal guidance similarly refers to the "aggregate balance" the accounts at issue in guiding the exercise of discretion to set penalties within that maximum. *E.g.*, Interim Guidance, attach. 1 at 1. The approach of using an account's balance, without delving into whether some of the funds at issue might be otherwise encumbered, has obvious efficiency benefits. Generally, the Court finds no abuse of discretion in taking into account balances representing funds held for a short period of time in the process of accessing or repaying a loan.

49. The March 25, 2013 balance discussed above, however, is an extreme case. It is clear from the face of the bank statement that those funds either never were actually present in Hughes's account, or at least never *should* have been present there but for a bank error. As discussed above, the IRS abused its discretion in setting penalties based on the premature loan payment reversal transaction, which artificially inflated the value of Hughes's 2013 highest aggregate balance by several hundred thousand dollars.

50. The United States contends that any error was harmless, because Hughes's total penalty was well below the statutory maximum. Pl.'s Reply (dkt. 168) at 3–4. As the United States notes in its brief, however, the harmless error rule looks to whether "'the court has a "substantial doubt" that the agency would not have reached the result it did.'" *Id.* at 4 (quoting *Romano-Murphy v. Comm'r*, 152 T.C. 278, 311 (2019)). The test is not whether the amount assessed is statutorily permissible, but whether it is the amount that would have been assessed but

14

for the error. When faced with deviations from the IRS's internal procedures or its stated grounds for a decision assessing FBAR penalties, courts have remanded for recalculation. *See Schwarzbaum*, 2020 WL 1316232, at *13; *Gentges*, 531 F. Supp. 3d at 754; *Jones*, 2020 WL 2803353, at *8.

51. The IRS's apparent failure to adhere to its internal procedures and stated basis for its decision accurately (with respect to the maximum account balances in 2010 and 2011) and reasonably (with respect to the 2013 balance)—or to articulate reasons for departing from those procedures to set a higher penalty—renders the assessment arbitrary, and thus subject to reversal under the APA.

### D. Eligibility for Mitigation

52. Hughes also argues that she is entitled to mitigation of her penalty under IRS procedures. Def.'s Br. at 10. One factor used to determine whether mitigation is available is whether the IRS sustained a fraud penalty against the taxpayer for underpayment based on failure to report foreign accounts. *See, e.g.*, IRM § 4.26.16.6.6.1 (Nov. 6, 2015). The parties have not sufficiently briefed the question of how subsequent settlement of underpayment allegations affects a taxpayer's eligibility for FBAR penalty mitigation.

53. Since recalculation is required here in any event for the reasons discussed above, the Court does not reach the question of whether Hughes is eligible for mitigation in light of the her settlement in tax court. The United States is instructed to consider that question on remand.

## V. CONCLUSION

54. For the reasons discussed above, the Court finds that although the United States has established that Hughes willfully violated the FBAR reporting requirements for the 2012 and 2013 calendar years, the United States abused its discretion in setting penalties for those violations.

55. The matter is therefore REMANDED for further administrative proceedings to calculate an appropriate penalty based on the account balances reflected in Hughes's bank statements (and not obviously attributable to a bank error), or to articulate valid reasons for some

/ / /

/ / /

other value not exceeding the statutory maximum.  The Clerk shall enter judgment accordingly and close the case.

**IT IS SO ORDERED.**

Dated: March 29, 2022

JOSEPH C. SPERO
Chief Magistrate Judge