1

2

3

4                           UNITED STATES DISTRICT COURT

5                       NORTHERN DISTRICT OF CALIFORNIA

6

7    UNITED STATES OF AMERICA,                Case No.  18-cv-05931-JCS

          Plaintiff,
8
                                              **FINDINGS OF FACT AND**
9         v.                                  **CONCLUSIONS OF LAW**
                                              **REGARDING RECALCULATED**
10   TIMBERLY E. HUGHES,                       **PENALTY**

          Defendants.
11

12

13   **I.      INTRODUCTION**

14          1.      Plaintiff the United States of America brought this action seeking to enforce civil

15   penalties against Defendant Timberly Hughes, pro se, for failure to report foreign bank accounts

16   by filing a report commonly known as an "FBAR" as required by the Bank Secrecy Act ("BSA")

17   and its implementing regulation.  The Court held a bench trial on June 8 and 9, 2021.[1]

18          2.      The Court previously determined that Hughes willfully failed to file FBARs for the

19   years 2012 and 2013 and remanded for further administrative proceedings regarding calculation of

20   penalties for those years.  The United States recalculated penalties in accordance with the Court's

21   previous determinations and now moves for judgment against Hughes in the amount of

22   $343,298.24.

23          3.      For the reasons discussed below, the United States' motion is GRANTED as to

24   substantive penalties totaling $238,125.19, but denied as to pre-judgment interest and late payment

25   penalties.

26          4.      After briefing closed on the United States' motion, Hughes filed a motion to

27   _____

28   [1] The parties have consented to the jurisdiction of a magistrate judge for all purposes pursuant to
     28 U.S.C. § 636(c).

dismiss.  For the reasons discussed below, that motion is STRICKEN, or in the alternative, DENIED.

## II.     PROCEDURAL HISTORY AND STANDARD OF REVIEW

5.     The Court held a bench trial by videoconference on June 8, 2021 and June 9, 2021.

6.     In the Court's first Findings of Fact and Conclusions of Law, the Court found that the United States failed to carry its burden to show that Hughes's failure to file FBARs in 2010 and 2011 was "willful" within the meaning of the Bank Secrecy Act ("BSA"), but that the United States carried its burden to show that her failure to file FBARs in 2012 and 2013 was "willful" based on a standard of recklessness.  *See generally* Findings of Fact & Conclusions of Law re Willfulness ("1st FFCL," dkt. 162).[2]  That order reserved the question of whether the United States assessed valid penalties to be decided after further briefing.

7.     In the Court's second Findings of Fact and Conclusions of Law, the Court determined that the United States abused its discretion in setting penalties, and remanded for further administrative proceedings to determine an appropriate penalty.  *See generally* Findings of Fact & Conclusions of Law re Penalty ("2d FFCL," dkt. 171).[3]  The primary error identified by that order was that the IRS based its penalty calculations in part on a certain account having a maximum balance of $1,373,375 New Zealand dollars ("NZD") in 2013, but the bank statements reflecting that value showed that it resulted solely from a bank error that the bank quickly identified and reversed.  *Id.* ¶¶ 23–29, 44–51.

8.     On remand to the Internal Revenue Service ("IRS"), the United States calculated new penalties, accounting for the 2013 bank error that the Court identified and applying mitigation standards in light of the settlement of fraud allegations that had previously caused Hughes to be ineligible for mitigation.

9.     The Court also previously identified purported errors in certain account balances in 2010 and 2011.  The IRS determined on remand that the Court erroneously transposed certain NZD and U.S. dollar ("USD") values in reaching that conclusion.  The 2010 and 2011 balances

---

[2] *United States v. Hughes*, No. 18-cv-05931-JCS, 2021 WL 4768683 (N.D. Cal. Oct. 13, 2021).
[3] *United States v. Hughes*, No. 18-cv-05931-JCS, 2022 WL 911721 (N.D. Cal. Mar. 29, 2022).

were relevant to the IRS's previous method of calculating penalties even though the Court determined that the United States did not substantiate its position that Hughes acted willfully in those years, because the calculation method without mitigation allocated the overall penalty across different years based on their relative account balances, so understated balances in 2010 and 2011 would have resulted in larger penalties for 2012 and 2013.  These values are no longer relevant to the calculation of penalties under the IRS's mitigation method, which looks to each year individually.  The Court therefore does not reach any questions regarding the 2010 and 2011 balances here, but apologizes if the previous findings of fact and conclusions of law included errors as to those years.

10.     In a stipulation that the Court initially denied without prejudice due to potential evidentiary disputes, and then again at the January 6, 2023 case management conference, the parties agreed to reopen the case and resolve it on a briefing schedule consisting of an opening brief by the United States, an opposition brief by Hughes, and a reply brief by the United States. *See* dkts. 173, 179

11.     The parties' agreement to resolve the remaining issues in the case on the United States' motion and to waive any right to an evidentiary hearing resembles a trial on the papers. The Court therefore finds the following facts by the preponderance of the evidence and makes the following conclusions of law under Rule 52(a)(1) of the Federal Rules of Civil Procedure.  To the extent that any finding of fact is better characterized as a conclusion of law, or any conclusion of law is better characterized as a finding of fact, the Court adopts it as such.

12.     In the alternative, if the Court were to treat the United States' motion as seeking summary judgment under Rule 56 and apply the standard applicable to such a motion, the outcome would be the same.

13.     Before the Court reopened the case and set a briefing schedule for the present motion, Hughes filed a motion to dismiss, arguing that the BSA does not apply because she has not engaged in money laundering, terrorism, or other harmful conduct that appears in the BSA's statement of purpose.  *See* dkt. 177.  The Court denied that motion on both procedural and substantive grounds.  Order re Mot. to Dismiss (dkt. 178).  The Court noted that the case was

closed at the time and Hughes cited no rule of civil procedure allowing her to bring such a motion. *Id.* at 1.  Even if those procedural defects were excused, the Court held that the BSA's statement of purpose did not limit its operative provisions, including the requirement for Hughes to file reports as required by the Secretary of the Treasury (here, FBARs) and the statutory penalties applicable for her failure to do so.  *Id.* at 1–2.

14.     After briefing closed on the United States' motion, Hughes filed another motion to dismiss on February 21, 2023.  *See* dkt. 183.

15.     The United States is currently pursuing penalties only for the years 2012 and 2013, where the Court previously found willful violations.  The United States is not pursuing penalties for either willful or non-willful violations in 2010 and 2011.  Reply (dkt. 182) at 2.

## III.    FINDINGS OF FACT

16.     This order adopts in full the findings of fact stated in the Court's previous findings of fact and conclusions of law regarding Hughes's conduct and the United States' initial assessment of penalties, and does not repeat all relevant facts here.

17.     As the Court previously found, Hughes failed to file FBARs for 2012 and 2013, despite submitting Schedule B (which included instructions relevant to FBARs) with both of those years' tax returns, and despite checking a box on her 2012 Schedule B indicating that she believed she was required to file an FBAR for that year.  The Court previously found that Hughes's failure to file FBARs for those years was "willful" at least under a standard of recklessness.

### A.    The IRS's Recalculation of Penalties

18.     The only new evidence submitted by the United States after reopening the case is an IRS report explaining its recalculation of penalties.  Mot. (dkt. 180) Ex. 1.  At the January 6, 2023 case management conference, Hughes stipulated to waive any evidentiary objection to that report.  *See* dkt. 179.

19.     On remand, the IRS relied on the Internal Revenue Manual ("IRM")[4] to assess

---

[4] The IRS uses the IRM as internal guidance for matters falling within its discretion.  *See, e.g.*, *In re Ransom*, 577 F.3d 1026, 1028 (9th Cir. 2009) (noting that "[t]he IRS uses the IRM in determining a taxpayer's ability to pay a delinquent tax liability"), *aff'd sub nom. Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61 (2011).  The IRM "does not have the force of law and does not

United States District Court
Northern District of California

Hughes's eligibility for mitigation and the applicable penalties.  The Court takes judicial notice of the current version of the IRM, available at https://www.irs.gov/irm/, as a matter of public record not reasonably subject to dispute.  *See Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001).

20.     Based on guidance in the IRM, the IRS determined that Hughes is eligible for mitigation because the following conditions are satisfied: (1) Hughes has no history of relevant criminal convictions or previous FBAR penalty assessments; (2) no money passing through the relevant accounts "was from an illegal source or used to further a criminal purpose"; (3) Hughes cooperated during the IRS's investigation; and (4) no penalty was assessed against Hughes for fraudulently underreporting her taxes related to foreign accounts for the years at issue.  Mot. Ex. 1 at 2–3; *see* IRM Ex. 4.26.16-2.

21.     In reaching its determination that Hughes satisfied the fourth factor, the IRS noted that although it had initially found a civil fraud penalty applicable, the settlement that Hughes ultimately reached only assessed penalties under 26 U.S.C. § 6662, which governs penalties for negligence and other errors not rising to the level of fraud, not under 26 U.S.C. § 6663, which governs penalties for fraud.  Mot. Ex. 1 at 3 (citing Trial Ex. 41 at 1044[5]).

22.     The IRM includes a table with guidelines for calculating penalties for willful failure to file an FBAR where a taxpayer is eligible for mitigation.  Under that guidance, "[i]f the maximum aggregate balance (per IRM 4.26.16.2.6) for all accounts to which the violations relate . . . exceeds $250,000 but does not exceed $1,000,000, then Level III-Willful mitigation applies to all violations," and penalties are assessed at "the greater of 10% of the maximum account balance during the calendar year at issue or 50% of the account balance on the violation date (defined in IRM 4.26.16.5.2)" for each account the taxpayer filed to report.  IRM Ex. 4.26.16-2.  If the aggregate balance is between $50,000 and $250,000, penalties are assessed at "the greater of $5,000 or 10% of the maximum account balance" per account.  *Id.*

---

confer rights on taxpayers."  *Fargo v. Comm'r*, 447 F.3d 706, 713 (9th Cir. 2006).
[5] For ease for reading, this order omits alphabetical prefixes and leading zeros from citations to Bates page numbers of trial exhibits.

United States District Court
Northern District of California

23. On remand, the IRS found the following maximum account balances for Hughes's accounts in 2012 and 2013, before accounting for any transfers between accounts:

| Year | Account No. | Raw Maximum Balance (NZD) | Citation (Trial Ex. 28) |
|------|-------------|---------------------------|-------------------------|
| 2012 | -0625 | $127,516.64 | 617 |
| 2012 | -0600 | $714,215.20 | 441 |
| 2012 | -1000 | $14,173.73 | 333 |
| 2012 | -1006 | $46,413.26 | 285 |
| 2012 | -1005 | $52,370.82 | 298 |
| 2012 | -1004 | $56,507.72 | 308 |
| 2013 | -1006 | $46,896.67 | 287 |
| 2013 | -1000 | $14,377.27 | 338 |
| 2013 | -0600 | $895,561.45 | 500 |
| 2013 | -1005 | $53,830.98 | 301 |
| 2013 | -0625 | $78,643.85 | 546 |
| 2013 | -4400 | $26,743.59 | 277 |
| 2013 | -1004 | $58,216.51 | 310 |

24. These values are identical to what the IRS identified before remand, except for the -0600 account in 2013, where the IRS has now set aside the $1,372,374.78 NZD value that the Court determined resulted from a bank error.

25. The values set forth above are supported by records included in Trial Exhibit 28 on the pages cited in the table.

26. The IRS further reduced certain values to reflect transfers between accounts, so that the same funds did not count towards multiple penalties. That screening is consistent with guidance in IRM sections 4.26.16.1.6 and 4.26.16.2.6(2)(a) to determine aggregate account balances. The IRS reduced the -0600 account's 2012 maximum balance by $10,265.20 NZD to reflect funds remaining after a larger transfer from the -0625 account had been partially drawn down before the account was funded from other sources to reach its 2012 maximum, *see* Trial Ex.

United States District Court
Northern District of California

6

28 at 440, reduced the -0625 account's 2013 maximum balance by $53,830.98 NZD to exclude a transfer from the -1005 account, *see id.* at 546, and reduced the -4400 account's 2013 maximum balance by $16,000 NZD to exclude transfers from the -0600 and -0625 accounts, *see id.* at 278. Mot. Ex. 1 at Table B.  Those reductions are supported by the evidence cited.

27.     After accounting for those reductions, and converting to U.S. dollars using contemporaneous exchange rates, the IRS found the following adjusted maximum balances for each account:

| Year | Account | Adjusted Maximum (NZD) | Adjusted Maximum (USD) |
|------|---------|------------------------|------------------------|
| 2012 | -0625 | $127,516.64 | $104,865.66 |
| 2012 | -0600 | $703,950.00 | $578,906.25 |
| 2012 | -1000 | $14,173.73 | $11,656.03 |
| 2012 | -1006 | $46,413.26 | $38,168.80 |
| 2012 | -1005 | $52,370.82 | $43,068.11 |
| 2012 | -1004 | $56,507.72 | $46,470.16 |
| 2013 | -1006 | $46,896.67 | $38,566.34 |
| 2013 | -1000 | $14,377.27 | $11,823.41 |
| 2013 | -0600 | $895,561.45 | $736,481.46 |
| 2013 | -1005 | $53,830.98 | $44,268.90 |
| 2013 | -0625 | $24,812.87 | $20,405.32 |
| 2013 | -4400 | $10,743.59 | $8,835.19 |
| 2013 | -1004 | $58,216.51 | $47,875.42 |

28.     These values reflect aggregate maximum balances of $823,135.01 USD for 2012 and $908,256.34 USD for 2013, both of which fall in the range for Level III mitigated penalties under the guidance of the IRM.

29.     As noted above, Level III penalties call for the greater of ten percent of the maximum annual balance or fifty percent of the violation date balance for each account.  IRM Ex. 4.26.16-2.  The violation date is defined as June 30th on the year after the year in question, which

1  was the due date for filing each year's FBAR.  IRM § 4.26.16.5.2(2)(a).[6]

2       30.    The IRS did not have access to Hughes's account balances in 2014, so it treated the

3  violation date balance as zero for the purpose of 2013 penalties.  *See* Mot. at 4; Mot. Ex. 1 at

4  Tables A, D.  Since the guidance calls for using the greater of the annual maximum method or the

5  violation date method, that choice can only serve to reduce Hughes's penalties as compared to if

6  the data were available and considered.  The -0600 account was overdrafted as of June 30, 2013,

7  so the IRS used a balance of zero for that account's 2012 violation date as well.  Mot. Ex. 1 at

8  Tables A, D; Trial Ex. 28 at 508.  The IRS found that the remaining accounts had the following

9  balances on June 30, 2013 (the violation date for 2012), converted to USD using the

10 contemporaneous exchange rate:

| Year | Account | Violation Balance (NZD) | Violation Balance (USD) | Citation[7] |
|---|---|---|---|---|
| 2012 | -0625 | $58,181.69 | $45,454.45 | 542 |
| 2012 | -1000 | $14,377.27 | $11,232.24 | 337 |
| 2012 | -1006 | $46,896.67 | $36,638.02 | 287 |
| 2012 | -1005 | $52,923.56 | $41,346.53 | 300 |
| 2012 | -1004 | $56,507.72 | $44,146.66 | 311 |

     31.    Those balances are supported by the records cited.

     32.    Applying the guidance of the IRM, the IRS assessed the following penalties.  *See* Mot. at 5 & Ex. 1 at Table F.  All balances in the following table use U.S. dollars.  Single asterisks designate penalties calculated at ten percent of the maximum account balance, while double asterisks designate penalties calculated at fifty percent of the violation date balance.

| Year | Account | Adj. Max. Balance | Violation Date Balance | Penalty |
|---|---|---|---|---|
| 2012 | -0625 | $104,865.66 | $45,454.45 | $22,727.23** |
| 2012 | -0600 | $578,906.25 | - | $57,890.63* |
| 2012 | -1000 | $11,656.03 | $11,232.24 | $5,616.12** |

[6] A different method of determining the violation date for years after 2015 is not at issue here.  *See* IRM § 4.26.16.5.2(2)(b).
[7] Citations here are to pages of Trial Exhibit 28.

| Year | Account | Adj. Max. Balance | Violation Date Balance | Penalty |
|------|---------|-------------------|------------------------|---------|
| 2012 | -1006 | $38,168.80 | $36,638.02 | $18,319.01** |
| 2012 | -1005 | $43,068.11 | $41,346.53 | $20,673.27** |
| 2012 | -1004 | $46,470.16 | $44,146.66 | $22,073.33** |
| 2013 | -1006 | $38,566.34 | - | $3,856.63* |
| 2013 | -1000 | $11,823.41 | - | $1,182.34* |
| 2013 | -0600 | $736,481.46 | - | $73,648.15* |
| 2013 | -1005 | $44,268.90 | - | $4,426.89* |
| 2013 | -0625 | $20,405.32 | - | $2,040.53* |
| 2013 | -4400 | $8,835.19 | - | $883.52* |
| 2013 | -1004 | $47,875.42 | - | $4,787.54* |

33. These penalties total $147,299.59 for 2012 and $90,825.60 for 2013, for a grand total of $238,125.19.

34. Where the IRS based penalties on annual maximum balances, it used the adjusted maximums with deductions for transfers between accounts. It is not clear whether the IRM calls for taking those transfers into account in this context, as opposed to in the context of determining aggregate maximum balances across all accounts for non-mitigated penalties and for determining the violation level applicable to mitigated penalties. If the use of these deductions to calculate mitigated penalties is a deviation from IRM guidance, it is a deviation that benefits Hughes.

35. In contrast to the annual maximums, the IRS did not deduct anything from the violation date balances appearing on Hughes's bank records. It is not entirely clear whether any of the transfers that the IRS considered in adjusting the annual maximums affected the violation date balances. Even if they did, neither party has identified any guidance in the IRM or elsewhere that calls for deducting inter-account transfers to determine the violation date balance when the IRS uses that method of mitigated penalty calculation.

36. The IRM states that total penalties should not "exceed 100 percent of the highest aggregate balance of all foreign financial accounts to which the violations relate during the years

1     under examination." IRM § 4.26.16.5.5.3(7).  The total penalty assessed here does not exceed the

2     highest aggregate balance.

3              37.     The IRM states that where mitigation applies, total penalties should not exceed "50

4     percent of the highest aggregate balance of all unreported foreign financial accounts (to which the

5     violations relate) during the years under examination."  IRM § 4.26.16.5.5.3(2).  The total penalty

6     assessed here does not exceed fifty percent of the highest aggregate balance.

7              38.     The IRS generally followed its internal guidance in calculating penalties.  To the

8     extent that it may have deviated from those policies as discussed above, any such deviation

9     benefited Hughes by reducing the total penalty value.

10             39.     On September 30, 2016, the IRS served a demand letter on Hughes for payment of

11    FBAR penalties totaling $678,899, which reflected total assessed penalties before the Court's

12    determination that Hughes's violations as to 2010 and 2011 were not willful and before the IRS's

13    recalculation of penalties on remand to exclude the bank error and account for mitigation.  Trial

14    Ex. 43.

15             **B.      Hughes's Factual Assertions Regarding Transfers Between Accounts**

16             40.     Hughes asserts in her opposition brief that the majority of the funds used in the

17    IRS's determination of her account balance reflect transfers between those accounts.  Opp'n at 2 &

18    Ex. B.  That assertion is not substantiated by evidence.  While the trial record includes voluminous

19    bank records, Hughes for the most part has not identified specific evidence of transfers between

20    her accounts that the IRS failed to deduct.

21             41.     In an exhibit to her opposition brief, Hughes asserts that the IRS failed to properly

22    deduct three specific transfers of funds.  Opp'n Ex. B.

23                      **1.      $123,000 NZD in 2012**

24             42.     First, Hughes asserts that the IRS double-counted $123,000 NZD transferred from

25    the -0600 account to the -0625 account in 2012.  Opp'n Ex. B at n.1.

26             43.     As the United States notes in its reply, these funds were in fact transferred from

27    the -0625 account to the -0600 account—the reverse of what Hughes asserts—on March 14, 2012.

28    *See* Trial Ex. 28 at 440, 621.

44.     At least some portion of these funds[8] may have been included in the IRS's maximum balance for the -0625 account for the purpose of determining Hughes's aggregate maximum value and setting the level of her mitigation penalties, since that maximum occurred at the start of the year.  Trial Ex. 28 at 617.

45.     The IRS assessed a maximum balance for the -0600 account on March 16, 2012, a few days after the transfer.  Mot. Ex. 1 at Table A; Trial Ex. 28 at 441.  The IRS deducted $10,265.20 from that maximum to account for the transfer, reasoning that since the balance had been drawn down to that amount on March 15, 2012 before rising to its maximum with a large deposit the next day, the bulk of the $123,000 NZD transfer was no longer in the account when it reached its maximum.  Mot. Ex. 1 at Tables A, B (Explanation J); Trial Ex. 28 at 441.  Those withdrawals are reflected in Hughes's bank records.  Trial Ex. 28 at 441.

46.     The IRS assessed 2012 penalties for the -0600 account based on its March 16, 2012 maximum balance, but deducted $10,265.20 NZD to reflect the funds remaining from the transfer.

47.     The IRS assessed 2012 penalties for the -0625 account based on its violation date balance on June 30, 2013.  The funds at issue from this transfer were not included in that value because they had been transferred to the -0600 account the prior year.

48.     Even if the IRS somehow deviated from its guidance or otherwise acted unreasonably in determining the maximum values of the -0600 and -0625 accounts for the purpose of assessing Hughes's *aggregate* 2012 maximum balance (and thus her mitigated penalty level), that aggregate maximum was assessed at $823,135.01 USD, and even fully deducting the $123,000 NZD transfer from that aggregate value would leave it well above the $250,000 USD threshold for Level III penalties.

**2.     $53,830.98 NZD in 2013**

49.     Second, Hughes asserts that the IRS double-counted $53,830.98 NZD deposited to the -0600 account when the -1005 term deposit account matured in 2013.  Opp'n Ex. B at n.2.

---

[8] Significant withdrawals from the -0625 account occurred between its January 2012 maximum balance and the March 14, 2012 transfer, so it is not obvious that all of the funds transferred in March reflected the same funds counted towards the earlier maximum.

11

50.     The United States is correct that the -1005 account matured to the -0625 account, not the -0600 account.  Trial Ex. 28 at 546.

51.     The United States is correct that the IRS properly deducted the full $53,830.98 NZD that originated from the -1005 account in determining the maximum value of the -0625 account for 2013, and that the IRS included an explanatory note to that effect in its report.  Mot. Ex. 1 at Tables A, B (Explanation L).

52.     The maximum balance assessed by the IRS for the -0600 account in 2012 did not include funds from the -1005 account because those funds matured to the -0625 account, not the -0600 account.  The adjusted maximum balance assessed by the IRS for -0625 account in 2012 did not include funds from the -1005 account because the IRS deducted those funds in its calculation.

### 3.     $47,737.53 NZD in 2013

53.     Third, Hughes asserts that the IRS triple-counted $47,737.53 NZD deposited to the -0600 account when the -1004 term deposit account matured in 2013, and then transferred from the -0600 account to the -0625 account later in 2013.  Opp'n Ex B at n.3.

54.     As the United States notes in its reply, Hughes's bank records reflect a maturity balance of $58,216.51 NZD, not $47,737.53 NZD, for the -1004 account in 2013.  Trial Ex. 28 at 311.

55.     The United States is also correct that the bank records reflect that all funds from the -1004 account were reinvested in the same account upon its December 2013 maturity, with a subsequent maturity date in 2014, and not transferred to any other account at that time.  Trial Ex. 28 at 310.

56.     Hughes has identified no record evidence showing that funds were transferred in 2013 from the -1004 account to the -0600 account, the -0625 account, or any other account.

57.     The IRS counted the funds in the -1004 account towards that account's maximum balance in 2013.  The IRS did not count those funds towards any other account's maximum balance for that year.

United States District Court
Northern District of California

12

1

### C.   Hughes's Other Factual Assertions

2       58.    Aside from its assertions regarding specific transfers addressed above, Exhibit B to

3   Hughes's opposition brief lists generally lower maximum balances for all of the accounts at issue.

4   Those balances are not supported by evidence, and the Court disregards them.

5       59.    Hughes asserts in her declaration that the IRS's penalty calculation included "bank

6   originated journal entries."  Hughes Decl. ¶ 1.  That may be true.  As discussed further below in

7   the Court's conclusions of law, however, it is not clear why it is relevant.

8       60.    Hughes asserts that "Page # 246" demonstrates that the IRS included "the duplicate

9   number and the bank error on the calculations for FBAR penalties, knowing that they were

10   doubling nearly $700K into their calculations."  Hughes Decl. ¶ 3.  It is not clear whether any page

11   bearing that number was presented in the trial record.

12       61.    Assuming for the sake of argument that Hughes could have submitted new record

13   evidence now, which is far from clear, she has not provided that page with her opposition brief

14   and declaration.

15       62.    It is also not clear whether the duplication and bank error Hughes references here is

16   the same $688,006.21 NZD error that the Court previously identified and that the IRS removed

17   from its penalty calculation on remand.  To the extent that Hughes asserts a separate error

18   duplicating $700,000, she has not provided evidence to show such an error occurred, and the

19   Court finds her mere assertion of that fact insufficient and not credible.

20       63.    Hughes asserts that she "ha[s] an ANZ Bank letter stating that three of the accounts

21   were collateral . . . even though [she was] a signatory on them."  Hughes Decl. ¶ 4.  Hughes does

22   not cite any evidence supporting that assertion in her declaration, which is inadmissible as hearsay.

23       64.    Assuming for the sake of argument that such a letter exists, Hughes identifies no

24   evidence that the letter was available to the IRS during its investigation and assessment of

25   penalties.

26       65.    Even if such a letter was presented to the IRS, it is not clear why it is relevant, as

27   discussed further below in the Court's conclusions of law.

28       66.    Hughes asserts that she never willfully failed to disclose any information.  Hughes

Decl. ¶ 6.  To the extent that she means she did not have a specific intent to withhold information, that may be true, but is not relevant to the finding of recklessness on which the Court previously based its holding that Hughes satisfied the test for a willful violation.  To the extent she means that she did not meet the legal standard for a willful violation, her declaration does not alter the Court's previous conclusion that she was at least reckless in failing to file FBARs for 2012 and 2013.

67.     Similarly, Hughes asserts that she is "not aware of any facts or documents that would demonstrate that [she] ever knowingly or recklessly violated a statute."  Hughes Decl. ¶ 9.  To the extent this statement reflects Hughes's opinion as to the legal definition of recklessness, it is irrelevant.  To the extent it is intended as a refutation of the factual findings on which the Court based its decision that Hughes at least acted recklessly—including but not limited to the facts that Hughes was presented with instructions relevant to FBARs and checked a box indicating that she was required to file an FBAR—the Court finds the assertion not credible and insufficient to overcome the evidence on which the Court based its previous conclusion.

68.     Hughes asserts that an IRS auditor initially told her "that he did not consider her failure to disclose to be willful," and that the decision was later changed before penalties were assessed.  Hughes Decl. ¶ 7.  This assertion is generally consistent with trial testimony from IRS revenue agent Jonathan Lauren, who stated that he initially told Hughes's representative that the IRS would not pursue penalties for a willful violation, but that his assessment changed after he learned more about the relevant legal standard.  *See* 1st FFCL ¶¶ 105-06.  Lauren's initial assessment is not relevant to the validity of the IRS's final decision.

69.     Hughes asserts that she cooperated in the IRS's investigation, she has never been indicted and convicted of a crime relating to the facts at issue, she has no previous tax or Bank Secrecy Act convictions or FBAR penalty assessments, the IRS never assessed a fraud penalty against her for income tax underpayment related to foreign accounts, and the IRS never alleged that she transferred "illicit funds."  Hughes Decl. ¶¶ 8, 10, 12–16, 18.  These assertions generally are not in dispute, and the IRS based its determination that Hughes is eligible for mitigation on many of these facts.  *See* Mot. Ex. 1 at 2–3.

70.     Hughes asserts that she is "not aware of any records or information where [she]

was ever accused, indicted or convicted for bankruptcy fraud or tax fraud." Hughes Decl. ¶ 11. As to accusations, this statement is not credible. Hughes was accused of fraudulently underreporting her taxes, although she settled those allegations without any fraud-based penalties. *See, e.g.*, Trial Ex. 41 at 876–77 (notice of deficiency asserting penalties for underpayment due to fraud). To the extent this statement pertains to indictments or convictions, it is undisputed.

71.     Other assertions in Hughes's declaration, including that defense counsel asked her to admit that her account balances were correct, are not relevant to any issue in the case, and therefore do not warrant any finding of fact as to their truthfulness. *See, e.g.*, Hughes Decl. ¶ 17.

IV.     **CONCLUSIONS OF LAW**

    A.     **Legal Standard for Reviewing FBAR Penalties**

72.     The BSA provides for maximum penalties of the greater of $100,000 or fifty percent of an account balance for willfully failing to file an FBAR regarding a foreign account. 31 U.S.C. § 5321(a)(5)(C)–(D). Hughes does not dispute the United States' position that the $100,000 maximum applies per account and per year. The Supreme Court very recently endorsed that approach, distinguishing penalties for willful violations (which apply to each account that should have been reported) from penalties for non-willful violations (which the Court held apply per report, rather than per account). *See Bittner v. United States*, 598 U.S. __, 2023 WL 2247233, at *6 (Feb. 28, 2023). Accordingly, the statutory maximum penalty is at least $1,300,000 for the six accounts at issue in 2012 and seven accounts at issue in 2013—well above the penalty actually assessed. The question, then, is not whether the IRS exceeded its authority under the BSA, but whether it abused its discretion in setting the particular penalties it assessed.

73.     In reviewing assessments of penalties pursuant to the Administrative Procedures Act, which is the applicable mechanism to consider FBAR penalties, courts will "set aside an agency's penalty selection only if it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Kimble v. United States*, 991 F.3d 1238, 1242 (Fed. Cir.), *cert. denied*, 142 S. Ct. 98 (2021). "Agencies have broad discretion to select the amount of a sanction to enforce programs within their jurisdiction." *Landa v. United States*, 153 Fed. Cl. 585, 601 (2021). "Even if the evidence is susceptible of more than one rational interpretation, the court

must uphold the agency's findings." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (cleaned up).  " 'While the scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency, the agency nevertheless must examine the relevant data and articulate a satisfactory explanation for its action.  In reviewing that explanation, a court must consider whether the decision was based on a consideration of the relevant factors and whether there was a clear error of judgment.' " *Jones v. United States*, No. CV 19-04950 JVS (RAOx), 2020 WL 2803353, at *8 (C.D. Cal. May 11, 2020) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30–31 (1983)).

74.     " 'If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.  The reviewing court is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.' " *Id.* (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)).

75.     Although the IRM does not have the force of law, *Fargo v. Comm'r*, 447 F.3d 706, 713 (9th Cir. 2006), courts have generally declined to disturb the IRS's assessment of FBAR penalties when conducted in accordance with IRM guidelines and within the bounds of statutory authority.  *See, e.g.*, *United States v. Rum*, 995 F.3d 882, 892–95 (11th Cir. 2021).

**B.     The Court Declines to Reconsider Willfulness**

76.     The Court previously concluded that Hughes's failure to file FBARs in 2012 and 2013 constituted willful violations of the BSA and its regulations at least based on a standard of recklessness.  *See generally* 1st FFCL.  The current posture of the case, after remand solely for the IRS to recalculate penalties, is not an opportunity to reconsider that holding.  Even if it were, Hughes has presented no evidence or authority that alters the Court's previous conclusions regarding willfulness.

77.     The revenue agent's initial impression that Hughes's conduct did not warrant

United States District Court
Northern District of California

United States District Court
Northern District of California

1 | penalties for willful violations, later reversed based on further research regarding the applicable

2 | legal standard, is of no consequence.

3 |     **C.   The IRS Did Not Abuse Its Discretion in Assessing FBAR Penalties**

4 |     78.    Except for the bank error previously identified by the Court and removed from the

5 | IRS's calculation on remand, the IRS's use of account balances reflected in Hughes's bank

6 | statements and similar records to calculate penalties was not arbitrary and capricious.

7 |     79.    Hughes now asserts that certain balances were held as collateral or otherwise

8 | unavailable to her, but she identifies no evidence in the trial record to support that assertion.

9 |     80.    Even if such evidence were available, Hughes also once again "cites no authority

10 | for [the] proposition" that funds associated with a loan or otherwise not fully available to her

11 | should be disregard.  *See* 2d FFCL ¶ 48 (rejecting this argument when Hughes previously asserted

12 | it).  The BSA provides that the maximum penalty for account reporting violations is the greater of

13 | $100,000 or fifty percent of "the balance in the account at the time of the violation."  31 U.S.C.

14 | § 5321(a)(5)(C).  Nothing in the text of the statute calls for looking beyond an account balance to

15 | determine whether funds included therein are encumbered or otherwise unavailable to the

16 | taxpayer.  Given that statutory structure, the IRS did not abuse its discretion in similarly

17 | calculating mitigated penalties based on account balances.  *See also* 2d FFCL ¶ 48 ("The approach

18 | of using an account's balance, without delving into whether some of the funds at issue might be

19 | otherwise encumbered, has obvious efficiency benefits.").

20 |     81.    Hughes identifies no authority for her position that "bank originated journal

21 | entries" should be excluded from her account balances in calculating penalties.  The Court holds

22 | that the IRS did not abuse its discretion in declining to exclude such entries.  No such entries

23 | reflect obvious bank errors in the same manner as the March 25, 2013 entry that the IRS has now

24 | disregarded in accordance with the Court's previous ruling.

25 |     82.    As discussed above in the Court's findings of fact, the IRS generally adhered to its

26 | own internal guidance in calculating penalties that fell well below the statutory maximum for

27 | Hughes's willful violations in 2012 and 2013.  To the extent it may have deviated from the IRM, it

28 | did so in ways that were either beneficial to Hughes or had no effect on the value of penalties.

1   The Court is satisfied that the penalties assessed by the IRS after remand are not arbitrary or

2   capricious.

3       83.     The United States is entitled to collect penalties totaling $238,125.19 USD.

4   **D.      Hughes's Other Arguments in Opposition and Motion to Dismiss**

5       84.     Hughes argues that she is not able to defend herself because the Court has allowed

6   the IRS to redact one page of a report from its initial investigation.  Opp'n at 2 & Ex. A; Hughes

7   Decl. ¶ 2.  As the United States correctly notes in its reply, that page was produced with fewer

8   redactions than the version Hughes attaches to her brief in December of 2020 after the parties met

9   and conferred regarding Hughes's concerns, *see* Opp'n to Mot. to Compel (dkt. 109) Ex. 4 at

10  USA000861, and the Court previously held that the remaining redacted material fell within the

11  deliberative process privilege and thus was properly redacted, Order Denying Mot. to Compel

12  (dkt. 118) at 3–5.[9]  The Court stands by that decision, and concludes that this redaction is not a

13  reason to refrain from entering judgment.

14      85.     Hughes asserts that she was "not allowed to actually see how these penalties were

15  actually calculated."  Opp'n at 2.  The redaction of internal deliberations does not prevent Hughes

16  from seeing the United States' penalty calculations.  The penalty calculations currently at issue are

17  presented in Exhibit 1 to the United States' motion, of which only Hughes's Social Security

18  number is redacted.

19      86.     Hughes's February 21, 2023 motion to dismiss deviates from the procedure to

20  resolve this case that the parties agreed on and the Court ordered.  There is no reason the

21  arguments in that motion could not have been included in Hughes's opposition to the United

22  States' motion for judgment.  Hughes cites no rule of procedure or other authority permitting her

23  to bring that motion.  The Court therefore strikes and disregards the February 21, 2023 motion to

24  dismiss as an unauthorized supplemental brief filed without permission.

25      87.     Hughes's opposition brief and her February 21, 2023 motion to dismiss (even if it

26  were considered) include the same arguments that she is not subject to the BSA or its FBAR

27

28  ───────────────

[9] *United States v. Hughes*, No. 18-cv-05931-JCS, 2021 WL 1091951 (N.D. Cal. Mar. 22, 2021).

United States District Court
Northern District of California

1   provisions as she presented in her January 3, 2023 motion to dismiss.  The Court rejects those

2   arguments for the reasons stated in its January 3, 2023 order denying that previous motion.  Those

3   arguments provide no basis for denying the United States' motion.  If the Court did not strike the

4   latest motion to dismiss, it would deny that motion on its merits.

5            **E.    Interest and Late Payment Penalties**

6            88.    The United States asserts that it is entitled to interest totaling $15,024.72 and late

7   payment penalties totaling $90,148.33 through January 20, 2023, "plus statutory additions

8   accruing after that date," using annual rates of one percent for interest and six percent for

9   penalties.  Mot. at 7.

10           89.     For interest, the United States cites 31 U.S.C. § 3717 subsections (a)(1) and (b)(2),

11  allowing interest at a rate equivalent to Treasury investment rates on debts owed to the United

12  States and running from the date of a notice mailed to the debtor.  For late payment penalties, the

13  United States cites 31 U.S.C. § 3717(e)(2), allowing the "head of an executive, judicial, or

14  legislative agency [to] assess . . . a penalty charge of not more than 6 percent a year for failure to

15  pay a part of a debt more than 90 days past due."

16           90.    The United States cites no authority applying these provisions to a demand letter

17  stating an amount that has subsequently been set aside by a Court as arbitrary and capricious, as is

18  the case here with respect to the IRS's September 30, 2016 demand letter for FBAR penalties

19  totaling $678,899.  The Court's previous ruling on penalties did not hold that any portion of the

20  initial demand was valid, but instead held that the IRS's assessment of penalties was arbitrary and

21  capricious, and that recalculation was required.  On remand, the IRS—in an exercise of

22  discretion—applied an entirely different standard to calculate penalties based on its mitigation

23  guidelines.  It is not obvious that the initial demand to pay a far greater penalty was valid under

24  the circumstances of this case.  Without ruling out that the statutes *might* apply in such

25  circumstances, the Court holds that the IRS has not satisfied its burden of persuasion to apply

26  them here.

27           91.     Even if the statutes apply, the United States has offered no evidence of the

28  applicable Treasury rates for the purpose of assessing interest under § 3717(a)(1), nor of any

United States District Court
Northern District of California

19

action by the Secretary of the Treasury any other "head of an executive . . . agency" to set late payment penalties at the maximum six percent rate (or at any lower rate) permitted by § 3717(e)(2).  The United States therefore has not satisfied its burden of proof to show that the one percent interest rate and six percent penalty rate it seeks to apply are valid.

92.     The United States' request for pre-judgment interest and late payment penalties is therefore DENIED.

93.     This order is without prejudice to the United States collecting any *post*-judgment interest that might accrue under applicable law between entry of judgment and Hughes's satisfaction of that judgment.

**V.     CONCLUSION**

94.     For the reasons discussed above, the United States' motion for judgment is GRANTED except as to pre-judgment interest and late payment penalties, and Hughes's most recent motion to dismiss is STRICKEN (or in the alternative, DENIED).  The Clerk shall enter judgment in favor of the United States in the amount of $238,125.19 and close the case.

**IT IS SO ORDERED.**

Dated: March 6, 2023

_____
JOSEPH C. SPERO
Chief Magistrate Judge